UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 02:05-cr-0240-GEB |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HAMID HAYAT, and | ) | AMENDED ORDER[*] |
| UMER HAYAT, | ) | |
| Defendants. | ) | |
| | ) | |

The government appeals and seeks reversal of a
Magistrate Judge's order, filed September 26, 2005, which ordered
the conditional release of Defendant Umer Hayat ("Umer").  Umer
seeks affirmance of that Order.  The propriety of Umer's
detention is reviewed de novo, meaning that the issues are
decided anew by this Court.  See United States v. Koening, 912
F.2d 1190 (9th Cir. 1990).

---

[*]        As indicated in the Order Re Local Rule 39-140,
which was filed today, this Amended Order substitutes addresses
of specific parcels of real property with the terms Property 1,
Property 2, Property 3, Property 4, and Property 5. The
modification striking condition of release number five
effectuated by the Order filed October 31, 2005, has also been
incorporated.

BACKGROUND

Umer was indicted by a grand jury on June 16, 2005, under the false statement provisions of 18 U.S.C. § 1001.  At his initial appearance on June 7, 2005, Umer was ordered detained. Umer moved for reconsideration of his detention and his motion was heard by a magistrate judge on September 23, 2005.  The magistrate judge ordered Umer released subject to certain conditions, including a $1,200,000 bond.  The government sought a stay of the release order pending review by a United States District Judge.  The stay was granted and this appeal followed.

At a hearing on the appeal held October 17, 2005, the Court indicated that Umer's flight risk status was at issue and the record lacked sufficient information on Umer's relationship to sureties pledging property for his release.  Since Pretrial Services is typically involved with release recommendations, counsel were asked whether the matter should be referred to Pretrial Services for a supplemental pretrial services report. Umer's counsel agreed, and government's counsel acquiesced. Therefore, the matter was referred to Pretrial Services, and another hearing was scheduled for October 20, 2005, based on the understanding a supplemental Pretrial Services report would be received on October 19, 2005.

The supplemental report was received on October 19. The supplemental report recommended that in addition to the bond set by the Magistrate Judge, "Mr. Sher Afzal's personal residence [would provide] more of an assurance of the defendant's

1  appearance at future court proceedings." (October Pretrial

2  Services Report ("Oct. PTSR") at 4.) Specifically, Pretrial

3  Services concluded that "the conditions of release as set by [the

4  Magistrate Judge] in addition to . . . five pieces of property

5  with equity of $1.5 million are sufficient to reasonably assure

6  the defendant's appearance at future court proceedings and

7  provide the necessary level of protection to the community."

8  (Id.)

9        The appeal was argued on October 20, 2005.

10                              DISCUSSION

11        The Bail Reform Act of 1984 ("the Act"), 18 U.S.C.

12  Section 3141 et seq., "determines the conditions under which bail

13  is available." United States v. Townsend, 897 F.2d 989, 993 (9th

14  Cir. 1990). "Federal law has traditionally provided that a

15  person arrested for a non-capital offense shall be admitted to

16  bail," id. (citations omitted); "[o]nly in rare circumstances

17  should release be denied," United States v. Motamedi, 767 F.2d

18  1403, 1406 (9th Cir. 1985)(citations omitted); and "[d]oubts

19  regarding the propriety of release should be resolved in favor of

20  the defendant." Id.

21        "Congress directed and empowered the judicial officer

22  to impose conditions of release designed to secure reasonable

23  assurance of the defendant's appearance and the safety of

24  others." United States v. McConnell, 842 F.2d 105, 109 (5th Cir.

25  1988). The government has the burden of proving, by a

26  preponderance of the evidence, that no conditions can be imposed

27

28                                3

to reasonably assure Umer's appearance at trial, <u>United States v.</u>
<u>Windsor</u>, 785 F.2d 755, 757 (9th Cir. 1986); or proving, by clear
and convincing evidence, that no conditions can be imposed to
mitigate any danger Umer poses to the community.  <u>Motamedi</u>, 767
F.2d at 1406.

