1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   UNITED STATES OF AMERICA,

11          Plaintiff,                CR. NO. S-05-0240 GEB (GGH)

12      vs.

13
     HAMID HAYAT and
14   UMER HAYAT,

15          Defendants.              ORDER (Amended)*[1]
     _____/

16

17      _Introduction and Summary_

18             Umer Hayat has moved for review of his detention order made by the Honorable

19   Peter Nowinski on June 7, 2005.  Hamid Hayat had also previously moved for the same review,

20   but withdrew that request on account of newly filed charges which included a federal crime of

21   terror.  For the reasons expressed below, Umer Hayat will be released on conditions pending his

22   trial.

23   /////

24   /////

25   _____
           [1]  This order is amended only insofar as it deletes one home address on page 15.  The
26   initial September 26, 2005 order (docket 56) is now sealed.

                                        1

1    *Background* [2]

2          According to the Complaint filed in this matter on June 7, 2005, Hamid Hayat was

3    traveling to the United States when it was determined that he was on the "No-Fly" list.  His

4    plane, which had left Korea, was diverted to Japan.  There, Hamid[3] was questioned about his

5    travels, which included a lengthy stay in Pakistan.  Based on his answers in Japan, or some other

6    reason, Hamid was permitted to continue travel to the United States.

7          On June 3, Hamid was interviewed by agents of the FBI, presumably in Lodi,

8    California.  He was asked whether he had ever attended terrorist training camps, or whether he

9    had attended a jihadi madrassah, a type of religious school sometimes known for its militant

10   philosophy.  Hamid denied both questions also stating that "he would never be involved with

11   anything related to terrorism."  Complaint at 3.  The next day Hamid traveled to the Sacramento

12   FBI where he underwent a polygraph after which he was told that his answers indicated

13   deception.  After some hours of further questioning, Hamid admitted that he had, in fact,

14   attended a jihadist training camp in Pakistan.  Complaint at 3.

15         Hamid admitted that he attended a jihadist training camp in
           Pakistan for approximately 6 months in 2003-2004.  Hamid stated
16         that Al-Qaeda supports the camp as providing structured
           paramilitary training, including weapons training, explosives
17         training, interior room tactics, hand to hand combat, and strenuous
           exercise.  Classroom instruction included ideological rhetoric
18         detailing opposition towards the United States and other non-
           Muslim countries.  Hamid stated that during his weapons training,
19         photos of various high ranking U.S. political figures, including
           President Bush, would be pasted onto their targets.  Hamid further
20         stated that he and others at the camp were being trained on how to
           kill Americans.  Hamid stated that although he did not participate
21         in all available instruction, he was aware the other training was
           ongoing.
22
           Hamid advised that he specifically requested to come to the United
23         States to carry out his Jihadi mission.

24   ─────────────────
           [2]  Unless otherwise noted, the background is taken from sworn pleadings in this case.
25
           [3]  The court will use first names after identifying the two defendants herein in that both
26   defendants have the same last name.

2

1  Complaint at 4.

2          Hamid's father, Umer Hayat, is also a defendant. Umer was interviewed by FBI

3  agents initially denying that his son was a terrorist, or that he had knowledge about terrorist

4  training camps in Pakistan.  However, after being shown Hamid's admissions, Umer admitted

5  that he knew his son had attended a terrorist training camp, and that he had supported his son in

6  this effort.  Apparently, the madrassah attended by Hayat was managed by a family relative.  This

7  person sent "students" from the madrassah to various training camps in Pakistan.  Hamid went to

8  a training camp run by a close personal friend of Umer.  Moreover, Umer had taken various tours

9  of camps while he was in Pakistan.

