1

2

3

4

5

6

7                           UNITED STATES DISTRICT COURT

8                   FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10    UNITED STATES OF AMERICA,        )
                                       )        2:05-cr-0240-GEB
11                   Plaintiff,        )
                                       )        ORDER*
12             v.                      )
                                       )
13    HAMID HAYAT, and                 )
      UMER HAYAT,                      )
14                                     )
                     Defendants.       )
15                                     )
                                       )
16    ─────────────────────────────────)

17             The Amended Order filed November 4, 2005, ordered

18    Defendant Umer Hayat ("Umer") released subject to six conditions,

19    one of which required the posting of "a bond in the amount of

20    $1,500,000" collateralized by five real properties.  (Amended

21    Order at 20.)  Umer moves to modify this bail condition "to allow

22    his release upon the posting of a bond in the amount of

23    $1,200,000" collateralized by four real properties because

24    Property 2 "is unavailable for use to secure an Appearance

25    ─────────────────
              *    This motion was determined suitable for decision
26    without oral argument because "the language of the statute [18
      U.S.C. § 3145(a)] does not require a detention hearing once the
27    defendant has demonstrated his inability to post a bond
      determined to be a necessary condition of his release."  United
28    States v. Fidler, 419 F.3d 1026, 1028 n.1 (9th Cir. 2005).

1  Bond."[1]  (Def.'s Mot. for Modification of Conditions of Release

2  ("Def.'s Mot.") at 2.)  The government opposes the motion.

3  <u>BACKGROUND</u>

4  Property 2 was originally proffered by Sher Afzal

5  ("Sher") to secure Umer's Appearance Bond.  During an interview

6  with Pretrial Services in October 2005, Sher "advised that he was

7  the owner of Property 2, that it had an estimated value of

8  $300,000, that it was unencumbered, and that he was willing to

9  use the property to secure an Appearance Bond for Umer Hayat."

10  (Def.'s Mot. at 2.)  However, "it has since been determined that

11  Safdar Afzal is the record owner of Property 2, that there is an

12  encumbrance of $125,000, and the property is unavailable for use

13  to secure an Appearance Bond."  (<u>Id.</u>)

14  Safdar Afzal ("Safdar") explains that title to

15  Property 2 was transferred to him by his father, Sher, and

16  recorded on September 30, 2004.  (Safdar Decl. ¶ 2; Def.'s Mot.

17  at 2.)  Upon transfer, Safdar obtained a loan for $125,000

18  secured by a first deed of trust on the property.  (Safdar Decl.

19  ¶ 3; Def.'s Mot. at 2.)  The loan has an adjustable interest

20  rate, which is expected to increase over the next twelve months.

21  (Safdar Decl. ¶¶ 7,9; Def.'s Mot. at 2.)  Safdar declares that he

22  "cannot afford higher monthly payments" and "must refinance

23  Property 2 as soon as possible so that [he] can obtain a fixed

24  rate to insure that [his] payments will remain approximately

25  

26      [1]    Pursuant to Order Re Local Rule 39-140, which was filed
   November 4, 2005, the proffered properties are referred to as
27  Property 1, Property 2, Property 3, Property 4, and Property 5.

28  2

$500.00 monthly." (Safdar Decl. ¶ 9; Def.'s Mot. at 2-3.) However, Safdar will not be able to refinance Property 2 if it is used to secure an Appearance Bond. (Safdar Decl. ¶ 10; Def.'s Mot. at 3.) Safdar declares that his "decision not to use Property 2 to secure the Appearance Bond is in no way intended to say or imply" that he has "any concerns that Umer Hayat would flee." (Sadfar Decl. ¶ 11; Def.'s Motion at 3.) Safdar asserts that if he "had such a concern . . . [he] would not continue to allow Property 3 to be used to secure a bond." (Sadfar Decl. ¶ 11; Def.'s Motion at 3.)

