1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8            FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10   UNITED STATES OF AMERICA,      )
                                    )      2:05-cr-0240-GEB
11                  Plaintiff,      )
                                    )
12           v.                     )      AMENDED ORDER[†][*]
                                    )
13   HAMID HAYAT, and               )
     UMER HAYAT,                    )
14                                  )
                    Defendants.     )
15                                  )
                                    )
16   _____)

17         The Amended Order filed November 4, 2005, ordered

18   Defendant Umer Hayat ("Umer") released subject to six conditions,

19   one of which required the posting of "a bond in the amount of

20

21         [†]    The Order filed November 14, 2005, is amended as
     follows:  (1) the word "Untied" on page thirteen at line twelve
     is changed to "United"; (2) the words "it does not appear that"
22   on page thirteen at line twenty-six are stricken; (3) the word
     "not" is inserted after the word "would" on page fourteen at line
23   one; and (4) the words "do not appear adequate" on page fourteen
     at line seven are stricken, and in their place the words "are
24   inadequate, based on the current record," are substituted.  This
     Amended Order serves only to reflect these changes.
25
           [*]    This motion was determined suitable for decision
26   without oral argument because "the language of the statute [18
     U.S.C. § 3145(a)] does not require a detention hearing once the
27   defendant has demonstrated his inability to post a bond
     determined to be a necessary condition of his release."  United
28   States v. Fidler, 419 F.3d 1026, 1028 n.1 (9th Cir. 2005).

$1,500,000" collateralized by five real properties.  (Amended

Order at 20.)  Umer moves to modify this bail condition "to allow

his release upon the posting of a bond in the amount of

$1,200,000" collateralized by four real properties because

Property 2 "is unavailable for use to secure an Appearance

Bond."[1]  (Def.'s Mot. for Modification of Conditions of Release

("Def.'s Mot.") at 2.)  The government opposes the motion.

<u>BACKGROUND</u>

Property 2 was originally proffered by Sher Afzal

("Sher") to secure Umer's Appearance Bond.  During an interview

with Pretrial Services in October 2005, Sher "advised that he was

the owner of Property 2, that it had an estimated value of

$300,000, that it was unencumbered, and that he was willing to

use the property to secure an Appearance Bond for Umer Hayat."

(Def.'s Mot. at 2.)  However, "it has since been determined that

Safdar Afzal is the record owner of Property 2, that there is an

encumbrance of $125,000, and the property is unavailable for use

to secure an Appearance Bond."  (<u>Id.</u>)

Safdar Afzal ("Safdar") explains that title to

Property 2 was transferred to him by his father, Sher, and

recorded on September 30, 2004.  (Safdar Decl. ¶ 2; Def.'s Mot.

at 2.)  Upon transfer, Safdar obtained a loan for $125,000

secured by a first deed of trust on the property.  (Safdar Decl.

¶ 3; Def.'s Mot. at 2.)  The loan has an adjustable interest

---

[1]     Pursuant to Order Re Local Rule 39-140, which was filed
November 4, 2005, the proffered properties are referred to as
Property 1, Property 2, Property 3, Property 4, and Property 5.

rate, which is expected to increase over the next twelve months.
(Safdar Decl. ¶¶ 7,9; Def.'s Mot. at 2.)  Safdar declares that he
"cannot afford higher monthly payments" and "must refinance
Property 2 as soon as possible so that [he] can obtain a fixed
rate to insure that [his] payments will remain approximately
$500.00 monthly."  (Safdar Decl. ¶ 9; Def.'s Mot. at 2-3.)
However, Safdar will not be able to refinance Property 2 if it is
used to secure an Appearance Bond.  (Safdar Decl. ¶ 10; Def.'s
Mot. at 3.)  Safdar declares that his "decision not to use
Property 2 to secure the Appearance Bond is in no way intended to
say or imply" that he has "any concerns that Umer Hayat would
flee."  (Sadfar Decl. ¶ 11; Def.'s Motion at 3.)  Safdar asserts
that if he "had such a concern . . . [he] would not continue to
allow Property 3 to be used to secure a bond."  (Sadfar Decl.
¶ 11; Def.'s Motion at 3.)

