1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,          NO.  CR. S-05-0240 GEB

12         Plaintiff,
                                       <u>ORDER RE PROFFERED PROPERTIES</u>
13      v.
                                       <u>AND PROPOSED SURETIES</u>
14  UMER HAYAT,

15         Defendant.

16  _____/

17                           INTRODUCTION

18         On November 14, 2005, United States District Judge Garland

19  E. Burrell, Jr., issued an order setting bail for defendant Umer

20  Hayat in the amount of $1.2 million and addressing various issues

21  with respect to the posting of property to secure the bond.

22  Thereafter, counsel on behalf of defendant Umer Hayat notified the

23  government that four properties were being proffered to secure the

24  defendant's bond.  Those properties are described as follows:

25  /////

26  /////

                                    1

**Property No. 1** - a residential property to be posted by the defendant's uncle, Sher Afzal, in which Mr. Afzal's oldest son and his family of seven reside;

**Property No. 3**[1] - a residential rental property to be posted by the defendant's cousin, Safdr Afzal;

**Property No. 4** - a residential rental property to be posted by the defendant's brother, Umer Khatab, in which Mr. Khatab's sister, brother-in-law, three children and two other family members reside; and

**Property No. 5** - a residential property to be posted by the defendant's brother, Umer Khatab, and the defendant's son and co-defendant Hamid Hayat on which is located the residence of Umer Khatab and eight other members of the Khatab family, a converted garage apartment in which Umer Hayat's own family lives and a rental unit in which a family of eight currently resides.

On November 17, 2005, counsel for the government filed an objection to the proffered properties. Both parties filed written arguments with respect to the objections, taking conflicting positions on how the matter should proceed. Defense counsel requested that an evidentiary hearing be held at which time the defense would call as witnesses the various sureties so that they could be examined regarding the posting of the proffered properties.

---

[1] Property No. 2 was withdrawn by the defense. Sher Afzal along with three of his sons, two daughters-in-law and nine grandchildren live at that residence. It was originally proffered to be posted by Sher Afzal and was reported to be unencumbered. It was later determined by the defense that Sher Afzal's son, Safdr Afzal, was the owner of record and that a $125,000 loan had been taken out on the property. Safdr Afzal reported that because that loan carried an adjustable rate, he needed to refinance to a fixed rate as soon as possible in light of rising interest rates and could no longer offer that property to secure the defendant's bond but was still willing to post his other property.

After considering the written arguments of the parties and Judge Burrell's order as amended, the undersigned granted defendant's request for a hearing to allow consideration of the proposed sureties and the properties being proffered to secure the $1.2 million bail. The hearing commenced on November 22, 2005, was recessed until November 28 and was ultimately completed on November 29, 2005. Johnny L. Griffin, III appeared on behalf of defendant Umer Hayat. Without objection from the government, Wazhma A. Mojaddidi specially appeared to assist Mr. Griffin.  Assistant United States Attorneys Laura L. Ferris and S. Robert Tice-Raskin appeared on behalf of plaintiff United States of America.

During the course of the hearing the court heard testimony from proposed sureties Safdr Afzal, Sher Afzal and Umer Khatab as well as from F.B.I. Special Agent Ronald T. Ribail.  Below, the undersigned will address the purpose of the hearing, the evidence presented and the applicable law.

PURPOSE OF THE EVIDENTIARY HEARING

In an order filed November 21, 2005, the undersigned interpreted Judge Burrell's November 14 order, as amended, as not precluding the proffering of Properties 1, 3, 4, and 5 as security for Umer Hayat's bond but rather as expressing serious concerns regarding the use of those properties for that purpose in light of the record then before the court.  The undersigned observed that Judge Burrell had noted a number of factors in the record as it then existed which caused him to question the adequacy of the proposed sureties and the proffered properties.  Nonetheless, the District

3

Judge left open the possibility that by further developing the record, through further hearing or otherwise the defense could possibly address those concerns.  The areas of concern noted by the District Judge in his order were the following:

(1) Given the recently discovered inconsistencies in their statements regarding the status of the Property No. 2 residence, there was now reason to believe that the relationship between Umer Hayat and Sher and Safdr Afzal was not sufficiently close so that the posting of their property would reasonably assure Umer Hayat's appearance.[2]

(2) Umer Khatab might not be sufficiently hurt by the loss of his interest in Property No. 4 and Property No. 5 because he was planning on building a home in Pakistan and could "simply return to Pakistan should Umer flee."

(3) The residences at Property No. 1, Property No. 3 and Property No. 4 are disposable rental properties, the loss of which would not deprive the sureties of their primary residence and would, therefore, not inflict a hurt sufficiently serious so as to ensure the defendant's appearance.

Against the background of these expressed concerns the undersigned will assess the testimony presented at the hearing.

---

[2]  The government had previously brought to the District Judge's attention the alleged inconsistencies between statements made by Sher and Safdr Afzal to Pretrial Services regarding their relationship with their nephew and cousin Umer Hayat and the statements they had made to the F.B.I. when interviewed.  Amended Order filed November 18, 2005 at p. 9-10.  Judge Burrell had initially resolved any doubt regarding the closeness of that relationship in favor of the defendant's release on bond with conditions.  Id. at 10.

1          TESTIMONY

2     <u>Safdr Afzal</u>

3          On November 22, 2005, Safdr Afzal testified through an

4     interpreter that he has lived in the United States since the age of

5     twelve and became a United States citizen in 1996.  He has returned

6     to Pakistan only twice since 1985, on both occasions for stays of

7     approximately one month.  He is defendant Umer Hayat's cousin[3] and

8     testified that they have known each other their entire lives.  Safdr

9     Afzal described the relationship between his family and the Hayat

10    family as a good one and explained that the two families lived within

11    walking distance of one another in Lodi, California.  As a result,

12    there was frequent contact between the families and he would see Umer

13    Hayat at the mosque as often as two or three times a day during

14    special prayer times.  He described his relationship with Umer Hayat

15    today as being very good.