Four factors are to be considered when determining
whether conditions can be designed to reasonably secure the
defendant's appearance and/or the safety of the community if a
defendant is released:  1) the nature and circumstances of the
offense charged, (2) the weight of the evidence against the
person, (3) the history and characteristics of the person, and
(4) the nature and seriousness of the danger to any person or the
community that would be posed by the person's release.  18 U.S.C.
§ 3142(g).

I.   <u>Analysis of Section 3142(g) factors</u>

A.   <u>Nature and Circumstances of the Offense Charged</u>

Umer Hayat is charged in count four of the Superseding
Indictment with making a false statement of material fact to a
federal agent in violation of 18 U.S.C. § 1001.  Umer's alleged
false statement was "that he had no first hand knowledge of
terrorist training camps in Pakistan that would prepare people to
fight for jihad, and that his son, Hamid Hayat, did not attend
any terrorist or jihadist training camps, when, in truth and in
fact . . . he had visited various terrorist training camps in
Pakistan, and [his son Hamid] had attended one or more jihadist

terrorist training camps in Pakistan . . . ."[2]  (Superseding

Indictment at 6.)   The government also contends that "Hamid

Hayat's grandfather [Saaed Ur Rehman] (the father-in-law to Umer

Hayat) . . . sends . . . students . . . to jihadist training

camps in Pakistan."  (Gov't Appeal filed October 7, 2005 ("Gov't

Appeal") at 28.)   Further, the government asserts Umer Hayat

admitted knowing that because of Hamid Hayat's "family

connections he was invited to observe more than four operational

training camps.   He was assigned [his father-in-law's] driver who

drove him from camp to camp.   While visiting these training

camps, he observed weapons and urban warfare training (including

target practice utilizing pictures of President Bush and

Secretary of Defense Rumsfeld), physical training, and classroom

education."  (Id.)

       The charged offense and circumstances concerning the

allegations indicate that Umer is associated with persons hostile

to the government of the United States.   The nature and

circumstances involving Umer's association with these individuals

indicate that Umer has disassociated himself from the United

States and is likely to flee if released.

       Consideration of "the penalties" a defendant may face

is also appropriate when evaluating the nature and circumstances

of the offense charged.   Townsend, 897 F.2d at 995.   The longer

---

       [2]    The Superseding Indictment defines "jihad" as an Arabic
word meaning "holy war," and in the context of the charge "refers
to the use of violence . . . against persons, property or
governments deemed to be enemies of a fundamentalist version of
Islam."  (Superseding Indictment at 2.)

the sentence, the more likely a defendant may flee to avoid the prospect of prolonged incarceration.  The government indicates that it intends to seek a sentence enhancement under U.S.S.G. § 3A1.4, which could increase Umer's potential sentence to eight years.  The government's argument for an enhancement under this provision is colorable because the charge against Umer Hayat may involve an alleged federal crime of terrorism.[3]

Therefore, the nature and circumstance of the offense indicate Umer could pose a danger to the community because of his apparent association with individuals engaged in a holy war against the United States and that he would be a flight risk if released.

B.   Weight of the Evidence Against the Person

The government has proffered considerable evidence against Umer.  But, the weight of the evidence against a defendant "is the least important" factor.  United States v. Gebro, 948 F.2d 1118, 1121 (9th Cir. 1991).  This factor does not favor release.