10          The United States has also averred that Umer maintains a house in Pakistan (now

11  up for sale according to Umer's counsel).  More recently, the government has intimated (without

12  proof) that Umer may have a connection with a second house in Pakistan.  The fact of the

13  Hayats' extensive ties to Pakistan is undisputed.  Both Hayats have spent significant periods of

14  time in Pakistan approaching major portions of their life.  Government counsel also highlight a

15  statement by Hamid allegedly recorded by an informant: "that this country [the United States] is

16  just a name and that his heart belongs to Pakistan."  Government brief filed August 19, 2005 at

17  17.  The United States has averred in its counsels' argument that Umer and family members had

18  been caught by Customs officers with cash in excess of $10,000 ($27, 000 more or less) on one

19  of the family's trips to Pakistan.  According to the argument, Umer and his family could not keep

20  a consistent story about the origin of this cash.  Moreover, the amount of cash carried appears

21  inconsistent with Umer's rather humble employment (ice cream truck driver).

22          The government proffers that a scrap of paper was found in Hamid's wallet at the

23  time of his June 5 arrest with the (translated) phrase "Lord, let us be at their throats, and we ask

24  you to give us refuge from their evil."

25  /////

26  /////

3

*Procedural Background*

An indictment was returned on June 16, 2005 by the grand jury for violation of the false statement provisions of 18 U.S.C. § 1001 tracking the false statements recounted above.

Umer Hayat made his initial appearance before Magistrate Judge Peter A. Nowinski on June 7, 2005. On that day, Judge Nowinski detained Umer as a flight risk and a danger to the community. Hamid made his first appearance on June 10, 2005, and the detention result was similar. Later, on August 22, 2005, defendants made a dual request for bail review before Magistrate Judge Dale Drozd. Judge Drozd questioned the legal basis for the danger to the community finding in that the charged offense, regardless of the proffered facts, did not appear to be an offense which could trigger "danger" as a basis on which to detain the defendants. The government argued that no bail review whatsoever should take place because "new and material" evidence/circumstances warranting a review of the initial order had not been submitted by either defendant, i.e., the indictment itself simply tracking the complaint and not adding more serious charges, the potentially erroneous legal basis for "danger," and the then recent vacating of the trial date, were not sufficient as new and material circumstances.

Judge Drozd held hearings on two days, and ultimately determined that no matter what the bona fides of the arguments submitted, the fact remained that the defendants were a flight risk on the present charges in view of the security for appearance then offered. Judge Drozd did opine that the matter of release on conditions might be reconsidered if more security were available.

On September 22, 2005, the complexion of the case changed significantly at least as far as Hamid is concerned. In a superseding indictment, Hamid Hayat was charged with a violation of 18 U.S.C. § 2339A (Providing Material Support to Terrorists). The charge tracked much of what had been set forth in the complaint, i.e., that Hamid provided himself as a trainee in a terrorist training camp, that he participated in training therein in order to prepare for "holy \\\\\\

4

1   war" against the United States and other countries, and that he had returned to the United States

2   for the purpose of waging that war.

3       *Issues*

4         1. Whether Umer has advanced new and material evidence or circumstances

5   which warrant a review of the detention determination(s);

6         2. If so, whether Umer can be detained as a danger to the community;

7         3. If not, and in any event, whether Umer may be detained as a flight risk.

8       I.  Whether Umer Has Advanced New and Material Evidence/Circumstances

9        In a published opinion, the undersigned has discussed the necessity for "bail

10  reviews," i.e., renewed detention/release proceedings, to be based on something other than

11  merely another bite at the apple, or judge shopping.  United States v. Flores, 856 F. Supp. 1400,

12  1405 (E.D. Cal. 1994):  "Basic notions of fairness work to preclude the reopening of a judicial

13  detention/release decision unless the [moving] party can demonstrate, at the least, good cause for

14  the failure to initially present the evidence."  Flores discussed at length the reasons why a

15  detention proceeding could not be reopened simply because a party had finally "gotten his act

16  together," when that party had the means by which to have fairly presented what needed to be

17  presented the first time.

18        However, legitimate reasons for not having secured evidence the first time around,

19  or a significant change in circumstances, need only be proffered.  Neither the Bail Reform Act,

20  nor common sense, requires a standard as strict as that of reconsideration of a heavily briefed

21  decision in a criminal or civil action.  Oftentimes, defendants, who have only recently been

22  arrested at the time of the initial detention hearing, and may have only seen their counsel for the

23  first time that day, or the day before, have neither the resources or the time to muster all possible

24  evidence, security, or the like for a full fledged detention hearing.  The initial hearing is quite

25  often simply an introduction to the defendant and his counsel as to the need to acquire what may

26  be difficult-to-find evidence. See United States v. Ward, 63 F. Supp. 2d 1203, 1206-07 (C.D.