In addition, Sher declares that although "Property 2 is in [his] son's name, as is [their] custom [he] commonly refer[s] to the property as [his] property." (Sher Decl. ¶ 3; Def.'s Mot. at 3.) He states that when he "represented to the Pretrial Services Officer that the property was unencumbered [he] did not recall that [his] son had obtained a loan . . . and used Property 2 to secure the loan." (Sher Decl. ¶ 4; Def.'s Mot. at 3.) In addition, Sher declares that his and Sadfar's "decision not to use Property 2 to secure the Appearance Bond is in no way intended to say or imply that [they] have any concerns that Umer Hayat would flee." (Sher Decl. ¶ 7; Def.'s Mot. at 3.) Sher asserts that if he "had such a concern, [he] would not continue to allow Property 1 to be used to secure a bond." (Sher Decl. ¶ 7; Def.'s Mot. at 3.)

Upon notification that Property 2 was no longer available to secure Umer's Appearance Bond, Pretrial Services

prepared a Supplemental Report, which was received on November 8, 2005.[2]  The Supplemental Report states that when Sher previously spoke to Pretrial Services, he "was confused about [Property 2's] value, and [it's] true ownership."  (Supplemental Report ("Supp. Rep.") at 2.)  But Pretrial Services states the "lack of availability [of Property 2] clarifies the Afzal family's financial situation and the increased significance of the posting of their [Property 1 and Property 3] with a total equity of $580,000."  (Id.)  Pretrial Services concludes that the "confirmed $1,200,000 in equity from [the remaining] four properties being offered . . . meets the necessary threshold to reasonably assure [Umer's] appearance at future court proceedings. . . ."  (Id.)

DISCUSSION

Once a release order issues, a defendant may file a motion with the district court for amendment of a condition of release.  United States v. Fidler, 419 F.3d 1026, 1027 (9th Cir. 2005) (discussing the options when a detained defendant is unable to meet a financial condition of release imposed by the district court).  Further, if the motion makes known that a condition of release "is unattainable," the court may re-evaluate the need for that condition.  United States v. Mantecon-Zayas, 949 F.2d 548,

---

[2]    Defense counsel contacted Pretrial Services regarding the unavailability of Property 2, and requested a supplemental report addressing Defendant's proposed modification to the condition of release. (Def.'s Mot. at 2, n.1.)

1  551 (1st Cir. 1991).   Therefore, the bond condition of release
2  will be re-evaluated.

3           A.   Amount of the Bond

4           In June 2005, Pretrial Services stated that "a large
5  secured bond would be necessary" for Umer's release in view of
6  his "ties to Pakistan and his recent extended overseas travel."
7  (June Rep. at 2.)   In September 2005, Magistrate Judge Hollows
8  ordered Umer released subject to certain conditions, including a
9  $1.2 million bond secured by Property 1, Property 3, Property 4,
10 and Property 5; the order was stayed pending appeal to this
11 Court.   In October 2005, at the request of this Court, Pretrial
12 Services interviewed all persons proffering property except
13 Shahana Khatab and co-Defendant Hamid Hayat.[3]   When Sher was
14 interviewed, he indicated that he was willing to post an
15 additional property, Property 2, as collateral for the bond.
16 Subsequently, Pretrial Services issued a report stating "the bond
17 set by Magistrate Judge Hollows is compelling, however, the
18 addition of . . . [Property 2] adds more of an assurance to the
19 defendant's appearance at future court proceedings."   (Pretrial
20 Services Report, October 18, 2005, ("Oct. Rep.") at 4.)   But when
21 notified that Property 2 was no longer available as collateral,
22 Pretrial Services issued the Supplemental Report,
23 which concludes "there is now a confirmed $1,200,000 in equity

24

25        [3]   The government's Response to Defendant's Motion for
   Approval of Bail Documents ("Resp. to Mot.") filed November 9,
26 2005, states that Umer Khatab's wife, Shahanu Khatab, "would be
   acting as a fifth surety in this case."   (Resp. to Mot. at 10
27 n.4.)

28                              5

from four properties being offered . . . [and] this bond meets the necessary threshold to reasonably assure Mr. Hayat's appearance at future court proceedings." (Supp. Rep. at 2.)