        In addition, Sher declares that although "Property 2 is
in [his] son's name, as is [their] custom [he] commonly refer[s]
to the property as [his] property."  (Sher Decl. ¶ 3; Def.'s Mot.
at 3.)  He states that when he "represented to the Pretrial
Services Officer that the property was unencumbered [he] did not
recall that [his] son had obtained a loan . . . and used Property
2 to secure the loan."  (Sher Decl. ¶ 4; Def.'s Mot. at 3.)  In
addition, Sher declares that his and Sadfar's "decision not to
use Property 2 to secure the Appearance Bond is in no way
intended to say or imply that [they] have any concerns that Umer
Hayat would flee."  (Sher Decl. ¶ 7; Def.'s Mot. at 3.)  Sher

asserts that if he "had such a concern, [he] would not continue to allow Property 1 to be used to secure a bond." (Sher Decl. ¶ 7; Def.'s Mot. at 3.)

Upon notification that Property 2 was no longer available to secure Umer's Appearance Bond, Pretrial Services prepared a Supplemental Report, which was received on November 8, 2005.[2]   The Supplemental Report states that when Sher previously spoke to Pretrial Services, he "was confused about [Property 2's] value, and [it's] true ownership." (Supplemental Report ("Supp. Rep.") at 2.)   But Pretrial Services states the "lack of availability [of Property 2] clarifies the Afzal family's financial situation and the increased significance of the posting of their [Property 1 and Property 3] with a total equity of $580,000." (Id.)   Pretrial Services concludes that the "confirmed $1,200,000 in equity from [the remaining] four properties being offered . . . meets the necessary threshold to reasonably assure [Umer's] appearance at future court proceedings. . . ." (Id.)

                                    DISCUSSION

Once a release order issues, a defendant may file a motion with the district court for amendment of a condition of release.  United States v. Fidler, 419 F.3d 1026, 1027 (9th Cir. 2005) (discussing the options when a detained defendant is unable

---

[2]     Defense counsel contacted Pretrial Services regarding the unavailability of Property 2, and requested a supplemental report addressing Defendant's proposed modification to the condition of release. (Def.'s Mot. at 2, n.1.)

to meet a financial condition of release imposed by the district court).  Further, if the motion makes known that a condition of release "is unattainable," the court may re-evaluate the need for that condition.  <u>United States v. Mantecon-Zayas</u>, 949 F.2d 548, 551 (1st Cir. 1991).  Therefore, the bond condition of release will be re-evaluated.

> A.  <u>Amount of the Bond</u>

In June 2005, Pretrial Services stated that "a large secured bond would be necessary" for Umer's release in view of his "ties to Pakistan and his recent extended overseas travel." (June Rep. at 2.)  In September 2005, Magistrate Judge Hollows ordered Umer released subject to certain conditions, including a $1.2 million bond secured by Property 1, Property 3, Property 4, and Property 5; the order was stayed pending appeal to this Court.  In October 2005, at the request of this Court, Pretrial Services interviewed all persons proffering property except Shahana Khatab and co-Defendant Hamid Hayat.[3]  When Sher was interviewed, he indicated that he was willing to post an additional property, Property 2, as collateral for the bond. Subsequently, Pretrial Services issued a report stating "the bond set by Magistrate Judge Hollows is compelling, however, the addition of . . . [Property 2] adds more of an assurance to the defendant's appearance at future court proceedings."  (Pretrial

---

[3]   The government's Response to Defendant's Motion for Approval of Bail Documents ("Resp. to Mot.") filed November 9, 2005, states that Umer Khatab's wife, Shahanu Khatab, "would be acting as a fifth surety in this case."  (Resp. to Mot. at 10 n.4.)

Services Report, October 18, 2005, ("Oct. Rep.") at 4.)  But when notified that Property 2 was no longer available as collateral, Pretrial Services issued the Supplemental Report, which concludes "there is now a confirmed $1,200,000 in equity from four properties being offered . . . [and] this bond meets the necessary threshold to reasonably assure Mr. Hayat's appearance at future court proceedings." (Supp. Rep. at 2.)