16         On direct examination Safdr Afzal acknowledged that F.B.I.

17    agents had come to his home to speak to him in September of this

18    year.  He also conceded that when the agents asked about his

19    relationship with defendant Umer Hayat he told them that they were

20    cousins but did not have a good relationship.  He explained that he

21    told the agents this because F.B.I. vehicles were in front of his

22    family's house, agents were following his nephew and other family

23    members and he was afraid that if he said he had a close relationship

24    /////

25    _____

26         [3]  The fathers of the two men are brothers.

                              5

with Umer Hayat he might be served with papers to come to court because that is what happened to his nephew and other family members.

Safdr Afzal explained that it is common in his culture for extended families to live together under one roof to save money and acquire additional property.  He indicated that the Property No. 3 residence he was offering to post as bail was a rental property, the income from which he and his family relied upon to make both their house payments.  With respect to the confusion over the ownership and status of the Property No. 2 residence, he indicated that the property actually is his father's but that title was put in his (Safdr's) name to care for it.  However, his father instructed him that upon his father's death the property is to go to Safdr Afzal and his siblings.[4]  Safdr Afzal also testified that his father, Sher, is now eighty years old, in failing health and suffered a stroke about a year and a half ago that has adversely affected his memory.  Nonetheless, Safdr Afzal reported speaking to his father about the posting of both their homes to secure Umer Hayat's release, the consequences to them if Umer Hayat was to flee and their willingness to post those properties because of their belief that Umer Hayat would "never flee."

In terms of the harm that his family would suffer if Property No. 1 and Property No. 3 were forfeited to the government, Safdr Afzal testified that his entire family would be devastated by such an outcome.  In this regard, he explained that his brother (Sher

---

[4]  See fn. 1, infra.

6

Afzal's oldest son) has resided at Property No. 1 for many years with his wife and five children.  Moreover, to make the house payments on the Property No. 2 home (where Sher Afzal, Safdr Afzal and at least 13 other members of the Afzal family live including 9 of Sher's grandchildren) the Afzals are dependent in part on the income derived from the Property No. 3 rental.  Thus, Safdr Afzal claimed, were Property No. 1 and Property No. 3 to be forfeited to the government, his brother and family of seven would be homeless, at least fifteen members of the extended family including his father and himself could find themselves homeless because of lack of funds to make payments on their Property No. 2 home and all the work the family had done in this country would have been in vain.  For these reasons Safdr Afzal affirmed that he would take all steps necessary to ensure that Umer Hayat made all of his court appearances, including visiting him, telephoning him and notifying Pretrial Services and the federal authorities if anything were to occur to cause him to doubt Umer Hayat's intention to appear in court.

On cross-examination the government's first question to Safdr Afzal was: "Did I hear you say that you lied to the F.B.I. about the closeness of your relationship to Umer Hayat?"  Mr. Afzal responded: "[T]he answer is, I was scared."  The government's next question to the witness was: "So you told them something that was not true, correct?"  At that point, counsel for defendant Umer Hayat objected and suggested that in light of the line of questioning being pursued by the government, Safdr Afzal might be entitled to the advice of counsel.  While expressing disbelief that the government

would seriously wish to preserve the right to prosecute the witness, the undersigned undertook to appoint panel counsel, Michael Bigelow, to confer with and advise Safdr Afzal.[5]   To allow that consultation to occur Mr. Afzal's testimony was interrupted and his appearance was continued to the following Monday.

When Safdr Afzal was re-called to the stand on November 28, 2005, his appointed counsel advised the court that the government had declined to offer his client immunity at that time and reported that it needed additional time before deciding whether Mr. Afzal might be subject to prosecution, presumably for making a false statement to a federal agent.  Counsel for the government confirmed that they were not offering the witness immunity.  In light of the government's position, Mr. Bigelow informed the court that while he felt no credible case against his client could be assembled, he had no choice but to advise Safdr Afzal to invoke his Fifth Amendment right to remain silent in response to any further questions from the prosecution.  When asked by the court whether they wished to test the assertion of privilege by Mr. Afzal on a question by question basis, the government elected to accept the blanket assertion of privilege by Mr. Afzal's counsel.  In addition, the government immediately moved to strike Safdr Afzal's testimony in its entirety.  The defense responded by moving for an order compelling the government to grant the witness immunity with respect to his testimony.  The undersigned

---

[5] Of course, defendant Umer Hayat is charged in this case solely with making a false statement to a federal agent in violation of 18 U.S.C. § 1001.

took both requests under submission and excused Safdr Afzal as a witness.

Umer Khatab

Umer Khatab testified through an interpreter at the hearing on November 22, 2005.  Mr. Khatab is defendant Umer Hayat's brother.[6] He is 41 years old and was born in Pakistan.  He is a legal permanent resident of the United States as are his parents.  He has resided in this country for approximately twenty-one years.[7]  In that time he reported having returned to Pakistan only twice, once in 1988-89 for approximately ten months to marry his wife and, more recently, between April 11 and August 18, 2005 accompanied by his wife and children.  Most, but not all, of their relatives live in the United States with the remainder living in Pakistan.  Mr. Khatab testified that he did not stay in Pakistan for more than six months after obtaining his green card because to do so would jeopardize his status as a legal permanent resident of this country.  He and his wife have five children all of whom were born in this country and are United States citizens.

Mr. Khatab has resided at Property No. 5 with his extended family of nine, which includes his mother and father, since 1985.[8] There is a garage on that property which has been converted into

---

[6] The two men share the same father but have different mothers.

[7] Mr. Khatab testified that he once attempted to gain U.S. citizenship but did not complete the requirements because he could not adequately speak or write in English.