C.   History and Characteristics of the Person

Umer was born in Pakistan in 1958, and came to the United States in 1976.  (Pretrial Services Report dated June 6, 2005 ("June PTSR") at 1.)  He became a naturalized citizen in 1993.  (Id. at 3.)  Umer has been married for twenty-five years

---

[3]   The relevant portion of this sentencing provision indicates that the terrorism enhancement applies if the crime of conviction "involved . . . terrorism."  United States v. Graham, 275 F.3d 490, 517 (6th Cir. 2001).

and has two sons and two daughters.  (Gov't Appeal at 35.)  Since 1976, he has maintained some form of residence in Lodi, California.  (June PTSR at 1; Gov't Appeal at 35.)  For the past twenty years, Umer has lived at Property 5 in Lodi, California. (June PTSR at 1; Gov't Appeal at 35.)  This is one of two single family homes on the property; Umer indicated to Pretrial Services that the other house is rented for $1,000 a month.  (June PTSR at 1.) He owns and operates an ice cream truck during the summer, work from which it has been represented that he earns approximately $1,500 a month.  (Id. at 2.)  He has operated an ice cream truck for fifteen years.  (Id.)  Pretrial Services was told that his only assets are his 1996 van and his ice cream truck.  (Id.)  Umer's seasonal income as an ice cream vendor and the rental income is used to support his family.  (Id.)

        "[A]mong [Umer's] characteristics [is whether he has] access to substantial cash."  Townsend, 897 F.2d at 996.  On April 19, 2003, Umer and other family members "were stopped by U.S. Customs authorities as they were on a jetway preparing to board a plane at Washington-Dulles International Airport, while en route to Pakistan," and were found to have in their possession almost $27,000 in cash.  (Gov't Appeal at 32-33.)  Umer made inconsistent statements about the origin of most of that money, which invites skepticism as to its true source.  The origin of this cash is further suspect since Umer's tax returns indicate that most years his reported income was approximately $10,000, and "during the last five years, [his] income ranged from about

$10,000 to $12,000." (Gov't Appeal at 42.)

Umer also has familial ties to Pakistan. "[M]any [of Umer's] close relatives . . . reside in Pakistan and/or frequently travel to Pakistan. [Umer's] two sisters currently reside in Pakistan. Umer['s] parents as well as his brother recently visited Pakistan between April, 2005 and July, 2005. Umer['s] in-laws reside in Pakistan including his father-in-law, Saaed Ur Rehman (grandfather to Hamid Hayat), his mother-in-law (believed to be Shaheen Begum), and possibly his brother-in-law, Attiq Rehman (uncle to Hamid Hayat). In addition, defendant Umer['s] daughter-in-law (wife to Hamid Hayat) currently resides in Pakistan." (Gov't Appeal at 37.)

Further, Umer "reports he and his family spent 2003 and 2004 in Pakistan . . . witnessing the marriage of two of their children." (Id. at 1.) He came back to the United States in February 2005, and his wife and children returned about May 2005. (Id. at 1-2.) Umer's spouse declares that Umer has a house in Pakistan, which he and his spouse "decided to renovate . . . to accommodate [their] family during [their] visit in Pakistan." (Salma Hayat Decl., Exh. A. to Def.'s Opp'n filed October 12, 2005.) This house was given to Umer and his wife in April 2003, and his wife declares it "is currently listed for sale. . . ." (Id.) Umer's counsel stated at the October 20 hearing that the house is being sold because the Hayats desire to remain in the United States. However, it appears that the Hayats intended otherwise until recently. The representation that the family

8

does not intend to return to Pakistan -- to the home they just
renovated to accommodate the family -- is suspicious, especially
in light of other evidence in the record evincing Umer's
connection to Pakistan.  For example, the government proffers
that "during a conversation [Umer had] with [a confidential
witness] in 2003, [Umer] stated that this country [referring to
the United States] is just a name and that his heart belongs to
Pakistan."  (Gov't Appeal at 36-37.)

        Thus, Umer has ties to both Lodi and Pakistan.  But the
nature of his seasonal work indicates his occupational tie to the
United States is minimal, and his association with individuals
that appear to be engaged in a holy war against the United States
suggests that his ties to the United States are tenuous.
Further, he appears to have access to a significant amount of
cash from an unexplained source; it is assumed that this source
could fund his flight and assist him in living abroad.
Therefore, Umer's history and characteristics indicate that he is
a serious flight risk.