Cal. 1999) (citing <u>Flores</u>, <u>supra</u>, and finding that the availability of $1,000,000 in bond warranted a reopening of the detention determination.)[4]   The government's citation of <u>United States v. Navarro,</u> 972 F. Supp. 1296, 1298 (E.D. Cal. 1997) for its strict "law of the case" reconsideration standard is inapposite.  It is not supported by the language of the Bail Reform Act.  Therefore, a rule of reason must be employed on a case-by-case basis.

Here, there is not much difficulty in determining that the initial detention decision, and the second determination to continue the detention without prejudice, should be reopened. The government had investigated these defendants (according to defense counsel) for a number of years and had acquired much information which had not been divulged to defendants at the time of the initial hearing.  Even final translations of critical evidence had not been made.  Also, it was apparent in this much publicized case that a significant bond would have to be secured with real property or other assets of unimpeachable deterrent value.  Umer has now assertedly proffered bond in excess of $1,000,000.  Time was required to research and brief the legal basis for a danger determination.  Finally, the undersigned does not accept the government's protestations that in a fairly straightforward "false statement" case on its face, the government's twice-made request to vacate the trial date on the basis of volume of evidence and complexity, and the subsequent granting of that request, did not significantly alter the calculus of this case for defendants.

Moreover, the addition of the material support charge against Hamid significantly changes the nature of the case, and actually works to the benefit of Umer, who has not been charged with a crime of terror despite what must have been a significant amount of investigatory work since his initial arrest.  While this new charge does not assist Hamid's position, it is one of

---

[4]  The government also may find itself in such a situation in a particular case.  Oftentimes, defendants are arrested on an opportune basis, and the government has little knowledge about the particular defendant to present at an initial hearing.  When necessary, government counsel can seek (and have sought) to reopen release decisions when they have acquired significant evidence which demonstrates flight risk or danger.

1   the changes that warrants a re-opening of the previous decision for Umer.

2          II.   <u>Whether a Legal Basis Exists to Detain Umer on a Danger to the Community</u>

3   <u>Basis</u>

4          So there is no misunderstanding, if the government had been able to charge Umer

5   with a federal crime of terror, the undersigned would find him to be a danger to the community.

6   The facts, both sworn and proffered, do not paint a picture of persons who simply disagree with

7   the policies of the United States, and have so stated an unpopular position.  Rather, the picture

8   painted is one of a person (Hamid) who was actively training to commit murder and mayhem of

9   Americans, and a father (Umer) supporting and/or encouraging such training.  The allegations

10  depict Hamid as one who would be ruthless in his disregard for human life if and when ordered

11  to do so on account of a "religious" philosophy.  Although religion can form the basis of

12  mankind's most noble deeds, it can also have the effect attributed to it by Pascal:  "Men never do

13  evil so completely and cheerfully as when they do it from religious conviction."[5]  The scrap of

14  paper found in Hamid's wallet certainly speaks to the latter category. There is good reason

15  counsel for Hamid withdrew her request for detention review – Hamid is certainly a danger to the

16  community at large.

17        However, there are two reasons why detaining Umer as a danger to the

18  community is problematical.  First, the government has not charged Umer with a federal crime of

19  terror as defined by 18 U.S.C. § 2332b(g)(5), nor has it charged him with a crime of violence.

20  The undersigned respects the measured judgment of the U.S. Attorney that such charges could

21  not be sustained at this time against Umer.  Nevertheless, the judgment remains, and despite the

22  contrary encouragement of the AUSAs arguing the case, the court will not find in a detention

23  proceeding what the U.S. Attorney is unwilling or unable to sustain.

24  \\\\\

25  

26      [5]  *Pensees*, no. 894 (1670).