Thus far, the amount of the Appearance Bond has been largely determined by the properties offered as security. However, since Property 2 is no longer available, it is necessary to determine whether the $1.5 million collateralized bond "is an indispensable component of conditions of release." <u>Mantecon-Zayas</u>, 949 F.2d at 551. A bond should be set at "such an amount as is reasonably necessary to assure the appearance of the person as required." <u>United States v. McConnell</u>, 842 F.2d 105, 108 (5th. Cir. 1988). Four factors enumerated in 18 U.S.C. § 3142(g) are relevant to determining what bond amount would reasonably assure Umer's appearance at trial: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against Umer, (3) his history and characteristics, and (4) the nature and seriousness of the danger his release would pose to any person or the community. <u>See</u> <u>Fidler</u>, 419 F.3d at 1029 (upholding the district court's determination on the amount of bail because the defendant was a serious flight risk in light of the analysis of the four § 3142(g) factors).

Each factor was considered in the Amended Order. As to the first factor, the Order stated that the nature and circumstance of the offense "indicate that Umer is associated with persons hostile to the government of the United States . . . [thus Umer appears to have] disassociated himself

from the United States and is likely to flee if released."
(Amended Order at 5.)  As to the second factor, the Order noted
that although "the weight of the evidence against the defendant
'is the least important factor' . . . this factor does not favor
release."  (Id. at 6.)  As to the third factor, the Order
observed that Umer owns a home in Pakistan, has "familial ties to
Pakistan," and appears to have "access to a significant amount of
cash from an unexplained source."  (Id. at 7-8.)  It recognized
that Umer has some ties to the United States, but concluded that
"the nature of his seasonal work indicates his occupational tie
to the United States is minimal, and his association with
individuals that appear to be engaged in a holy war against the
United States suggests his ties to the United States are
tenuous."  (Id. at 9.)  As to the fourth factor, the Order noted
Umer "appears potentially dangerous because of his association
with individuals involved in or sympathetic to jihad," but stated
"the government's proffer against him does not indicate the
nature of his association and involvement makes him a danger to
the community."  (Id.)

        Based on consideration of these four factors, the
Amended Order concluded that the government "has proved by a
preponderance of the evidence that Umer is a serious flight
risk."  (Id. at 10.)  In light of this determination, a large
bond is necessary to reasonably assure Umer's appearance at
trial.  See McConnell, 842 F.2d at 109 ("Should the judicial
officer conclude that a large bond is an essential part of a

package of conditions designed to secure a reasonable assurance of the defendant's appearance, and the record contains a reasonable basis for that conclusion, the condition would be neither constitutionally nor statutorily infirm."); see also United States v. Bernal, 183 F. Supp. 2d 439, 441 (D.P.R. 2001) (holding that a high bail condition was "an indispensable component of the conditions of release").

Umer's Appearance Bond was originally set at $1.2 million, but was increased to $1.5 million based on consideration of the § 3142(g) factors and the recommendation of Pretrial Services. However, Pretrial Services now states it "has always believed the amount of bond was not as important as the significance of the properties to the people pledging the bond." (Supp. Rep. at 2.) Pretrial Services concludes that a bond of $1.2 million "meets the necessary threshold to reasonably assure Mr. Hayat's appearance at future court proceedings." (Id.) Based on a reconsideration of the § 3142(g) factors and Pretrial Services' Supplemental Report, a bond in the amount of $1.2 million appears sufficient to reasonably assure Umer's appearance at trial.[4] Therefore, the first condition of the Amended Order is modified to allow Umer's release upon the posting of a bond in the amount of $1.2 million.[5]

---

[4] This amount is determined sufficient when considered in conjunction with the other five conditions of release.

[5] This release condition includes a court certified interpreter's certification that the bond paperwork has been translated into each surety's native language.