Thus far, the amount of the Appearance Bond has been largely determined by the properties offered as security. However, since Property 2 is no longer available, it is necessary to determine whether the $1.5 million collateralized bond "is an indispensable component of conditions of release." Mantecon-Zayas, 949 F.2d at 551.  A bond should be set at "such an amount as is reasonably necessary to assure the appearance of the person as required." United States v. McConnell, 842 F.2d 105, 108 (5th. Cir. 1988).  Four factors enumerated in 18 U.S.C. § 3142(g) are relevant to determining what bond amount would reasonably assure Umer's appearance at trial: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence against Umer, (3) his history and characteristics, and (4) the nature and seriousness of the danger his release would pose to any person or the community.  See Fidler, 419 F.3d at 1029 (upholding the district court's determination on the amount of bail because the defendant was a serious flight risk in light of the analysis of the four § 3142(g) factors).

6

1   　　　　Each factor was considered in the Amended Order.  As to

2   the first factor, the Order stated that the nature and

3   circumstance of the offense "indicate that Umer is associated

4   with persons hostile to the government of the United

5   States . . . [thus Umer appears to have] disassociated himself

6   from the United States and is likely to flee if released."

7   (Amended Order at 5.)  As to the second factor, the Order noted

8   that although "the weight of the evidence against the defendant

9   'is the least important factor' . . . this factor does not favor

10  release."  (Id. at 6.)  As to the third factor, the Order

11  observed that Umer owns a home in Pakistan, has "familial ties to

12  Pakistan," and appears to have "access to a significant amount of

13  cash from an unexplained source."  (Id. at 7-8.)  It recognized

14  that Umer has some ties to the United States, but concluded that

15  "the nature of his seasonal work indicates his occupational tie

16  to the United States is minimal, and his association with

17  individuals that appear to be engaged in a holy war against the

18  United States suggests his ties to the United States are

19  tenuous."  (Id. at 9.)  As to the fourth factor, the Order noted

20  Umer "appears potentially dangerous because of his association

21  with individuals involved in or sympathetic to jihad," but stated

22  "the government's proffer against him does not indicate the

23  nature of his association and involvement makes him a danger to

24  the community."  (Id.)

25  　　　　Based on consideration of these four factors, the

26  Amended Order concluded that the government "has proved by a

27

28                                    7

preponderance of the evidence that Umer is a serious flight risk." (Id. at 10.)   In light of this determination, a large bond is necessary to reasonably assure Umer's appearance at trial.  See McConnell, 842 F.2d at 109 ("Should the judicial officer conclude that a large bond is an essential part of a package of conditions designed to secure a reasonable assurance of the defendant's appearance, and the record contains a reasonable basis for that conclusion, the condition would be neither constitutionally nor statutorily infirm."); see also United States v. Bernal, 183 F. Supp. 2d 439, 441 (D.P.R. 2001) (holding that a high bail condition was "an indispensable component of the conditions of release").

Umer's Appearance Bond was originally set at $1.2 million, but was increased to $1.5 million based on consideration of the § 3142(g) factors and the recommendation of Pretrial Services.  However, Pretrial Services now states it "has always believed the amount of bond was not as important as the significance of the properties to the people pledging the bond." (Supp. Rep. at 2.)   Pretrial Services concludes that a bond of $1.2 million "meets the necessary threshold to reasonably assure Mr. Hayat's appearance at future court proceedings." (Id.) Based on a reconsideration of the § 3142(g) factors and Pretrial Services' Supplemental Report, a bond in the amount of $1.2 million appears sufficient to reasonably assure Umer's appearance

at trial.[4]  Therefore, the first condition of the Amended Order is modified to allow Umer's release upon the posting of a bond in the amount of $1.2 million.[5]

### B.  Adequacy of Proposed Sureties

The government contests Umer's release, arguing that the inconsistencies concerning the ownership of Property 2 indicate neither Safdar nor Sher are adequate sureties.  (Gov't Opp'n Mod. Mot. ("Gov't Opp'n") at 7-11.)  The Ninth Circuit has stated that the defendant must have a "close" relationship with the sureties, otherwise, a bond "would not [reasonably] assure [the defendant's] appearance."  United States v. Koenig, 912 F.2d 1190, 1193 (9th Cir. 1990) (rejecting a bond offered by the defendant's parents because "there [was] reason to believe that his relationship with his parents [was] not a close one").  Consequently, Umer's relationship with the sureties must be such that the loss of the properties would be "a deeply felt hurt to the defendant and [the sureties]; the hurt must be so severe that defendant will return for trial rather than flee."  United States v. Townsend, 897 F.2d 989, 996 (9th Cir. 1990).