[8] Mr. Khatab testified that both of his parents are diabetic and in poor health.

living quarters where Umer Hayat's wife and their two children reside

and where Umer Hayat would live if released from custody.  Finally,

there is a another home on Property No. 5 which is rented out to a

family of eight.[9]  Umer Khatab originally purchased Property No. 5

along with his brother, Umer Hayat.  However, in March of 2003

defendant Hamid Hayat[10] (Umer Hayat's son) replaced his father on the

deed.  According to Mr. Khatab's testimony, such a substitution of a

son for a father on title to property is common in his culture even

though the father remains recognized by the family as the true owner

of the property.

Mr. Khatab also testified that he owns Property No. 4 where

his brother-in-law, his sister and their family of seven reside.  He

receives approximately $700 per month in rent.  He testified that he

was willing to post both of these properties to secure his bother's

release, recognizing that if Umer Hayat were to flee, he would lose

his interest in both properties.  Mr. Khatab stated that the loss of

the properties would cause his family to suffer in that the family

would have nothing and would lose all that they had worked and saved

for in this country.  Because Umer Hayat would be living at the same

property on which he resides, Mr. Khatab stated that he would keep in

_____

[9]   According to Mr. Khatab, Umer Hayat's wife collects the rent
from these tenants and the Hayat family has relied on this money to
live on.

[10]   Hamid Hayat has been charged both with providing material
support to terrorists in violation of 18 U.S.C. § 2339A and two
counts of making a false statement in violation of 18 U.S.C. § 1001.
Hamid Hayat has been previously ordered detained without bail as both
a danger to the community and a flight risk.

1  close contact with his brother and make sure he attended his court

2  proceedings.

3          Through his testimony Mr. Khatab recounted how he came to

4  acquire a house in Pakistan.  In this regard, he reported that their

5  father gave he and his brother, Umer Hayat, a piece of property in

6  Pakistan that had been in the family.  Umer Hayat's half of the

7  property already had an older home on it.  Mr. Khatab sold another

8  rental home he owned in the Stockton area and with the proceeds

9  (approximately $120,000 to $140,000) built a one-story home on his

10  half of that property about three or four years ago.  That home has a

11  kitchen and four bedrooms and is somewhat larger than the home and

12  property he lives at on Property No. 5.  Nonetheless, it was Mr.

13  Khatab's testimony that he built this home in Pakistan to stay in

14  during vacation visits to Pakistan and not with any intention to live

15  there permanently.  He attempted to explain this by stating that

16  there were no hotels in that area and that it was not unusual for

17  people from Pakistan living in the United States to have such homes

18  in Pakistan.[11]  He also stated that he intended one day to give the

19  property in Pakistan to his children.  On cross-examination he denied

20  ever telling others in the Lodi community, when he was about to

21  return to Pakistan in April of 2005, that he was moving back to

22  Pakistan with his family and his parents and intended to stay there.

23          On cross-examination into various areas Umer Khatab

24  testified that he had been disabled with back problems since August

25  _____

26          [11]  According to Mr. Khatab, people from the local village live
in the home as caretakers in exchange for free rent.

11

22, 1997 and had also received medical care for depression.  He also

indicated that he had approximately $31,000 in savings that

represented the pooled resources of his extended family.

        Sher Afzal

        Sher Afzal was the final witness to testify at the hearing

on November 22, 2005.  Sher Afzal is the eighty year-old uncle of

defendant Umer Hayat.  It was the court's observation that Mr. Sher

Afzal is a frail, elderly man who found it physically challenging to

take the witness stand.  Nonetheless, he did so after pausing to

catch his breath.  On the particular day of his testimony, Sher Afzal

appeared confused and mistaken regarding rather simple facts.[12]

He conceded that he sometimes had difficulty remembering things.

This would appear consistent with the testimony and statements of

other family members who described Mr. Afzal as having suffered from

a stroke which impaired his memory and as being in generally poor

health.

        In any event, Sher Afzal testified that he lived in Lodi

with his son Safdr.  He also testified that he owned the residence on

Property No. 1 where another son and his family currently live.  Mr.

---

        [12]   In this regard, Sher Afzal stated he did not remember
speaking to the Pretrial Services Officer and appeared confused about
whether he had visited Umer Hayat at the jail or spoken to him on the
telephone since his incarceration.  On the other hand, F.B.I. Special
Agent Ribail testified that he found Sher Afzal suffering from no
obvious health problems and that while he was "an older gentleman" he
was not confused by the questions of the agents.  This was also the
view of the Pretrial Services Officer who interviewed Sher Afzal in
October of 2005.  It may well be the case that, as with many elderly
individuals suffering from a number of medical conditions, some days
are dramatically better than others.

Afzal testified that he was willing to post that property to secure Umer Hayat's release because his nephew was like one of his own sons to him and they were very close.  He confirmed that this was his own decision.  He expressed confidence that Umer Hayat would not flee and would not jeopardize his property.

On cross-examination Sher Afzal testified that Umer Hayat had called him from jail crying and pleaded with him to post his property to secure his release and he had agreed to do so.  He also testified that his family cooks and otherwise cares for him in all respects.

F.B.I. Special Agent Ronald Troy Ribail

On the final day of the evidentiary hearing completed on November 29, 2005, the government called F.B.I. Special Agent Ronald Troy Ribail to the witness stand.  Agent Ribail testified that on September 20, 2005, he and F.B.I. Special Agent Gary Price went unannounced to the Property No. 2 residence for the purpose of interviewing Safdr and Sher Afzal.[13]  Their assignment was to interview the two men regarding the nature of their relationship with Umer Hayat and to determine whether they were in fact willing to post bail on Umer Hayat's behalf.  Agent Ribail has been a F.B.I. agent approximately three years and conceded that this was the first time he had ever been assigned to investigate the posting of a bond.

/////

---

[13]  On several occasions during his testimony Agent Ribail noted that Agent Price was the agent in charge on this assignment and that he was merely accompanying Agent Price in keeping with standard procedures.