        D.   <u>Nature and Seriousness of the Danger to Any Person
             or the Community that Would Be Posed by Umer's
             Release</u>

        Umer appears potentially dangerous because of his
association with individuals involved in or sympathetic to jihad.
But the government's proffer against him does not indicate that
the nature of his association and involvement makes him a danger
to the community.

        In conclusion, the totality of the § 3142(g) factors

1   evince that the government has proved by a preponderance of

2   evidence that Umer is a serious flight risk.  He appears to have

3   foreign contacts that could harbor him and finance his flight,

4   and help him live abroad and escape detection.  Nevertheless,

5   Pretrial Services has recommended releasing Umer, based on the

6   release conditions set by the Magistrate Judge plus an additional

7   bondable property; Pretrial Services has concluded that these

8   conditions, which include "five pieces of property with equity of

9   $1.5 million, are sufficient to reasonably assure the defendant's

10  appearance at future court proceedings and provide the necessary

11  level of protection to the community."  (Oct. PTSR at 4.)  All

12  five properties are owned by members of Umer's family: Safdr

13  Afzal, Sher Afzal, Umer Khatab, and Hamid Hayat.  (Id. at 2-3.)

14  II.  Conditions of Release

15          At the October 20 hearing on the government's appeal,

16  the government argued that the five pledged properties do not

17  provide Umer with a "disincentive" from fleeing because Umer does

18  not have a close relationship with the sureties and certain

19  sureties lack sufficient connection to the pledged properties.

20  Umer's relationship to a surety is important because "[t]he

21  purpose of bail is not served unless losing the sum would be a

22  deeply-felt hurt to the defendant and his family; the hurt must

23  be so severe that defendant will return for trial rather than

24  flee."  Townsend, 897 F.2d at 996 (citation omitted) (finding

25  that $1 million bail from defendant's friend was money that

26  failed to constitute reliable assurance of defendant's appearance

27

28                              10

1  since the loss of it would not engender sufficient "hurt");

2  <u>Koenig</u>, 912 F.2d at 1193 (rejecting bond offered by defendant's

3  parents because "there [was] reason to believe that his

4  relationship with his parents [was] not a close one and that the

5  bond would not assure his appearance").  Further, the sureties

6  must have a sufficient connection to the pledged properties such

7  that its loss would be a deeply-felt hurt to Umer and his family.

8  <u>See</u> <u>Townsend</u>, 897 F.2d at 996.

9               (i)   <u>Property Tendered by Sher Afzal</u>

10            Sher Afzal ("Sher") is Umer's 80-year-old uncle.

11  (Oct. PTSR at 3.)  He is the owner of two tendered properties:

12  Property 1 and Property 2.  Property 1 has an estimated value of

13  $250,000, and Property 2 has an estimated value of $300,000.

14  (<u>Id.</u>)  Both houses are unencumbered.  (<u>Id.</u>)  Sher resides with

15  his three sons, two daughters-in-law, and nine grandchildren at

16  Property 2.  (<u>Id.</u>)  Sher has another son living at Property 1

17  along with his spouse and six children.  (<u>Id.</u>)  Sher told

18  Pretrial Services that he has a "close relationship" with Umer

19  and that "he is family."  (<u>Id.</u>)

20            The government challenges the nature of Umer's

21  relationship with Sher.  The government notes that during an

22  interview with the FBI on September 21, 2005, Sher indicated that

23  "Umer Hayat made multiple, persistent calls from jail to

24  convince . . . [him] to put up his property."  (Gov't Appeal at

25  46.)  Sher also told the FBI "[a]lthough . . . [he] did not want

26  to do it, he ultimately acquiesced."  (<u>Id.</u>)  Defense counsel

27

28                              11

responds that "when the FBI interviewed . . . [Sher] on September
21st, they did not have an interpreter."  (Oct. 20, 2005 Hr'g.)
The government acknowledges that Sher "does not speak English"
and that "it was difficult to speak with Sher Afzal because of
the language barriers."  (Gov't Appeal at 46.)  Pretrial Services
reports "significant cultural differences . . . can cause
communication to be difficult even with a skilled interpreter."
(Oct. PTSR at 3.)  Significantly, when a Pretrial Services
officer interviewed Sher with a certified interpreter present,
Sher stated he has a "close relationship" with Umer and "he is
family."  (Id.)