Secondly, the *sine qua non* for a finding of danger to the community in the detention context, under the criminal justice system in which defendants find themselves, is that defendants have been charged with an offense which authorizes the court to make the finding. The court is not authorized to detain a person based on his dangerousness per se regardless of the charge, but only if the crime charged permits the finding in the first instance. United States v. Twine, 344 F. 3d 987 (9th Cir. 2003). Despite some ambiguity in the controlling statute, 18 U.S.C. § 3142(f), every court to squarely rule on the subject has determined that a defendant may not be detained as a danger to the community unless one of the "triggers" in subsection (f)(1) is present. See United States v. Giordano, 370 F. Supp. 2d 1256 (S.D. Fla. 2005) citing United States v. Byrd, 969 F.2d 106, 109-10 (5th Cir. 1992); United States v. Ploof, 851 F. 2d 7, 11 (1st Cir. 1988); United States v. Himler, 797 F.2d 156, 160 (3rd Cir. 1986). All of the cited cases stand for the proposition that an (f)(1) circumstance is necessary in order to make a danger finding. See also United States v. DeBeir, 16 F. Supp. 2d 592 (D. Md. 1998); United States v. Jamal, 285 F. Supp. 2d 1221, 1222 (D. Ariz. 2003), vacated on other grounds, 326 F. Supp. 2nd 1006 (D. Ariz. 2003). Although not directly on point, United States v. Salerno, 481 U.S. 739, 747, 107 S. Ct. 2095, 2101 (1987) (upholding the danger-to-the-community detention basis) is instructive: "The Bail Reform Act carefully limits the circumstances under which detention may be sought to the most serious crimes. See 18 U.S.C. § 3142(f) (detention hearings available if case involves crimes of violence, offenses for which the sentence is life imprisonment or death, serious drug offenses, or certain repeat offenders)."

The government plausibly, but ultimately non-persuasively, reads the statute otherwise. It contends that the introductory "heading" in subsection (f), which permits a finding of flight risk *and* danger controls both sub-sub sections (1) and (2) because of the disjunctive "or" at the close of (1). Of course, (2) refers to flight risk only (and one category of violence – obstruction of justice). The government argues that once a hearing is ordered under flight risk, the court may then detain on a danger basis. However, the above-referenced cases which have

1   researched the legislative history do not agree.  These cases hold that Congress intended to limit

2   the number of crimes for which persons could be held as a danger to the community, especially

3   in light of the presumption that pre-trial release is the norm and not the exception.  See United

4   States v. Gebro, 948 F.2d 1118, 1121 (9th Cir. 1991) ("[o]nly in rare circumstances should

5   release be denied, and doubts regarding the propriety of release should be resolved in the

6   defendant's favor.").

7                Nor do the government's cited cases of United States v. Byrd, supra, or United

8   States v. Singleton, 182 F.3d 7 (D.C. Cir. 1999) assist the government's position.  Byrd clearly

9   held that an (f)(1) trigger was necessary. ("Dr. Byrd could have been detained only if the

10  government had *also* established that the case against him involves a crime of violence.").  Byrd,

11  supra, at 110 (emphasis in original).  The only possible assistance Byrd renders to the

12  government is that this court found that the charged offense did not have to be a crime of

13  violence as long as the "case" involves a crime of violence.  It is difficult for the undersigned to

14  understand how under the statute as a whole the case against the defendant involves violence if

15  the charged offense does not.  Although § 3142(f)(1) does indeed use the terminology:  "[U]pon

16  motion of the attorney for the government, in a case that involves – (A) a crime of violence....",

17  the "involves" is simply a plural reference for the conditions set forth in (f)(1).  The statute does

18  not mean to convey an impression that the charged offense does not have to be a crime of

19  violence.  "Case" is synonymous with charged offense.  If the conclusion were otherwise,

20  subsection (g) would be nonsensical in that *only* the charged offense is listed as a factor to be

21  considered under the nature of the crime when determining detention or release, and *only* the

22  charged offense is referenced when considering whether a "crime of violence" exists.  Also, it is

23  perverse that one defendant's right to release would be predicated upon the charge against

24  another defendant.  The rejection of the government's "involves a case" argument, and the need

25  for the charged offense to be the crime of violence is precisely the holding of the government's

26  other cited case, United States v. Singleton, 182 F.3d at 12, 14.