                    B.  Adequacy of Proposed Sureties

        The government contests Umer's release, arguing that
the inconsistencies concerning the ownership of Property 2
indicate neither Safdar nor Sher are adequate sureties.  (Gov't
Opp'n Mod. Mot. ("Gov't Opp'n") at 7-11.)  The Ninth Circuit has
stated that the defendant must have a "close" relationship with
the sureties, otherwise, a bond "would not [reasonably] assure
[the defendant's] appearance."  United States v. Koenig, 912 F.2d
1190, 1193 (9th Cir. 1990) (rejecting a bond offered by the
defendant's parents because "there [was] reason to believe that
his relationship with his parents [was] not a close one").
Consequently, Umer's relationship with the sureties must be such
that the loss of the properties would be "a deeply felt hurt to
the defendant and [the sureties]; the hurt must be so severe that
defendant will return for trial rather than flee."  United States
v. Townsend, 897 F.2d 989, 996 (9th Cir. 1990).

        The Amended Order recognized that "the government has
raised some doubt whether Umer has a sufficiently close
relationship with Sher and Safdr."  (Amended Order at 16.)
Specifically, the Court noted that although Sher told Pretrial
Services "he has a close relationship with Umer," Sher had
previously told the FBI that he posted his property because "Umer
Hayat made multiple, persistent calls from jail to
convince . . . [him] to put up the property . . . [and] although
[he] did not want to do it, he ultimately acquiesced."  (Id.
at 11.)  In addition, the Court observed that Safdar told

                              9

Pretrial Services "he feels a strong blood relationship with Umer," but that during an interview with the FBI, Safdar said "while he and his father are related to the Hayats, they are not particularly close with them." (Id.)  The Amended Order resolved this doubt in favor of Umer's release because "doubts regarding the propriety of release should be resolved in favor of the defendant." United States v. Motamedi, 767 F.2d 1403, 1406 (9th Cir. 1985).

The government argues that the additional inconsistent statements by Sher and Safdar about Property 2 undermine their credibility and their conclusory assurances about their relationship with Umer. (Gov't Opp'n at 7-11.)  The government notes Sher originally told Pretrial Services that he was the owner of Property 2, that it had an estimated value of $300,000, and that it was unencumbered, when in fact Safdar is the record owner of Property 2, there is an encumbrance of $125,000, and the property is unavailable for use to secure an Appearance Bond. (Id. at 10-11.)  In addition, the government observes Safdar represented to Pretrial Services that Property 3 was his "only asset," when in fact Safdar owns both Property 3 and Property 2. (Id. at 7.)

Defense counsel argues that Safdar's misrepresentation about the ownership of Property 2 is "understandable when viewed in context of his culture."[6]  (Def.'s Reply at 2.)  However, his

_____

[6]   Although defense counsel attempts to explain why Safdar would not consider Property 2 as his "asset," neither Safdar's declaration nor Pretrial Services' report discuss any cultural

misrepresentation hardly appears "understandable" because when he spoke with Pretrial Services in October he had owned Property 2 for over a year, he had been making loan payments on the property, and was monitoring the adjustable interest rate on the loan to assure that the payments did not become overly burdensome.  (See Safdar Decl. ¶¶ 2,3,7,8,9.)  In light of his frequent attention to matters involving the property, it is hard to imagine that Safdar innocently misspoke about his property ownership interest when he was interviewed by Pretrial Services.

As to Sher's misrepresentations about the ownership of Property 2, Pretrial Services states "it appears Sher Afzal was confused" when he spoke with Pretrial Services in October 2005. (Supp. Rep. at 2.)  However, it taxes credulity to believe that when Sher unequivocally told Pretrial Services that he owned Property 2 "free and clear" and that the property has "a value of $300,000" that he forgot he had transferred Property 2 to his son only one year ago.  (Oct. Rep. at 3.)  Even if he did forget, then his ability to recall is questioned, including whether he remembers the true nature of his relationship with Umer.

The inconsistent statements by Safdar and Sher about Property 2 raise serious credibility concerns.  In light of these concerns, Safdar's and Sher's earlier conclusory statements indicating they have a close relationship with Umer lack sufficient support in the record.  Accordingly, what Safdar previously told the government - that even though "he and his

---

differences in the use of the term.

father are related to the Hayats, they are not particularly close to them" - is now given more weight.  (See Amended Order at 11.) In light of all their inconsistent statements made to date, "there is reason to believe that [Umer's] relationship with [Sher and Safdar] is not a close one and that the bond would not [reasonably] assure his appearance."  See Koenig, 912 F.2d at 1193.