The Amended Order recognized that "the government has raised some doubt whether Umer has a sufficiently close relationship with Sher and Safdr."  (Amended Order at 16.)

---

[4]     This amount is determined sufficient when considered in conjunction with the other five conditions of release.

[5]     This release condition includes a court certified interpreter's certification that the bond paperwork has been translated into each surety's native language.

1   Specifically, the Court noted that although Sher told Pretrial

2   Services "he has a close relationship with Umer," Sher had

3   previously told the FBI that he posted his property because "Umer

4   Hayat made multiple, persistent calls from jail to

5   convince . . . [him] to put up the property . . . [and] although

6   [he] did not want to do it, he ultimately acquiesced." (Id.

7   at 11.)   In addition, the Court observed that Safdar told

8   Pretrial Services "he feels a strong blood relationship with

9   Umer," but that during an interview with the FBI, Safdar said

10  "while he and his father are related to the Hayats, they are not

11  particularly close with them." (Id.)   The Amended Order resolved

12  this doubt in favor of Umer's release because "doubts regarding

13  the propriety of release should be resolved in favor of the

14  defendant." United States v. Motamedi, 767 F.2d 1403, 1406 (9th

15  Cir. 1985).

16          The government argues that the additional inconsistent

17  statements by Sher and Safdar about Property 2 undermine their

18  credibility and their conclusory assurances about their

19  relationship with Umer. (Gov't Opp'n at 7-11.)   The government

20  notes Sher originally told Pretrial Services that he was the

21  owner of Property 2, that it had an estimated value of $300,000,

22  and that it was unencumbered, when in fact Safdar is the record

23  owner of Property 2, there is an encumbrance of $125,000, and the

24  property is unavailable for use to secure an Appearance Bond.

25  (Id. at 10-11.)   In addition, the government observes Safdar

26  represented to Pretrial Services that Property 3 was his "only

27

28                              10

asset," when in fact Safdar owns both Property 3 and Property 2. (<u>Id.</u> at 7.)

Defense counsel argues that Safdar's misrepresentation about the ownership of Property 2 is "understandable when viewed in context of his culture."[6]   (Def.'s Reply at 2.)   However, his misrepresentation hardly appears "understandable" because when he spoke with Pretrial Services in October he had owned Property 2 for over a year, he had been making loan payments on the property, and was monitoring the adjustable interest rate on the loan to assure that the payments did not become overly burdensome.   (<u>See</u> Safdar Decl. ¶¶ 2,3,7,8,9.)   In light of his frequent attention to matters involving the property, it is hard to imagine that Safdar innocently misspoke about his property ownership interest when he was interviewed by Pretrial Services.

As to Sher's misrepresentations about the ownership of Property 2, Pretrial Services states "it appears Sher Afzal was confused" when he spoke with Pretrial Services in October 2005. (Supp. Rep. at 2.)   However, it taxes credulity to believe that when Sher unequivocally told Pretrial Services that he owned Property 2 "free and clear" and that the property has "a value of $300,000" that he forgot he had transferred Property 2 to his son only one year ago.   (Oct. Rep. at 3.)   Even if he did forget,

---

[6]    Although defense counsel attempts to explain why Safdar would not consider Property 2 as his "asset," neither Safdar's declaration nor Pretrial Services' report discuss any cultural differences in the use of the term.

then his ability to recall is questioned, including whether he remembers the true nature of his relationship with Umer.