The agents arrived at the home in the late morning and
knocked on the door.  To whomever first came to the door, they
identified themselves as F.B.I. agents and said that they needed to
speak to Safdr.[14]  When Safdr Afzal came to the door, it appeared to
the agent that they had awakened him.  Safdr changed clothes and came
out onto the front porch where he invited the agents to sit down.
The subsequent interview lasted approximately forty-five minutes.  It
was conducted in English.  According to Agent Ribail, Safdr Afzal
appeared to understand them fine, only asking on a few occasions for
them to rephrase their questions.  Agent Ribail recalled that
sometime early in the interview Agent Price told Safdr that they were
there to talk about his offer of property to secure Umer Hayat's
release and that Safdr responded by asking the agents if there was
anything wrong with him doing so.  Agent Price responded that there
was not.

During the course of this September 20, 2005 interview
Safdr Afzal told the agents that Umer Hayat was his cousin.  However,
Safdr indicated that they were not particularly close and that they
did not speak on the phone, visit or meet at social gathering
frequently.[15]  In this regard, Agent Ribail pointed to two matters

---

[14]  Agent Ribail could not recall many of the details of these
interviews.  In this regard, he could not recall who answered the
door but agreed that defense counsel was "probably correct" in
stating that it was a child.

[15]  Agent Ribail acknowledged that in his report Agent Price
indicated that Safdr Afzal suggested that he did not have a "good"
relationship with his cousin, Umer Hayat.  Agent Ribail testified
that had he written the report of interview he would have used the
word "close" instead of "good" because he did not get the feeling

that were discussed during the interview of Safdr Afzal.  First,
Safdr said that he first met Umer Hayat's son, Hamid, in Pakistan
when Hamid was twelve years old.[16]  Second, Safdr spoke of being
upset with Umer Hayat over an incident in which Umer had traveled to
Pakistan without first telling Safdr.  Safdr's father had suffered a
stroke in Pakistan and had Safdr known of Umer's travel plans he
would have asked him to take money to Pakistan for delivery to his
father.  Later, when Safdr learned of Umer's travel to Pakistan he
asked Umer to take $500 back to his father for him and Umer did so on
another trip.

        In this same interview Safdr Afzal indicated that he
understood that Umer Khatab was living in Pakistan where he was
building a house and planned on staying there but instead returned to
the United States when he learned of his brother's arrest.[17]
According to Agent Ribail, Safdr reported that Umer Hayat was calling
them from jail every other day, "crying like a baby."  His father
Sher Afzal asked him to offer his property to secure Umer Hayat's
release.  Initially, he was reluctant but he did then agree to do so.

---

from Safdr Afzal that the relationship was a bad one, just that it
was not a close one.

    [16]  Agent Ribail acknowledged that he was unaware whether Safdr
Afzal and Hamid Hayat were in the same country when Hamid Hayat was
born.

    [17]  On cross-examination Agent Ribail conceded that while he
interpreted this to mean that Safdr Afzal understood that Mr. Khatab
planned on staying in Pakistan "indefinitely," he could not recall
the words used by Safdr and he did not know if instead Safdr stated
that Khatab planned on staying in Pakistan "until he had to come
back" in reference to the six month period after which one would
jeopardize his legal resident alien status in this country.

He reported that Sher Afzal was also initially hesitant to put up his property but then agreed to do so.[18]  The agents asked Safdr if he was aware that he could lose his property if Umer Hayat fled and Safdr acknowledged that he was aware of that.

At the conclusion of the interview the agents asked Safdr if they could return if they had any follow-up questions and he agreed.  The next day the two agents returned and asked Safdr Afzal if they could speak to Sher Afzal.  The agents were taken into a back bedroom of the Property No. 2 residence where they spoke to Sher Afzal for approximately 20 minutes with Safdr Afzal translating. Sher Afzal told agents that he was initially hesitant to post his property to secure Umer Hayat's bail but was willing to do so because they were family and he felt that Umer Hayat would not flee.  Sher Afzal acknowledged that he understood he would lose his property if Umer Hayat failed to appear.  In addition, on September 21, 2005, Agent Ribail found Sher Afzal suffering from no obvious health problems and, while elderly, not to be confused by their questions.

At the conclusion of one of the two interviews, according to Agent Ribail, Safdr Afzal took the agents on a tour of the rest of Property No. 2, showing them the trees and birds that were kept there.  The government points to this as evidence that Safdr Afzal was not intimidated by, or afraid of, the F.B.I. agents.

/////

/////

_____

[18]  Safdr Afzal also reportedly told the agents his father, Sher Afzal, had suffered a stroke and was somewhat forgetful.

16

ANALYSIS

As a preliminary matter the undersigned will address the motions of both parties with respect to the testimony of Safdr Afzal. As noted above, cross-examination by the government did not proceed after the witness was immediately asked if he lied to the F.B.I. about the closeness of his relationship to Umer Hayat.  Thereafter, counsel was appointed and the court was advised that, absent a grant of immunity, Safdr Afzal intended to invoke his Fifth Amendment right to remain silent and would decline to answer further questions.

The government elected to accept this representation of counsel for the witness rather than testing the assertion of the privilege on a question by question basis.  Instead, the government moved to strike Safdr Afzal's testimony in its entirety.[19]  In turn, counsel for defendant Umer Hayat moved the court for an order compelling the government to grant Safdr Afzal immunity so that his cross-examination could be completed.  The defense argued that the government was "intentionally distorting the fact-finding process" by refusing to grant Safdr Afzal immunity under the circumstances.[20]

/////

_____

[19]   In so moving the prosecution relied upon the decision in Denham v. Deeds, 954 F.2d 1501, 1503-04 (9th Cir. 1992).  That case involved a jury trial, as do most of the cases addressing this issue. Here, the issue is raised in the context of a bail hearing where the court, and not a jury, is the finder of fact.