>                    (ii)  Property Tendered by Safdr Afzal

Safdr Afzal ("Safdr") is Umer's first cousin and one of
Sher's sons.  (Oct. PTSR at 2.)  Safdr owns Property 3, which has
an estimated equity of $330,000.  (Id.)  The Pretrial Service
Report states the house "is a rental property . . . [Safdr] has
had for over ten years"  and "the house is currently rented for
$1,200 a month."  (Id.)  Safdr also "indicates he feels a strong
blood relationship with . . . [Umer] even if they do not have a
lot of personal contact." (Id.)  He told Pretrial Services that
he "does not feel coerced into posting his property for bond,
however, noted he would obey his elder[ly] father in any
situation such as this."  (Id.)

The government challenges the nature of Umer's
relationship with Safdr.  The government contends that during an
interview with the FBI on September 21, 2005, Safdr stated that

"while he and his father are related to the Hayats, they are not particularly close to them." (Gov't Appeal at 46.)  The government also asserts Safdr "reluctantly agreed to post the property" because his father requested him to do so.  (Id.) However, during Safdr's interview with Pretrial Services, Safdr indicated that "he feels a strong blood relationship with the defendant." (Oct. PTSR at 2.)  In addition, he stated although he sees Umer "mostly on holidays and family gatherings . . . his sister lives near . . . [Umer] and he goes by his house on a daily basis." (Id.)

The government also challenges the type of property Safdr has offered as security.  The government observes that Safdr's property is a rental and argues that "a primary residence is far better security than an investment property since, in theory, a defendant would be less inclined to violate a condition of his release if it meant depriving a surety of his or her homestead." (Gov't Appeal at 47.)  The investment nature of this property does somewhat undermine its effectiveness as security. But Safdr told Pretrial Services "he has worked hard for the property and reports it as his only asset." (Oct. PTSR at 2.) Consequently, the loss of the property would deprive Safdr of both the rental income and his only asset.

(iii) Property Tendered by Umer Khatab and Hamid Hayat

Umer Khatab ("Khatab") is the brother of Umer and the uncle of Hamid Hayat. (Oct. PTSR at 2.)  He is the owner and part-owner of two tendered properties: he owns Property 4

individually, and Property 5 with Hamid Hayat.  (Id.)  Property 4
has an equity of $243,000 and Property 5 has an equity of
$390,000.  (Id.)  Khatab told Pretrial Services "his sister,
brother-in-law, and their three children reside at Property 4 and
pay him $700 a month in rent."  (Id.)   He also stated there are
two houses on the property at Property 5: he "resides with his
parents, his wife, and four children" in the back house,  "Umer's
wife and three children" live in the garage of that house, and
"the front house is rented out for $1,000 a month and the rent
goes to Umer Hayat's family."  (Id.)

        The government argues that the "nature of the
property . . . leads the government to question whether the loss
of these properties would constitute such a hardship to the
Khatabs that it would serve as a substantial disincentive against
flight."  (Gov't Appeal at 48.)  The government notes that prior
to Umer's indictment, "the Khatabs were planning on building a
house and living in Pakistan . . . [and they] solely returned [to
the United States] to assist in connection with the Hayat
matter."  (Id.)  The government asserts since the Khatabs own a
house in Pakistan "neither [Property 4] or [Property 5] is the
primary residence for the Khatabs . . . [thus the property] is
investment property."  (Id.)  However, Khatab told Pretrial
Services that Umer receives all the rental income from Property
5, for a total of $12,000 per year.  (See Oct. PTSR at 2.)  In
light of the fact that "during the last five years, [Umer's]
income ranged from about $10,000 to $12,000" it would appear that

14

the loss of the rental income from Property 5 would significantly affect Umer and his immediate family. (See Gov't Appeal at 42.)