                                         9

1    At some point, the principle of *stare decisis* controls contrary readings of a statute,

2 and that point has been reached in this case.  All of the cases relegate a danger finding only to

3 (f)(1); no case discovered by the undersigned permits a danger finding simply because a hearing

4 has been held on flight risk.  Therefore, for purposes of this case as presently charged, the court

5 has no authority to detain Umer as a danger to the community unless the charged offense is a

6 "crime of violence" or involves a defined federal crime of terror.  Congress can further change

7 the pre-September 11 detention law, but only Congress can do so – and it has not.

8    This brings the issue to whether Umer has been charged with a crime of violence

9 or a federal crime of terror as set forth in § 3142(f)(1).  Under any reasonable construction of 18

10 U.S.C. § 3156(a)(4), which defines crime of violence for detention purposes, the government has

11 not charged a crime of violence against Umer.  This definitional section requires that the *offense*

12 has an element of the use, attempted use or threatened use of force, or any other felony which by

13 its nature involves a substantial risk that physical force may be used in the course of committing

14 the *offense.*  No case, to the undersigned's knowledge, has ever held that making false statements

15 to the FBI is a crime of violence.  Nor is such a finding intuitive – it is counter-intuitive.  Making

16 such a finding would rob "crime of violence" of any distinguishing meaning whatsoever.  Nor

17 can the court agree with the government that because the context of the false statements had a

18 nexus to contemplated violence, the act of lying to the FBI about the circumstances is itself

19 "violence."  Under the government's logic, every single crime within Title 18 would be a crime

20 of violence as long as it was somehow related to terrorism.  That is, mail fraud would be a crime

21 of violence, misrepresenting facts on a passport application would also, and so on.

22    Moreover, Congress expressly contemplated in § 3142(f)(1) that certain terrorism

23 offenses listed in 18 U.S.C. § 2332b(g)(5)(B) would be danger-to-the community eligible

24 offenses. Title 18 U.S.C. § 1001, the offense Umer is charged with, is not listed therein.  If

25 \\\\\

26 \\\\\

1  Congress had wanted a false statement related to terrorism as a danger offense, it knew full well

2  how to do it – but it did not.[6]

3          Therefore, based on the above discussion which requires the *charged offense* to be

4  a crime of violence or federal crime of terror in order to trigger the danger basis for detention,

5  Umer cannot be detained on such a basis.

6                  III.  Whether Defendant Umer Remains a Flight Risk

7          Obviously, there is risk in every decision to order release pretrial.  No

8  adjudicating official can probe the present and future mind set of a defendant in such verifiable

9  detail to guarantee that no flight will occur.  Nevertheless, the law does not require such absolute

10  assurance, United States v. Orta, 760 F.2d 887 (8th Cir. 1985); rather, it is the government's

11  burden pretrial to demonstrate that no conditions or combinations of conditions can be set which

12  *reasonably* will assure the defendant's appearance.  Congress has indicated that, overall, pretrial

13  release is the rule, and detention is the exception.  As observed above, "[o]nly in rare

14  circumstances should release be denied, and doubts regarding the propriety of release should be

15  resolved in the defendant's favor." United States v. Gebro, supra at 1121 (citing United States v.

16  Motamedi, 767 F.2d 1403, 1405 (9th Cir. 1985)).

17          The statute, § 3142(g), lists three categories of information relevant to the flight

18  risk analysis: (1) The nature and circumstances of the offense charged; (2) the weight of the

19  evidence against the person; and (3) the history and characteristics of the person.  With respect to

20  category (1), the nature of the charged offense, analysis is intuitive.  That is, there are some

21  crimes by their nature which suggest flight, e.g., prison escape, and some crimes which do not

22  suggest flight at all, e.g., non-aggravated battery.  Also very pertinent to this category is the

23

24          [6]  The situation is different for Hamid.  Section, § 2339A, the material support to
   terrorism offense, is listed as an offense under 18 U.S.C. § 2332b(g)(5)(B) which is itself a
   trigger for a finding of danger under § 3142(f)(1).  The grand jury has found probable cause to

25  believe that Hamid was bent on preparing for and committing terrorist acts.  No amount of
   secured bond, or any other condition, would reasonably assure the safety of the community given

26  the grand jury's finding.