### C.  Adequacy of the Proffered Properties

In addition, the government argues that the four remaining pledged properties are not adequate collateral for bail.  (Gov't Opp'n at 12-13.)  The nature of the pledged properties must be evaluated for purposes of determining whether they provide "a reliable assurance of [Umer's] appearance at trial."  Townsend, 897 F.2d at 996.  The sureties' connection to the remaining four properties must be such that the loss of these properties would inflict a hurt "so severe that [Umer] will return for trial rather than flee."  Id.

The government contends that "the net result [of withdrawal of Property 2] is that a major disincentive for flight has been removed."  (Gov't Opp'n at 12, n.5.)  The government contends that Property 2 was the best collateral for bail purposes since Sher "resides [on it] as well as three of his sons (including Safdar), two of his daughter-in-laws [sic]; and nine of his grandchildren."  (Id. at 12.)  The government asserts "[l]oss of this property would have imposed a genuine 'hurt' . . . on these sureties, likely more so than any other property."

1   (<u>Id.</u>)   The government concludes that "the removal of Property 2

2   severely undercuts a key condition of defendant's bail

3   and . . . shift[s] the scales against release."  (<u>Id.</u> at 13.)

4          The Amended Order noted that while the loss of

5   Property 5 "would have some impact on Umer and his immediate

6   family [because they reside at Property 5] . . . there is doubt

7   regarding the extent of this impact given his [newly renovated]

8   second home in Pakistan."  (Amended Order at 18.)  The Amended

9   Order also observed that Property 5 and Property 4 are owned and

10  part-owned by Umer Khatab, who prior to Umer's indictment was

11  "planning on building a house and living in Pakistan" but

12  returned to the Untied States solely to assist Umer.  (<u>Id.</u> at

13  14.)  Thus it appears Umer Khatab would not be hurt by the loss

14  of these properties because he would simply return to Pakistan

15  should Umer flee.  Furthermore, the loss of Property 5 would have

16  little impact on co-defendant Hamid Hayat because Umer exercises

17  control over it.  (<u>See</u> <u>id.</u> at 15.)

18         In addition, Property 1, Property 3, and Property 4

19  appear to be disposable rental properties, which as the Amended

20  Order recognized "somewhat undermine . . . [their] effectiveness

21  as security."  (Amended Order at 13.)  Although Pretrial Services

22  characterizes Property 1 and Property 3 as having "increased

23  significance" because of "the Afzal family's financial

24  situation," the loss of Property 1 and Property 3 would not leave

25  Sher or Safdar without their primary residence.  (Supp. Rep. at

26  2.) Consequently, it does not appear that the loss of the four

27

28                              13

remaining properties would inflict a hurt "so severe that [Umer] will return for trial rather than flee." Townsend, 897 F.2d at 996.

                              CONCLUSION

        Although the amount of bail has been reduced from $1.5 million to $1.2 million, the proposed sureties and proffered property do not appear adequate because the "purpose of bail is not served unless losing . . . [the properties] would be a deeply felt hurt to the defendant and his family." Townsend, 897 F.2d at 996.[7]  Therefore, condition 1 of the Amended Order is modified as follows:

              A bond in the amount of $1,200,000 must be
              posted and secured with adequate security.
              Defendant may proffer property or properties
              to secure the bond.  The United States may
              object to the adequacy and value of the
              property proffered; such objection must be
              formally made before the duty Magistrate
              Judge no longer than three (3) days after the
              property has been proffered by Defendant.

              IT IS SO ORDERED

DATED:  November 14, 2005

                              /s/ Garland E. Burrell, Jr.
                              GARLAND E. BURRELL, JR.
                              United States District Judge

_____

        [7]     The purpose of a bail is not to provide funds to the government should the defendant flee, but rather to reasonably assure his appearance at trial.  See United States v. Melville, 309 F. Supp. 824, 828-27 (S.D.N.Y. 1970).