The inconsistent statements by Safdar and Sher about Property 2 raise serious credibility concerns.  In light of these concerns, Safdar's and Sher's earlier conclusory statements indicating they have a close relationship with Umer lack sufficient support in the record.  Accordingly, what Safdar previously told the government - that even though "he and his father are related to the Hayats, they are not particularly close to them" - is now given more weight.  (See Amended Order at 11.) In light of all their inconsistent statements made to date, "there is reason to believe that [Umer's] relationship with [Sher and Safdar] is not a close one and that the bond would not [reasonably] assure his appearance."  See Koenig, 912 F.2d at 1193.

C.  Adequacy of the Proffered Properties

In addition, the government argues that the four remaining pledged properties are not adequate collateral for bail.  (Gov't Opp'n at 12-13.)  The nature of the pledged properties must be evaluated for purposes of determining whether they provide "a reliable assurance of [Umer's] appearance at trial."  Townsend, 897 F.2d at 996.  The sureties' connection to the remaining four properties must be such that the loss of these properties would inflict a hurt "so severe that [Umer] will return for trial rather than flee."  Id.

12

The government contends that "the net result [of withdrawal of Property 2] is that a major disincentive for flight has been removed." (Gov't Opp'n at 12, n.5.) The government contends that Property 2 was the best collateral for bail purposes since Sher "resides [on it] as well as three of his sons (including Safdar), two of his daughter-in-laws [sic]; and nine of his grandchildren." (Id. at 12.) The government asserts "[l]oss of this property would have imposed a genuine 'hurt' . . . on these sureties, likely more so than any other property." (Id.) The government concludes that "the removal of Property 2 severely undercuts a key condition of defendant's bail and . . . shift[s] the scales against release." (Id. at 13.)

The Amended Order noted that while the loss of Property 5 "would have some impact on Umer and his immediate family [because they reside at Property 5] . . . there is doubt regarding the extent of this impact given his [newly renovated] second home in Pakistan." (Amended Order at 18.) The Amended Order also observed that Property 5 and Property 4 are owned and part-owned by Umer Khatab, who prior to Umer's indictment was "planning on building a house and living in Pakistan" but returned to the United States solely to assist Umer. (Id. at 14.) Thus it appears Umer Khatab would not be hurt by the loss of these properties because he would simply return to Pakistan should Umer flee. Furthermore, the loss of Property 5 would have little impact on co-defendant Hamid Hayat because Umer exercises control over it. (See id. at 15.)

1   In addition, Property 1, Property 3, and Property 4
2   appear to be disposable rental properties, which as the Amended
3   Order recognized "somewhat undermine . . . [their] effectiveness
4   as security." (Amended Order at 13.)  Although Pretrial Services
5   characterizes Property 1 and Property 3 as having "increased
6   significance" because of "the Afzal family's financial
7   situation," the loss of Property 1 and Property 3 would not leave
8   Sher or Safdar without their primary residence. (Supp. Rep. at
9   2.) Consequently, the loss of the four remaining properties would
10  not inflict a hurt "so severe that [Umer] will return for trial
11  rather than flee." Townsend, 897 F.2d at 996.

12                              CONCLUSION

13      Although the amount of bail has been reduced from $1.5
14  million to $1.2 million, the proposed sureties and proffered
15  property are inadequate, based on the current record, because the
16  "purpose of bail is not served unless losing . . . [the
17  properties] would be a deeply felt hurt to the defendant and his
18  family." Townsend, 897 F.2d at 996.[7]  Therefore, condition 1 of
19  the Amended Order is modified as follows:

20          A bond in the amount of $1,200,000 must be
            posted and secured with adequate security.
21          Defendant may proffer property or properties
            to secure the bond.  The United States may
22          object to the adequacy and value of the
            property proffered; such objection must be
23

24

25      [7]      The purpose of a bail is not to provide funds to the
26  government should the defendant flee, but rather to reasonably
    assure his appearance at trial. See United States v. Melville,
27  309 F. Supp. 824, 828-27 (S.D.N.Y. 1970).

28                                 14

1    formally made before the duty Magistrate
     Judge no longer than three (3) days after the
2    property has been proffered by Defendant.

3        IT IS SO ORDERED

4  Dated:  November 18, 2005

5
                              /s/ Garland E. Burrell, Jr.
6                             GARLAND E. BURRELL, JR.
                              United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                              15