[20]   The defense provided the court with citations to United States v. Lord, 711 F.2d 887 (9th Cir. 1983); United States v. Westerdahl, 945 F.2d 1083 (9th Cir. 1991); United States v. Young, 86 F.3d 944 (9th Cir. 1996) and Williams v. Woodford, 384 F.3d 567 (9th Cir. 2002) in support of the oral motion for an order compelling the granting of immunity to Safdr Afzal.

17

Having taken both the motions under submission, the court will rule

on them below.

As the Ninth Circuit has explained:

> "Immunity is an executive, not a judicial
> function, and '[t]his court has emphatically
> rejected the argument that the sixth amendment
> provides a defendant with a right to demand use
> immunity for defense witnesses who invoke their
> privilege against self-incrimination.' " United
> States v. Baker, 10 F.3d 1374, 1414 (9th Cir.
> 1993) (quoting United States v. Brutzman, 731
> F.2d 1449, 1451-52 (9th Cir. 1984)). An exception
> to this rule exists, however, where the
> prosecutor intentionally distorts the
> fact-finding process. See id. The fact-finding
> process is intentionally distorted where the
> prosecutor intentionally causes the witness to
> invoke the Fifth Amendment privilege, see United
> States v. Montoya, 945 F.2d 1068, 1078 (9th Cir.
> 1991), or "grant[s] immunity to a witness in
> order to obtain his testimony, while denying
> immunity to a defense witness whose testimony
> would directly contradict that of the government
> witness." United States v. Westerdahl, 945 F.2d
> 1083, 1087 (9th Cir. 1991).

United States v. Duran, 189 F.3d 1071, 1087 (9th Cir. 1999), cert.

denied, 529 U.S. 1081 (2000).[21]

In this case it is the first exception that the defense

seeks to invoke.[22]  Under the circumstances it is apparent why the

---

[21] To qualify under this exception the defense must also
satisfy the minimal requirement that the testimony of the witness in
question would be relevant to the defense presentation.  Williams v.
Woodford, 384 F.3d 567, 600 (9th Cir. 2004), cert. denied,
___ U.S. ___ , 126 S. Ct. 419 (2005); United States v. Whitehead, 200
F.3d 634, 640 (9th Cir.), cert. denied, 531 U.S. 885 (2000).

[22] Counsel for Umer Hayat did question the credibility of the
government's representations that it had not had sufficient time to
assess whether an investigation should be pursued against Safdr Afzal
based upon his allegedly inconsistent statements.  In this regard,
defense counsel argued that the government had all the information

18

defense would question the government's motives in pursuing the

cross-examination in the manner that it did.  Nonetheless, in order

to justify the granting of immunity the court must find that the

prosecution engaged in misconduct by intentionally causing the

witness to invoke his Fifth Amendment privilege.  United States v.

Montoya, 945 F.2d 1068, 1078 (9th Cir. 1991); United States v. Lord,

711 F.2d 887, 891-92 (9th Cir. 1983).  The Ninth Circuit recently

examined such a claim and observed:

> Undue prosecutorial interference in a defense
> witness's decision to testify arises when the
> prosecution intimidates or harasses the witness
> to discourage the witness from testifying, for
> example, by threatening the witness with
> prosecution for perjury or other offenses.
> United States v. Angiulo, 897 F.2d 1169, 1192
> (1st Cir. 1990); see also United States v.
> Morrison, 535 F.2d 223, 229 (3d Cir. 1976) (the
> prosecutor's repeated statements to the defense
> witness about the dangers of perjury and
> self-incrimination and about the witness's right
> not to testify, culminating in a highly
> intimidating personal interview, improperly
> interfered with the witness's choice to testify
> and violated the defendant's right to due
> process); Lord, 711 F.2d at 891 (remanding for an
> evidentiary hearing on whether the prosecutor
> engaged in misconduct when the prosecutor told
> the defense witness about the self-incrimination
> privilege, said that the government would not
> prosecute the witness if he submitted to an
> interview and testified truthfully, and stated

---

relevant to that determination before them and had seen fit to grant
immunity to other individuals during the course of their
investigation of Umer Hayat when it served their purpose.
Nonetheless, this is clearly not a case where the government granted
immunity to a witness to obtain testimony while denying immunity to a
defense witness whose testimony would contradict that of the
immunized government witness.  See United States v. Westerdahl, 945
F.2d 1083, 1087 (9th Cir. 1991);  United States v. Young, 86 F.3d
944, 948 (9th Cir. 1996).  Accordingly, this prong of the exception
does not apply here.

1          that any prosecution of the witness depended upon
           his testimony).  The prosecution's conduct must
2          amount to a substantial interference with the
           defense witness's free and unhampered
3          determination to testify before the conduct
           violates the defendant's right to due process.
4          United States v. Emuegbunam, 268 F.3d 377, 400
           (6th Cir. 2001); United States v. Pinto, 850 F.2d
5          927, 932 (2d Cir. 1988).

6    Williams v. Woodford, 384 F.3d at 601-02.

7          The prosecution conduct here does not rise to the

8    prohibited level.  There is no doubt that the prosecution's cross-

9    examination of Safdr Afzar was blunt.  It suggested that the

10   prosecution believed that the differences between what Safdr had told

11   F.B.I. agents and the testimony he had given regarding the nature of

12   his relationship with Umer Hayat were so significant as to make one

13   or the other materially false.  When coupled with the government's

14   reluctance to preclude further investigation of the statements and

15   the government's acceptance of a blanket assertion of the Fifth

16   Amendment privilege by the witness, the fact that Safdr Afzal would

17   refuse to testify further in these bail proceedings came as a

18   surprise to no one.  Nonetheless, the government was within its right

19   to cross-examine the witness in the way it saw fit and was under no

20   obligation to forego further investigation.  See Williams, 384 F.3d

21   at 602.  The prosecution did not harass, intimidate or threaten the

22   witness in a way designed to improperly discourage the witness from

23   testifying.  The witness was represented by counsel, counsel advised

24   him to assert the privilege and the witness elected to follow that

25   advice.