In addition, the government argues that Hamid Hayat's interest in Property 5 "is of little value for the purposes of bail." (Id. at 49.)  The government contends that because Hamid Hayat faces a potential thirty-year prison sentence, "the potential loss of Hamid Hayat's half interest in this property would hardly be a significant disincentive for defendant Umer Hayat's flight." (Id.)  However, since Umer's wife and three children reside on the Property 5 premises, the loss of the property would affect Umer's immediate family.

The government also notes Khatab told Pretrial Services that Umer "was removed from the deed of the property at [Property 5] several years ago and Hamid Hayat placed on the deed." (Oct. PTSR at 2.)  When Pretrial Services inquired why the change had been made, Khatab "could not explain why they had changed the ownership of the property." (Id.)  The government asserts this "was an odd response for somebody who is claiming that they are a half owner of this property." (Oct. 20, 2005 Hr'g.)  However, Umer told Pretrial services that Property 5 "was transferred to his son's name, however, as is common in their culture . . . [he] still controls the property." (Oct. PTSR at 3.)  Pretrial Services also indicated "it has become apparent there are significant cultural differences [about] the defendant and his family . . . . [Their] actions with property ownership and living arrangements is not the norm for a great deal of

people of other heritages."  (Id.)

Lastly, the government argues Umer's family would not be hurt by the loss of Property 5 because Umer owns a home in Pakistan.  (Gov't Appeal at 49.)  The government acknowledges that the home in Pakistan has been placed on the market, but notes that there has been no verification the house has sold. (Id.)  During the hearing on October 20, defense counsel argued that the house has been placed on the market because the Hayats "have no intent to return" to Pakistan.  (Oct. 20, 2005 Hr'g.) Defense counsel also asserted "there is corroborating proof [that they have no intent to return] . . . Mr. Umer Hayat's mother, his father, his brother, they have all come back to stay here." (Id.)  However, this assertion appears incredulous because the dwelling in Pakistan was recently renovated to "add more rooms to accommodate [Umer's] family during [their] visit."  (Def.'s Opp'n Ex. A.)  Umer's ownership of the renovated property in Pakistan indicates that Umer and his immediate family members would have a place to live if Umer were to flee the United States.

In sum, the government challenges the sufficiency of a bond as a condition of release on two bases: the nature of Umer's relationship with the sureties, and the sureties' connection to the pledged properties.  As to Umer's relationship with the sureties, the government has raised some doubt whether Umer has a sufficiently close relationship with Sher and Safdr, two of the four sureties.  However, all of the sureties "posting property or money need[] . . . [not] have strong personal ties to the

16

defendant, so long as there are adequate assurances of financial
responsibility on the part of those putting up the money and
moral suasion over the defendant by one or more of those
individuals." United States v. Hammond, 204 F. Supp. 2d 1157,
1166 (E.D. Wis. 2002).  The record indicates the sureties have
provided adequate financial assurances because the proposed bond
would be secured by real properties with equity totaling $1.5
million.  The Pretrial Services Report indicates Sher has a
family relationship with Umer from which the inference can be
drawn that Sher exercises a degree of moral suasion over Umer
that should dissuade Umer from fleeing.[4]  Sher has known Umer for
some time, lives in the same area, and Umer must realize that
Sher stands to lose a considerable amount if he flees.  See id.
(stating that the sureties exercised sufficient moral suasion
over the defendant because they had known him for some time,
lived in the same area, and stood to lose a considerable amount
if he absconded).