1  potential, realistic sentence to be imposed if the defendant is found guilty.  It takes no extensive

2  exercise in logic to realize that the more potential time one can be locked away in prison, the

3  more tendency there may be to flee.

4           In the present case, the charge of relating a falsehood to a federal official does not,

5  in itself, suggest a tendency towards flight.  There are some circumstances which favor the

6  government's position because the charged falsehood involves details about terrorist training, but

7  those are more properly analyzed in factor (3).  Thus, the charged crime in this case does not

8  indicate flight. With respect to the potential realistic sentence, the court can only say that the

9  government's position appears to be not well taken vis-a-vis Umer.  All would agree that the

10 basic sentencing guideline applicable to a 18 U.S.C. § 1001 (maximum potential sentence 8

11 years) charge is 2B1.1.  There are enhancement and departure considerations within 2B1.1 which

12 can vary the charge, but assessing their imposition, which can only be a very rough estimate on

13 the part of this non-sentencing judge,[7] the sentencing range would be between 0 months/years to

14 3 years.  However, the government urges that a 3A1.4 "terrorism" enhancement would be

15 applicable which would greatly enhance the potential sentence to its statutory maximum.  Upon

16 looking at 3A1.4, however, it is definitionally unavailable.  Section 3A1.4 defines a "federal

17 crime of terrorism," which is the basis for application of the section.  The guideline definition

18 expressly depends, in turn, wholly upon 18 U.S.C. § 2332b(g)(5).  This section requires two

19 criteria to be met before a crime is determined to be a " federal terrorism" crime, neither of which

20 is met in this case.  The first criteria requires that the crime "is calculated to influence or affect

21 the conduct of government by intimidation or coercion, or to retaliate against government

22 conduct."  Telling an untruth to the FBI cannot logically be included within the first criteria if the

23 words of that criteria are to be used with their common meaning.  The second criteria includes a

24 long list of specific crimes which would be considered federal terrorism crimes, and § 1001 is

25

26        [7]  The only purpose for looking at the potential sentence is to gauge the risk of flight.  Of
   course, the undersigned's estimate will have no effect if and when sentence is actually imposed.

not listed within that list.  Therefore, on the charged offense against Umer, the government's position is overstated.

The undersigned cannot find that the length of the potential sentence weighs in favor of flight.  There is even the possibility on the present charge that Umer will have served all of his time even if found guilty on the § 1001 offense.

The second flight criteria involves the weight of the evidence.  At this point, this criteria clearly weighs in favor of the government.  However, even as the government concedes, "the weight of the evidence is the least important" factor.  <u>Gebro</u>, 948 F.2d at 1121.

Finally, the history and characteristics of defendant Umer involves a variety of factors.  At the outset, however, the analysis here is not simply whether the factors weigh in favor of flight, but ultimately, whether there are conditions or combinations of conditions which would alleviate most of the risk of flight.

The factors posited by the government indicate a potential for flight risk.  Umer has strong familial and financial ties in a foreign country (Pakistan) which is notorious for having regions of the country "beyond the law."  Based on the present record, the defendant apparently has no compunction against lying to government officials – why should the court believe his protestations that he will not flee?  Umer seemingly has access to more money than his station in life would ordinarily indicate.  Absent a consideration of secured bond, for the moment, these factors clearly weigh in favor of detention.

Even absent a consideration of bond, Umer has some factors favoring his position.  He does have substantial family ties in the United States, and would certainly be an official pariah in Pakistan, the only country in which Umer has close contacts. The government's belief that Umer could "just set up shop" in Pakistan in a notorious fashion is unrealistic. His supposed homes would be the first place government officials would look for the fugitive.  Traveling outside the United States would be difficult, for as defense counsel indicated, Umer would be on every "no-fly" list in existence.  Finally, the court has a difficult time believing that Umer would

1   simply fly off leaving his son to fend for himself – all to avoid a relatively modest (as far as

2   federal sentences go) prison sentence.