26   /////

Accordingly, the defense motion for an order compelling the government to grant Safdr Afzal immunity is denied. However, that does not mean that the government is entitled to have the witness's testimony stricken. As has long been recognized:

> Striking the testimony of a witness is a drastic remedy. It is not to be lightly done. Any action by the court may be inappropriate when a witness invokes the fifth amendment privilege to avoid cross-examination on purely collateral matters. Even when the witness refuses to answer questions relevant to matters at issue, striking only portions of the testimony may be the more reasonable remedy if that can avoid the unfairness created by the avoidance of full cross-examination, but the purpose of cross-examination is to test the credibility of the witness and the truthfulness of his earlier testimony. Striking all of the testimony of the witness may be the only appropriate remedy when refusal to answer the questions of the cross-examiner frustrates the purpose of the process. United States v. Lord, 711 F.2d 887, 892 (9th Cir. 1983).

Lawson v. Murray, 837 F.2d 653, 656 (4th Cir. 1988). See also United States v. Curry, 993 F.2d 43, 45 (4th Cir. 1993); United States v. McKneely, 69 F.3d 1067, 1076 (10th Cir. 1995); Arredondo v. Ortiz, 365 F.3d 778, 786 (9th Cir.) ("[S]triking all of Hansen's testimony would still have been an extreme sanction unjustified in light of Arredondo's constitutional right to present a defense.") (Kozinski, Circuit Judge, concurring), cert. denied, ___ U.S. ___, 125 S. Ct. 102 (2004). A trial court has wide discretion to determine whether such a sanction is appropriate. United States v. Seifert, 648 F.2d 557, 562 (9th Cir. 1980); United States v. Star, 470 F.2d 1214, 1217-18 (9th Cir. 1972). In making this determination the court is to determine whether the witness' selective refusal to testify so

distorts the meaning and reliability of his testimony that the

court's quest for truth is undermined.  Seifert, 648 F.2d at 562 (the

ultimate question is whether the party was deprived the right to test

the truth of the direct testimony and whether answers to the

particular questions would have undermined the opponents case);

Dunbar v. Harris, 612 F.2d 690, 693 (9th Cir. 1979).

In this instance the undersigned concludes that the

government was not deprived of the opportunity to test the truth of

Safdr Afzal's testimony, nor is there reason to believe that the

answers to the questions posed by the government would have

undermined the defense presentation with respect to bail-related

issues.  See Arredondo, 365 F.3d at 787 (striking of defense witness

testimony following invocation of Fifth Amendment privilege on cross-

examination was objectively unreasonable where the prosecution had

available means other than cross-examination to test the reliability

and truth of the challenged testimony) (Kozinski, concurring); United

States v. Kikumura, 698 F. Supp. 546, 553-55 (D.N.J. 1988)

(prosecution's motion to strike defendant's suppression hearing

testimony following invocation of Fifth Amendment privilege on cross-

examination denied where the prosecution had an adequate opportunity

to discredit the defendant through other evidence including the

testimony of law enforcement officers and thus there was no undue

prejudice suffered by the government).

In these bail proceedings the court is the fact-finder.

The undersigned had the opportunity to watch both Safdr Afzal and

Agent Ribail testify on direct examination at length.  Agent Ribail

testified regarding the September 20, 2005, interview of Safdr Afzal
and all circumstances surrounding that interview.  Through the
agent's testimony the government was able to fully explore those
aspects of Safdr Afzal's statement to the F.B.I. which the government
claimed were inconsistent with his testimony in court regarding the
nature of his relationship with his cousin, Umer Hayat.  The court
also had before it the reports reflecting the Pretrial Service
Officer's interview of Safdr Afzal.  Again, the government was able
to argue regarding any claimed inconsistencies between the statements
reflected in those reports and Safdr Afzal's sworn testimony.
Finally, on direct examination Safdr Afzal agreed that when asked by
the F.B.I. agents on September 20, 2005, about his relationship with
his cousin Umer Hayat, he told them that they did not have a good
relationship.  He further explained that he told the agents this
because he was afraid, that F.B.I vehicles were in front of his
house, the F.B.I. was following his nephew and other family members
and that he was concerned about what the agents might think of him if
he said he had a close relationship with Umer Hayat.  Safdr Afzal
also testified that he was concerned that if he acknowledged a close
relationship with the defendant the agents would serve him with
papers requiring him to come to court as they had done with other
family members.  When answering the prosecution's first question on
cross-examination whether he had lied to the F.B.I. agents, Safdr
Afzal merely repeated that he was scared.  Under these circumstances
there is no reason to believe that any further cross-examination of
/////

the witness would have resulted in testimony undermining the defense

bail presentation.[23]

The government having suffered no undue prejudice as a

result of the assertion of the Fifth Amendment privilege on cross-

examination by Safdr Afzal, the motion to strike his testimony will

be denied.  In reaching this conclusion the undersigned is influenced

by the fact that "[t]he rules concerning admissibility of evidence in

criminal trials do not apply to the presentation and consideration of

information" at bail hearings.  18 U.S.C. § 3142(f)(2).  See also

United States v. Winsor, 785 F.2d 755, 756 (9th Cir. 1986) ("As in a

preliminary hearing for probable cause, the government may proceed in

a detention hearing by proffer or hearsay.").  In enacting the Bail

Reform Act Congress did not want detention hearings to resemble mini-

trials.  United States v. Delker, 757 F.2d 1390, 1396 (3d Cir. 1985);

United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986).

Rather, the Act mandates a level of informality with respect to such

proceedings.  Martir, 782 F.2d at 1145.  In order to carry out that

Congressional intent, the judge conducting the hearing retains the

power to limit cross-examination as well as the responsibility to

assess the reliability and accuracy of the information presented.  Id.