        As to the sureties' connections to the proffered
properties, the government has raised some doubt whether Safdr,
Khatab, and Hamid Hayat have sufficient connections to the
properties.  The government contends Safdr does not have a
sufficient interest in Property 3 because it is a rental
property; however, Safdr indicated to Pretrial Services that the
property "is his only asset."  (Oct. PTSR at 2.)  The government

---

[4]    Because Sher possesses moral suasion over Umer, it need
not be decided whether Safdr also has a close relationship with
him.  See United States v. Hammond, 204 F. Supp. 2d at 1166.

also argues Khatab gave an "odd" response to questions by
Pretrial Services regarding a change in the title of Property 5,
but Pretrial Services has indicated that the response appears
explained by Umer and his family's cultural practices.  Lastly,
the government questions whether the loss of Property 4 and
Property 5 would constitute a hardship for either Khatab or
Hamid.  However, the Pretrial Service Report indicates that Umer
has a significant connection with Property 5 because he "controls
the property" (which is common in his culture), his wife and
three children live on the premises, and his family receives the
rental income from the property.  (<u>Id.</u> at 2,3.)  "The rationale
for the use of financial conditions of release is that the
prospect of forfeiture of . . . property used as collateral to
secure release is sufficient to deter flight."  <u>United States v.
Jessup</u>, 757 F.2d 378, 385 (1st Cir. 1985) (abrogated on other
grounds).  The loss of the property at Property 5 would have some
impact on Umer and his immediate family; however, there is doubt
regarding the extent of this impact given his second home in
Pakistan.

        In conclusion, although doubt remains regarding the
nature of Umer's relationship with the sureties and the sureties'
connections to the pledged properties, the Ninth Circuit has
stated "[d]oubts regarding the propriety of release should be
resolved in favor of the defendant."  <u>United States v. Motamedi</u>,
767 F.2d at 1406.  When a bond of $1.5 million dollars in home
equity is considered in combination with other conditions of

18

release, these conditions appear to reasonably assure the appearance of Umer at trial.  Accordingly, Defendant Umer Hayat is ordered released, subject to the following conditions:[5]

1.   A bond in the amount of $1,500,000 must be posted. The bond may be secured with the property proffered by the defendant unless the United States objects to the value of the subject property proffered; such objection must be formally made no later than November 3, 2005, before the duty Magistrate Judge;

2.   Defendant shall report to and comply with the rules and regulations of the Pretrial Services Agency;

3.   Upon the posting of the bond, the duty Magistrate Judge will sign a release order for Defendant to be released from the United States Marshals' office to Pretrial Services the following working day at 9:00 a.m;

4.   Defendant shall reside at Property 5, Lodi, California 95240, and absent a medical emergency, not leave that residence without the prior approval of the Pretrial Services officer; Defendant shall be subject to electronic monitoring, and

_____

[5]   Not all the conditions imposed by the Magistrate Judge and recommended by Pretrial Services have been adopted:

Defendant is not required to waive any rights he has under United States v. Scott, ___ F.3d. ___, 2005 WL 2174413 (9th Cir., Sept. 9, 2005) before he may be released because the validity of such a waiver is dubious and the government questions the utility of the proposed release condition.  (Gov't Appeal at 53.)

In addition, the government argues that the proposed condition of prior forty-eight hour approval of all visitors to Umer's residence has "little practical value for the purposes of deterring flight or danger on a real time basis."  (Gov't Appeal at 51.)  Therefore, this condition is not adopted.

shall pay the costs attendant to such electronic monitoring;

       5.   Defendant shall divest himself of any firearms or other dangerous weapons, and shall submit proof of divestment to the pretrial services officer;

       6.   Defendant shall not possess or attempt access to any documents authorizing international travel, and shall surrender any passport he posses to the Clerk of the United States District Court for the Eastern District of California.

       IT IS SO ORDERED.

DATED:  November 4, 2005

                       /s/ Garland E. Burrell, Jr.
                       GARLAND E. BURRELL, JR.
                       United States District Judge