3           Nevertheless, the undersigned will find that factor 3 favors the government.

4   Weighing all three statutory criteria, thus far, with one favoring Umer and two and three favoring

5   the government, the court would find that the government has met its burden by a preponderance.

6   However, when adding in over $1,000,000 secured bond, which would be forfeitable if Umer

7   fled, the calculus tips to the other side.  This sum of money is substantial, is far in excess of what

8   monies Umer has demonstrated access to, and would impose hardship, if forfeited, on numerous

9   other persons aside from defendants.  It is one thing to leave your own possessions and flee to a

10  foreign country; it is quite another to knowingly permit others to be left "holding the bag."  The

11  court cannot say on the *present* charge against Umer, that there are no conditions or combination

12  of conditions to be imposed that would *reasonably* assure the appearances of Umer Hayat.

13          One final concern expressed by the undersigned at hearing is that Umer may have

14  a motivation to flee outside of merely attempting to avoid punishment.  That is, given the

15  terrorism connection of this case, Umer might flee in order to wreak some type of revenge for

16  what he could view (unreasonably) as government harassment.  Worse yet, if the government is

17  correct in its assumptions about Umer, his true colors and allegiance might get him more actively

18  involved in terroristic activities than simply facilitating his son's involvement.  However, given

19  the facts that the government has proffered thus far about Umer, such would only be remote

20  speculation on the part of the undersigned.  Moreover, the undersigned will fashion conditions

21  which will ensure that Umer is a very watched person while out on pretrial release.[8]

22  \\\\\

23  \\\\\

24

25          [8] The undersigned in no way intends to convey that the flight risk decision of Judge
    Nowinski was anything but correct at the time it was made.  The point of this order is that more
26  information is known and circumstances have changed.

                                              14

CONCLUSION

Accordingly, IT IS HEREBY ORDERED:

1. As Hamid's counsel withdrew any request for detention review, defendant Hamid Hayat shall remain detained both as a danger to the community and as a flight risk.

2. Defendant Umer Hayat is ordered released subject to the following terms and conditions:

a. A bond in the amount of $1,200,000 must be posted. The bond may be secured with the property proffered by the defendant unless the United States objects to the value of the subject property proffered; such objection must be formally made no later than September 27, 2005. The court will take up any objection on its September 29, 2005, 2:00 p.m. calendar.

b. Umer Hayat shall reside at [his residence], Lodi Ca. 95240, and, absent a medical emergency, not leave that residence without the prior approval of the pretrial services officer; Umer Hayat shall be subject to electronic monitoring, and shall pay the costs attendant to such electronic monitoring;

c. Umer Hayat shall permit all phones, including cellular phones, to be monitored via trap and trace and pen register; Umer Hayat shall submit a list of all phones which are presently in the premises, and no other phones shall be permitted in the residence;

d. The court finds that search of the Umer Hayat premises on reasonable suspicion is a necessary condition to deter flight without which the court would not order pretrial release on conditions; no release order will be signed without a waiver of any rights Umer Hayat may have under United States v. Scott, __F.3d__, 2005 WL 2174413 (9th Cir. 2005).

e. Umer Hayat shall divest himself of any firearms or other dangerous weapons, and shall submit proof of divestment to the pretrial service officer;

f. Umer Hayat shall disclose to pretrial services the identities of any persons, outside of those living with him and his attorney or persons working with the attorney, coming to visit him while he is under house arrest within two days of their visit;

1           g.  Umer Hayat shall not possess or attempt access to any documents

2    authorizing international travel.

3           3.  Except for that part of paragraph 2(a) which requires a review of proposed

4    security, this order shall not take effect until September 30. 2005; if the government seeks review

5    of this order with the assigned district judge on or before September 30, 2005, this order is stayed

6    until such time that the review process is completed.

7    DATED: 11/07/05

8                               /s/ Gregory G. Hollows

9                               GREGORY G. HOLLOWS
                           UNITED STATES MAGISTRATE JUDGE

10   GGH:gh:035 - hayat240.ord2

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

16