In addressing the pending matter the court is mindful that

the purpose of bail is to insure that the accused will reappear at a

---

[23]   The undersigned observes that cross-examination of other
defense witnesses at the hearing was not critical to an assessment of
their testimony with respect to the matters before the court.  Umer
Khatab, for instance, was cross-examined about such seemingly
collateral matters as his disability status and the name and address
of the doctor treating him for his back problems.

given time.  <u>Reynolds v. United States</u>, 80 S. Ct. 30, 32 (1959)

(Douglas, Circuit Justice); <u>United States v. Vaccaro</u>, 51 F.3d 189,

192 (9th Cir. 1995); <u>United States v. Arnaiz</u>, 842 F.2d 217, 220 (9th

Cir. 1987); <u>Bridges v. United States</u>, 184 F.2d 881, 886 (9th Cir.

1950).  "It is assumed that the threat of forfeiture of one's goods

will be an effective deterrent to the temptation to break the

condition's of one's release.  <u>Brady v. United States</u>, 82 S. Ct. 11,

12 (1961) (Douglas, Circuit Justice).  <u>See</u> <u>also</u> <u>United States v.</u>

<u>Jessup</u>, 757 F.2d 378, 385 (1st Cir. 1985) ("the rationale for the use

of financial conditions of release is that the prospect of forfeiture

of the amount of a bond or of property used as collateral to secure

release is sufficient to deter flight") (quoting 1984 U.S. Code Cong.

& Admin. News 26, 27).  In this regard, as Judge Burrell noted, it

has been said that the purpose of bail is served where "losing the

sum would be a deeply-felt hurt to the defendant and his family; the

hurt must be so severe that defendant will return for trial rather

than flee." <u>United States v. Townsend</u>, 897 F.2d 989, 996 (9th Cir.

1990) (quoting <u>United States v. Szott</u>, 768 F.2d 159, 160 (7th Cir.

1985)).  <u>See</u> <u>also</u> <u>United States v. Bernal</u>, 183 F. Supp.2d 439, 441

(D.P.R. 2001) ("[D]efendant is not likely to place his close friends

and relatives in the precarious position of having their valued

properties forfeited.").  Thus, the court is specifically authorized

to:

/////

/////

/////

conduct an inquiry into the source of the
property to be designated for potential
forfeiture or offered as collateral to secure a
bond, and shall decline to accept the
designation, or the use as collateral, of
property that, because of its source, will not
reasonably assure the appearance of the person as
required.

18 U.S.C. § 3142(g)(4).[24]

Turning to the concerns expressed by Judge Burrell
regarding the adequacy of the proposed sureties and the proffered
properties, the undersigned finds that those concerns have now been
adequately addressed.

### Closeness of the Relationship Between Umer Hayat and Sher and Safdr Afzal

Judge Burrell reconsidered and eventually questioned
whether the relationship between defendant Umer Hayat and Sher and
Safdr Afzal was sufficiently close that the posting of the Afzals'
property would reasonably assure Umer Hayat's appearance.  Judge
Burrell did so primarily because Safdr Afzal told Pretrial Services
that Property No. 3 was his only asset and Sher Afzal told Pretrial

---

[24]   Thus, in United States v. Townsend the district court found
in the case of a foreign national charged in this country with
unlicensed exportation of military critical technology who had access
to substantial sums of cash, that the proffered posting of a $1
million cash bail borrowed by the defendant's friend in Switzerland
from Swiss bankers, was insufficient to reasonably assure the
defendant's appearance.  897 F.2d at 996.  Similarly, in some
situations the posting of a bond by a family member may not suffice.
See United States v. Koenig, 912 F.2d 1190, 1193 (9th Cir. 1990) (in
context of narcotics and tax evasion prosecution stating that because
there was reason to believe that the defendant's relationship with
his parents was not a close one, their offer to post bond would not
assure the defendant's appearance without discussing the nature of
that relationship further).

Services that he owned Property No. 2 where he lived and that it was owned free and clear when, as it turned out, Safdr Afzal was the owner of record for Property No. 2 which had a $125,000 encumbrance that rendered it unavailable for posting.

As noted above, at the hearing Safdr Afzal explained that Property No. 2 had been put in his name but that he and his family considered it to still belong to Sher Afzal who had directed Safdr to care for it and instructed that it pass to all his children upon his death. The undersigned finds this testimony credible. It is not surprising under the circumstances that Safdr Afzal would not think of Property No. 2 as his rather than his father's. Moreover, this explanation is consistent with the fact that Sher Afzal is elderly, in poor health and his family is responsible for his daily care. Likewise, after seeing Sher Afzal testify, it is not surprising that Sher Afzal would tell someone that Property No. 2 belonged to him or that it had a value of $300,000. In his mind, these representations could very well be accurate.[25]

It is undisputed that Sher Afzal's recollection is impaired to a degree. It is reported that he suffered a stroke and that his memory was adversely affected thereby. He himself testified that he has difficulty remembering things. Again, this is not surprising given his age and his apparent medical condition. Nonetheless, Sher

---

[25]   There has been no suggestion of any motive on the part of the Afzal's to intentionally misrepresent these circumstances, for the ownership and equity of Property No. 2 would obviously be disclosed, as they were, once the property was prepared for posting as security.

Afzal his been consistent in every interview and in his testimony

about the most critical matters now before the court: it is his

decision to post his property to secure the release of his nephew

Umer Hayat, that he recognizes that he will lose his property if the

defendant were to flee and that he is willing to do so because he is

confident that Umer Hayat will appear in court as directed.

After presiding at the hearing, the undersigned believes

that concerns raised by any inconsistencies in the Afzals' statements

regarding the status of Property No. 2 have been adequately

addressed.  Moreover, the court finds that there is no other reason

to believe that the relationship between the Afzals and Umer Hayat is

so attenuated that the posting of their property would not reasonably

assure Umer Hayat's appearance.  That Umer Hayat asked them to post

their property or that they initially felt some reluctance before

deciding to do so does not change this conclusion.  In the court's

experience, those are factors present in many cases where individuals

offer to post property to secure a bond for a relative charged with a

criminal offense in federal court.

The undersigned also finds that the inconsistencies in

Safdr Afzal's statements as to the closeness of his relationship with

Umer Hayat are either minor, immaterial or have been adequately

explained.  In this regard, Safdr Afzal testified essentially that

his family and the Hayat family have a good relationship, the two

families live near each other, have frequent contact with one another

and that he sees his cousin Umer Hayat often at the mosque during

prayer.  This testimony does not paint the picture of an

28

1   extraordinarily close relationship, but one typical of many that

2   cousins may share.  Safdr Afzal also testified that he conferred with

3   his father, Sher Afzal, regarding the posting of the property for

4   bail.  The Pretrial Services reports reflect that Safdr Afzal

5   indicated that he had a strong blood relationship with Umer Hayat

6   although they did not have a lot of personal contact.  Those reports

7   also indicate that Safdr Afzal stated that he did not feel coerced

8   into posting his property for bond but acknowledged that he would

9   defer to his elderly father in situations such as these.  Finally,

10  according to agent Ribail, in September of this year Safdr told

11  F.B.I. agents that he did not speak or visit with his cousin Umer

12  that frequently.  From an example he gave, Agent Ribail interpreted

13  Safdr as saying that the two did not have a particularly close

14  relationship.  Safdr told agents that his father, Sher Afzal, asked

15  him to post his property to secure Umer Hayat's release and that

16  while initially reluctant, Safdr agreed to do so while recognizing

17  that he would lose the property if the defendant fled.

18       Although, the prosecution apparently feels there are

19  significant inconsistencies in Safdr's statements, the undersigned

20  does not.  Instead, the court finds that they paint a fairly

21  consistent picture of a normal relationship between cousins and

22  between a father and a son.  The record reflects that the loss of the

23  two properties would seriously harm the Afzals, causing them to lose

24  most of what they own.  Finally, the relationships are sufficiently

25  close that the posting of bond by the Afzals will contribute to

26  reasonably assuring Umer Hayat's presence.

1    Umer Khatab and the Impact of Losing His Lodi Properties In

2    Light of His Home in Pakistan

3           Judge Burrell expressed concern that it appeared Umer

4    Khatab might not be hurt by the loss of the properties he was

5    proffering to secure his brother's bond because Mr. Khatab could

6    simply return to Pakistan should Umer Hayat flee.  The undersigned

7    does not understand Umer Khatab's explanation as to why he sold a

8    rental property in Stockton several years ago and used the proceeds

9    to build a house on land in Pakistan which his father had given him.

10   Mr. Khatab's testimony that the home was built only as a place to

11   stay when visiting Pakistan, that such was a common practice among

12   immigrants from Pakistan and that he had no intention to relocate

13   there at some point strikes the court as peculiar.  On the other

14   hand, there is some indication that this explanation may have the

15   ring of truth.  On cross-examination the prosecution elicited

16   testimony that Mr. Khatab's home in Pakistan is approximately three

17   to four years old.  Yet, neither he nor his family have moved to

18   Pakistan during the time since then.  Nor is there any evidence that

19   he has taken steps to liquidate assets or otherwise prepare to move

20   away from this country.

21          Finally, it became clear throughout the course of the

22   hearing that any return to Pakistan would not merely require Umer

23   Khatab's relocation but would have impact on others far beyond

24   himself.  At least sixteen members of Mr. Khatab's extended family

25   reside on the two properties which he has proffered to post as

26   security.  Many of those are children who are apparently United

States citizens, having been born in this country.  Still others are elderly.  Mr. Khatab testified that his family would suffer a great deal if they were to lose Property No. 4 and Property No. 5 because there would be nowhere for them to live and they would have nothing left in this country.  The undersigned concludes that the loss of those properties would inflict a hurt so severe on his brother's family that their posting provides reasonable assurances that Umer Hayat will return for trial rather than flee.

Finally, there is the question of whether the rental properties, Property No. 1 and Property No. 3, are so disposable that their loss would not inflict a hurt serious enough to ensure Umer Hayat's presence.  Again, the undersigned finds that this concern was adequately addressed at the hearing.  Safdr Afzal testified that he and his family rely on the rent from Property No. 3 to help pay the other mortgages.  He indicated that if the Property No. 3 rental were lost to forfeiture, the chances were they would be unable to make the payments on their Property No. 2 residence and the family would lose that as well.  Similarly, while the Property No. 1 residence is a rental property, it is not disposable to the Afzal family.  Safdr Afzal's brother, wife and five children live in that home.  There is no evidence or proffer before the court that would suggest otherwise.  Accordingly, the posting of these properties will also assist in reasonably assuring the appearance of the defendant as required.

/////

/////

/////

31

CONCLUSION

For the reasons set forth above, the undersigned finds the proposed sureties and the proffered properties sufficient to reasonably assure the appearance of Umer Hayat when coupled with the other conditions of release set by Judge Burrell.  The government has requested a stay of any such order to allow it to seek review before the assigned District Judge.  In light of the concerns previously expressed by Judge Burrell in this regard, the request for a stay is reasonable and will be granted.  Accordingly, IT IS HEREBY ORDERED that:

(1) The defense motion for an order compelling the government to grant Safdr Afzal immunity is denied;

(2) The government's motion for an order striking the testimony of Safdr Afzal is denied;

(3) The sureties proposed and the properties proffered by the defense are found suitable and sufficient to secure defendant Umer Hayat's release on the bail of $1.2 million and the conditions set by Judge Burrell;

(4) The government's request for a stay of this order is granted and the order shall be stayed for seven days from the date of the order; and

(5) If no appeal or motion to reconsider is filed and noticed for hearing before Judge Burrell by the government within

/////

/////

/////

32

seven days of the date of this order, an order for the release of

defendant Umer Hayat on the conditions previously set will be issued.

DATED: December 12, 2005.

_Dale A. Drozd_
_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:lg
Ddad1/orders.criminal/hayat12-1-05.ord