IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 2:05-cr-240-GEB |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER |
| v. | ) | |
| | ) | |
| UMER HAYAT, | ) | |
| | ) | |
| Defendant. | ) | |

The government appeals to the undersigned District Judge the Order filed by Magistrate Judge Dale Drozd on December 12, 2005, ("December 12 Order") which found that Defendant Umer Hayat ("Umer") has proffered adequate sureties and properties to secure an appearance bond. On December 23, 2005, the undersigned District Judge conducted an evidentiary hearing on the appeal. The decision on Umer's proposed sureties and proffered properties follows.

BACKGROUND

On June 7, 2005, Umer made his initial appearance on a false statement charge before Magistrate Judge Peter Nowinski, who ordered Umer detained both as a flight risk and as a danger to the community. On September 12, 2005, Umer filed a motion for reconsideration of the detention order, in which he proffered four

1

real properties (Property 1, Property 3, Property 4, and Property 5) asserted to have a collective value of $1,200,000 as collateral for an appearance bond.[1]  Magistrate Judge Gregory Hollows decided the reconsideration motion in an Order filed September 26, 2005, ("September 26 Order"), which held that Umer is a flight risk, but because of the nature of the charge, he is not a danger to the community.  The September 26 Order released Umer subject to certain conditions, including a $1,200,000 appearance bond collateralized by the four proffered properties.

On October 7, 2005, the government appealed the release order to the undersigned District Judge, arguing that Umer should be detained as both a flight risk and as a danger to the community.  At a hearing on the appeal held October 17, 2005, the undersigned District Judge indicated that Umer's flight risk status was at issue and the record lacked sufficient information about Umer's relationship to the sureties who were pledging property for his appearance bond.  The release issue was referred to Pretrial Services for a supplemental Pretrial Services Report since Pretrial Services is typically involved with release recommendations.

Pretrial Services subsequently spoke with three of the proposed sureties proffering properties: Safdar Afzal ("Safdar"), Sher Afzal ("Sher"), and Umer Khatab ("Khatab").  Pretrial Services issued a supplemental report dated October 19, 2005, ("October

---

[1]     As discussed infra, although Umer later proffered Property 2 as collateral for an appearance bond, he subsequently withdrew that property.  Pursuant to an Order filed November 4, 2005, the proffered properties are referred to as Property 1, Property 2, Property 3, Property 4, and Property 5, instead of their actual addresses.

Pretrial Services Report") recommending, inter alia, Umer be released on a $1,500,000 appearance bond collateralized by the four properties mentioned in the September 26 Order, plus an additional property (Property 2) that Sher told Pretrial Services he "own[ed] free and clear." (October Pretrial Services Report at 3.)

After the October Pretrial Services Report issued, argument was held on the government's appeal of the September 26 Order. A written order was issued ("November 4 Order"), which determined that Umer is a serious flight risk. (November 4 Order at 10.) The November 4 Order noted that "the government . . . raised some doubt whether Umer has a sufficiently close relationship with Sher and Safdar, two of the four sureties," and "some doubt whether Safdar, Khatab, and Hamid Hayat have sufficient connections to the properties." (Id. at 16-17.) Nevertheless, the November 4 Order adopted the recommendation of Pretrial Services and ordered Umer released subject to certain conditions, including a $1,500,000 appearance bond collateralized by the five proffered properties.

Umer subsequently filed a motion to reduce the amount of his appearance bond to $1,200,000 because Property 2 was no longer available. Umer's counsel contacted Pretrial Services about the reduction motion and requested that Pretrial Services prepare a supplemental report addressing the proposed reduction. Pretrial Services prepared a supplemental report dated November 8, 2005, ("November Pretrial Services Report"), which recommended reducing the amount of the appearance bond because "the amount of bond was not as important as the significance of the properties to the people pledging the bond." (November Pretrial Services Report at 2.) The government opposed the motion to reduce the amount of the appearance

3

bond and also challenged the adequacy of the proposed sureties and the remaining pledged properties.

An Order filed November 18, 2005, ("November 18 Order") granted Umer's request to reduce the amount of his appearance bond. (November 18 Order at 9.)  However, the November 18 Order noted Sher's and Safdar's inconsistent statements about Property 2 raised serious concerns about their credibility and their adequacy as sureties. (Id. at 10.)  Specifically, "Sher originally told Pretrial Services that he was the owner of Property 2, that it had an estimated value of $300,000, and that it was unencumbered, when in fact Safdar [Sher's son] is the record owner of Property 2, there is an encumbrance of $125,000, and the property is unavailable for use to secure an Appearance Bond." (Id. at 10.)  The November 18 Order also stated "it taxes credulity to believe that when Sher . . . [made these misrepresentations] that he forgot he transferred Property 2 to his son a year ago.  Even if he did forget, then his ability to recall is questioned . . . ." (Id. at 11-12.)  In addition, "Safdar represented to Pretrial Services that Property 3 was his 'only asset,' when in fact Safdar owns both Property 3 and Property 2." (Id. at 10-11.)  The November 18 Order stated "it is hard to imagine that Safdar innocently misspoke about his property ownership interest" because of his admitted "frequent attention to matters involving the property." (Id. at 11.)  The November 18 Order reasoned that "[i]n light of these [serious credibility] concerns, Safdar's and Sher's earlier conclusory statements indicating they have a close relationship with Umer lack[ed] sufficient support in the record." (Id. at 12.)

The November 18 Order also indicated that without Property 2, a significant disincentive for flight had been removed. (Id. at 14.)  Specifically, "the loss of Property 1 and Property 3 would not leave Sher and Safdar without their primary residence," as would the loss of Property 2.  (Id.)  In addition, "Property 1, Property 3, and Property 4 appear[ed] to be disposable rental properties, which . . . somewhat undermine[d] their effectiveness as security."  (Id.)  Furthermore, it appeared "Umer Khatab would not be hurt by the loss of [Property 4 and Property 5]" because he was "planning on building a house and living in Pakistan."  (Id.) Consequently, the November 18 Order found that based on the record before the court, the proposed sureties and proffered property were inadequate collateral for the appearance bond.  (Id.)

Subsequently, Umer again proffered Property 1, Property 3, Property 4, and Property 5, as collateral for the appearance bond.  When the government filed objections to the proposed sureties and proffered properties, Umer requested an evidentiary hearing on the adequacy of the proposed sureties and proffered properties. Magistrate Judge Drozd conducted evidentiary hearings, at which Safdar, Sher, Khatab, and FBI Special Agent Ronald Troy Ribail ("Special Agent Ribail") testified.  (December 12 Order at 7.)

The first question the government asked Safdar on cross examination was whether he had lied to the FBI about the closeness of his relationship with Umer.  (Id.)  When Safdar responded, "the answer is, I was scared," the government asked "so you told them something that was not true correct?"  (Id.)  Before Safdar answered, Umer's counsel suggested Safdar might be entitled to the advice of counsel.  (Id. at 7-8.)  Magistrate Judge Drozd agreed,

5

appointed counsel for Safdar, and continued the hearing to allow
Safdar to consult with counsel.  (Id. at 8.)

When the hearing reconvened, appointed counsel advised
Magistrate Judge Drozd that the government had declined to offer
Safdar immunity, and that he had advised Safdar to invoke the Fifth
Amendment in response to any further questions by the government.
(Id.)  The government accepted Safdar's blanket assertion of the
Fifth Amendment privilege, and then moved to strike Safdar's
testimony in its entirety.  (Id. at 8-9.)  Umer's counsel responded
by moving for an order compelling the government to grant Safdar
immunity so he could testify.  (Id.)  Magistrate Judge Drozd took
both requests under submission.  (Id. at 9.)  In the December 12
Order Magistrate Judge Drozd denied both motions and found that the
proposed sureties and proffered properties were adequate collateral
for Umer's appearance bond.  (Id. at 32.)  Magistrate Judge Drozd
stayed the December 12 Order pending appeal to the undersigned
District Judge, and this appeal followed.  (Id.)

The undersigned District Judge issued an Order on
December 21, 2005, ("December 21 Order") scheduling a de novo
evidentiary hearing because Magistrate Judge Drozd "made multiple
credibility determinations following the evidentiary hearings" and
"the district judge is required to make an independent determination
whether these factual findings are correct . . . ."  (December 21
Order at 5-6.)  The evidentiary hearing was conducted on December
23, 2005, during which Sher, Khatab, and Special Agent Ribail
testified.  Safdar did not testify because he asserted a blanket
Fifth Amendment privilege; Umer's counsel and the government
accepted his assertion.  At the hearing, Umer's counsel moved for an

1  order compelling the government to grant Safdar immunity so he could

2  testify, and the government moved to strike Safdar's testimony at

3  the evidentiary hearing before Magistrate Judge Drozd.  Both motions

4  were taken under submission.

5                          DISCUSSION

6          On appeal, a district judge has discretion to conduct a de

7  novo evidentiary hearing.  Cf. United States v. Koenig, 912 F.2d

8  1190, 1193 (9th Cir. 1990).  Since significant credibility

9  determinations are at issue, the decision was made to conduct a de

10  novo evidentiary hearing.  "The law has long recognized the value"

11  of "first hand observations of witnesses and evidence."  United

12  States v. Ridgeway, 300 F.3d 1153, 1155 (9th Cir. 2002) (holding

13  that a district judge must conduct a de novo evidentiary hearing if

14  the judge decides to reject the factual findings of a magistrate

15  judge issued after an evidentiary hearing).

16  A.  Motion to Compel Immunity

17          At the de novo evidentiary hearing, Umer's counsel argued

18  the government should be compelled to grant Safdar immunity because

19  the government asked questions at the evidentiary hearing before

20  Magistrate Judge Drozd for an improper purpose.  Umer's counsel

21  asserted that the improper purpose "was to have the witness

22  incriminate himself on the stand."  The government rejoined that its

23  questions were not asked for an improper purpose because they were

24  designed to test the credibility of Safdar.[2]  In addition, the

25  government argued it did not distort the fact-finding process and

26

27          [2]  At the de novo evidentiary hearing, Umer's counsel
    acknowledged that "an appropriate reason [to ask a question] would
28  be to test the credibility and truthfulness of the witness."

                              7

did nothing to make Safdar unavailable.

The Ninth Circuit "'has emphatically rejected the argument that the sixth amendment provides a defendant with a right to demand use immunity for defense witnesses who invoke their privilege against self-incrimination.'" United States v. Duran, 189 F.3d 1071, 1087 (9th Cir. 1999) (quoting United States v. Baker, 10 F.3d 1374, 1414 (9th Cir. 1993)). An exception to this general rule exists where the government "intentionally distorts the fact-finding process" either by "grant[ing] immunity to a witness in order to obtain his testimony, while denying immunity to a defense witness whose testimony would directly contradict that of the government witness" or by "intentionally caus[ing] the witness to invoke the Fifth Amendment privilege." Duran, 189 F.3d at 1087 (citations and quotation marks omitted). The government intentionally causes a witness to invoke the privilege if it takes "affirmative steps," such as "intimidating or harassing the witness to discourage the witness from testifying," which amounts "to a substantial interference with the defense witness's free and unhampered determination to testify." Williams v. Woodford, 384 F.3d 567, 601-02 (9th Cir. 2004).

The government did not deny Safdar immunity while granting immunity to another witness. Nor did the government intentionally cause Safdar to invoke the privilege because it did not harass, intimidate or threaten Safdar in an effort to discourage him from testifying.[3]  Rather, Safdar voluntarily invoked his Fifth Amendment

---

[3]  Magistrate Judge Drozd reached the same conclusion in the December 12 Order:

(continued...)

privilege upon the advice of his counsel, free from and unhampered by governmental misconduct.   Therefore, the motion for an order compelling the government to grant Safdar immunity is denied.

B.  Motion to Strike Testimony

        The government argues that Safdar's testimony before Magistrate Judge Drozd should be stricken because Safdar refused to submit to cross examination on issues central to the release decision. (Gov't Appeal at 30, 33-37.)  The government contends that Safdar's invocation of the Fifth Amendment distorted the fact-finding process and rendered his testimony on direct unreliable. (Id. at 31-32, 37-39.)  Umer argues that Safdar's testimony should not be stricken because the government did not suffer "undue prejudice . . . as a result of [Safdar's] assertion of the Fifth Amendment privilege on cross examination." (Def.'s Opp'n at 6.)  In addition, Umer contends that Safdar's refusal to testify did not frustrate the fact-finding process because there was "no reason to believe that any further cross examination of Safdar Afzal would have resulted in testimony undermining the defense['s] bail presentation." (Id.)

---

[3](...continued)
The prosecution conduct here does not rise to the prohibited level . . . . the government was within    its right to cross-examine the witness in the way it  saw fit and was under no obligation to forego further investigation.  The prosecution did not harass, intimidate or threaten the witness in a way designed to improperly discourage the witness from testifying.  The witness was represented by counsel, counsel advised him to assert the privilege and the witness elected to follow that advice.

(December 12 Order at 20.)

1   In light of the decision to conduct a de novo evidentiary
2   hearing, the issue whether Safdar's testimony before Magistrate
3   Judge Drozd should be stricken need not be reached because that
4   testimony is not part of the record on appeal.  See United States v.
5   Torres, 929 F.2d 291, 292 (7th Cir. 1991) (the district judge
6   "start[s] from scratch" when he decides to conduct a de novo
7   evidentiary hearing).  However, assuming arguendo that Safdar's
8   testimony should be considered part of the appellate record, the
9   government's motion is granted for the following reasons.

10   A defense witness's testimony may be stricken when he
11   refuses on cross-examination to respond to questions regarding
12   non-collateral matters.  Denham v. Deeds, 954 F.2d 1501, 1504 (9th
13   Cir. 1992).  Non-collateral matters are those "germane to . . .
14   testimony on direct examination."  Id.  If the witness refuses to
15   answer questions about non-collateral matters, the court has wide
16   discretion to determine whether a witness's testimony should be
17   stricken.  United States v. Seifert, 648 F.2d 557, 562 (9th Cir.
18   1980).  When determining whether to strike the testimony, the court
19   should be guided by the principles that "arriving at the truth is a
20   fundamental goal of our legal system," United States v. Havens, 446
21   U.S. 620, 626 (1980), and that cross-examination is an indispensable
22   tool in the search for truth.  See Davis v. Alaska, 415 U.S. 308,
23   316 (1974).  When a "witness refuses to answer questions that go to
24   the heart of the direct testimony on a central issue . . . the
25   truth-seeking function of the court is impaired . . . [and] the
26   testimony cannot be considered reliable."  Denham, 954 F.2d at 1504.

27   During the evidentiary hearing before Magistrate Judge
28   Drozd, Safdar answered questions on direct examination primarily

about his relationship with Umer and about his property ownership.
Specifically, Safdar testified he had close relationship with Umer
and they had frequent contact, but admitted he told FBI agents that
he did not have a close relationship with Umer.  In addition, Safdar
testified he represented to Pretrial Services that Property 3 was
his only asset, when in fact he also owned Property 2.  On cross
examination, the government began by asking about Safdar's
representations to the FBI concerning his relationship with Umer.
When Magistrate Judge Drozd asked the government about the purpose
of these questions, the government responded that it intended to
"explore" the closeness of Safdar's relationship with Umer and "was
just starting [with questions relating to credibility]."  After
Safdar invoked the Fifth Amendment and refused to testify on cross
examination, the government stated that all questions it intended to
ask Safdar on cross examination "would [have] relate[d] to his
closeness to the Hayats and to his property."

Since Safdar's relationship to Umer and his property
ownership were the primary subjects of Safdar's testimony on direct,
and the government's proposed inquiry on cross examination would
have covered the same issues, the proposed cross examination
questions were germane to the testimony on direct.  Accordingly, the
matters which the government intended to explore on cross
examination were non-collateral and Safdar's testimony may be
stricken.

Safdar made inconsistent statements about his relationship
with Umer and his property ownership prior to the evidentiary
hearing before Magistrate Judge Drozd.  A purpose of the evidentiary
hearing was to explore these issues in order to determine whether

11

1  Safdar was an adequate surety.  (<u>See</u> December 12 Order at 3-4.)

2  Safdar's assertion of his Fifth Amendment privilege on cross

3  examination impaired "the truth seeking function of the court."

4  <u>Denham</u>, 954 F.2d at 1504.  Therefore, the government's motion to

5  strike Safdar's testimony is granted because his "testimony cannot

6  be considered reliable."  <u>Id.</u>

7  C.  Adequacy of Proffered Property and Proposed Sureties

8          The remaining issue is whether the proffered sureties and

9  properties are adequate collateral for the $1,200,000 appearance

10 bond.  Under 18 U.S.C. § 3142(g)(4), "the judicial officer may upon

11 his own motion . . . conduct an inquiry into the source of the

12 property to be designated for potential forfeiture or offered as

13 collateral to secure a bond . . . ."  The judicial officer must

14 decline to accept property as collateral if, "because of its source,

15 [it] will not reasonably assure the appearance of the person as

16 required."  <u>Id.</u>  To determine whether the proffered property will

17 reasonably assure the appearance of a defendant, the court must

18 examine both the relationship between the defendant and the surety

19 and the nature of the property proffered.  <u>Koenig</u>, 912 F.2d at 1193;

20 <u>United States v. Townsend</u>, 897 F.2d 989, 996 (9th Cir. 1990).  The

21 relationship between the defendant and the sureties must be "close,"

22 which is not necessarily satisfied by a familial relationship.

23 <u>Koenig</u>, 912 F.2d at 1193 (rejecting a bond offered by the

24 defendant's parents because "there [was] reason to believe that his

25 relationship with his parents [was] not a close one").  In addition,

26 the property must be such that its loss would be a "deeply felt hurt

27 to the defendant and [the sureties]; the hurt must be so severe that

28 the defendant will return for [court proceedings] rather than flee."

12

1  <u>Townsend</u>, 897 F.2d at 966.

2            i.  <u>Khatab</u>[4]

3            Khatab testified that he and Umer are half-brothers.

4  Khatab owns Property 4, which he rents to his sister and her family,

5  and he is part owner of Property 5, which contains two houses and a

6  garage.  He lives in one of the houses on Property 5, an older

7  three-bedroom home, with his parents, wife, children, niece and

8  nephew.  Umer's wife and children live in the garage on Property 5.

9  A family rents the other house on Property 5, and Umer's spouse

10 collects the rental income.

11           Khatab and his wife are citizens of Pakistan and legal

12 permanent residents of the United States; his children are citizens

13 of the United States.  Khatab testified he came to the United States

14 approximately twenty-one years ago, and since that time he has

15 returned to Pakistan on two occasions, once for ten months in 1988,

16 and once for four months and one week in 2005.  Khatab stated that

17 several of his family members live in Pakistan, including three

18 uncles, a sister, a brother-in-law, nieces and nephews, and his

19 mother-in-law and father-in-law.[5]

20           Khatab testified that his father gave him and Umer

21 property in Pakistan approximately two years ago.  Upon receiving

22 his share of the property, Khatab sold a rental property in

23 Stockton, California, and used the proceeds, about $120,000 to

24 ────────────────────

25           [4]  Khatab and Sher testified at the de novo evidentiary
   hearing with the assistance of a certified interpreter.

26

27           [5]  During the evidentiary hearing before Magistrate Judge
   Drozd, Khatab did not disclose all the family members who live in
   Pakistan.  When asked why he did not disclose these family members,
28 he stated that he sometimes has difficulty remembering things.

13

$140,000, to build a four-bedroom house on that property in Pakistan.  Khatab asserted he built the house in order to provide his family with a place to stay during their visits, and he had no intention of living permanently in Pakistan because he wants to raise his children and have them educated in the United States.

At the evidentiary hearing, Umer's counsel argued Khatab was an adequate surety because he was willing to proffer his properties and do everything within his power to ensure Umer does not flee.  The government rejoined Khatab was not an adequate surety because he would not suffer a hardship by the loss of Property 4 and Property 5.  Specifically, the government asserted that if Umer were to flee and the properties were forfeited, Khatab and his family could live in Pakistan.  The government implied Khatab had no reservations about living in Pakistan because prior to Umer's indictment Khatab had planned on living there permanently.

Although Khatab asserted at the de novo evidentiary hearing that he has no intention of living in Pakistan, Special Agent Ribail testified that when he interviewed Safdar, Safdar said Khatab was in Pakistan and that he and his family planned on remaining in Pakistan permanently.  Moreover, Safdar's statement to Special Agent Ribail was corroborated by Khatab's testimony.  Khatab invested a substantial amount of money in a new a home in Pakistan, a home which is newer and larger than his home in the United States. In addition, Khatab has significant ties to Pakistan because he and his wife have several family members living in the country. Furthermore, Khatab testified that before his trip to Pakistan in April 2005, he removed his children from school in the United States, an act inconsistent with a desire to raise and educate his

1    children in the United States.  Therefore, the record reveals that

2    when Khatab left for Pakistan in April 2005, he intended to live

3    there permanently.[6]

4         Accordingly, Khatab does not have a significant connection

5    to Property 4 and Property 5 because he could return to his new home

6    in Pakistan should Umer flee.  This lack of connection is further

7    evidenced by the fact that Khatab does not receive the rental income

8    from Property 5, but rather Umer's spouse collects the rent.

9    Therefore, Property 4 and Property 5 are not adequate properties for

10   the purposes of bail because the loss of the properties would not

11   inflict a "deeply felt hurt" to Khatab such that Umer "will return

12   for [court proceedings] rather than flee."  <u>Townsend</u>, 897 F.2d at

13   966.

14        ii.  Sher

15        Sher testified he is Umer's eighty-year old uncle and the

16   owner of Property 1.  He lives at Property 2 under the care of

17   family members.[7]  It was apparent Sher had difficulty understanding

18   and answering questions, and believes his mental functioning is

19   impaired.  For example, the first question posed to Sher on direct

20   examination was "how old are you?"  In response, Sher said "eighty

21   years . . . my brain doesn't work."  When defense counsel asked Sher

22   how he would describe his "ability to remember and recall things,"

23   Sher said "I gave him the home and he was working.  My mind is

24   ──────────────────

25        [6]   Khatab's contrary testimony on this point is disbelieved.

26        [7]   Sher testified that his children prepare the food he eats,
27   take care of cleaning his room and the house in which he lives,
     drive him in a car when he needs to travel, shop for him when he
28   needs food or clothing, handle all of his personal finances, and
     assist him with his daily affairs.

15

1  working only regarding that issue.  My mind doesn't work."  In
2  addition, on cross examination, when government counsel asked Sher
3  if he had ever suffered a stoke, he responded "yes."  But when
4  government counsel asked Sher when he suffered the stroke, Sher
5  first responded "what stroke? what?"  When government counsel asked
6  Sher if he has any mental difficulties as a result of the stroke,
7  Sher said "Yes I do . . . my brain doesn't work."  Government
8  counsel asked what he meant when he said his brain didn't work, and
9  he replied "meaning."  He did not finish his answer, but instead
10 appeared to stare into space and then, for an inexplicable reason,
11 at the judge.

12         Furthermore, it was apparent Sher had difficulty recalling
13 simple facts about his interaction and relationship with his nephew
14 Umer.[8]  When government counsel asked whether he had any phone
15 conversations with Umer since Umer has been in jail, Sher said that
16 he spoke with Umer on one occasion.  However, when government
17 counsel asked Sher if it was true Umer called him from jail by
18 telephone almost every other day, Sher responded "correct."[9]  In
19 addition, when government counsel asked if he had any contact with
20 Umer after Umer returned from Pakistan but before he went to jail,

21

22     [8]   Magistrate Judge Drozd also observed that "[o]n the
23 particular day of his testimony, Sher Afzal appeared confused and
   mistaken regarding rather simple facts."  (December 12 Order at 12.)
24 He also stated "[i]t is undisputed that Sher Afzal's recollection is
   impaired to a degree . . . . [and that] this is not surprising given
25 his age and his apparent medical condition."  (Id. at 27.)

26     [9]   Special Agent Ribail testified Sher told him that Umer
27 called his house every other day, upset and crying, and pleading
   with Sher to proffer his property for bail.  These constant phone
28 calls raise concerns as to whether Sher was pressured into
   proffering his property.

Sher responded "I saw him every time . . . he's my son . . . ."

Even though Sher demonstrated difficulty understanding and answering questions and recalling basic facts, Umer argues Sher is an adequate surety "notwithstanding his age and medical condition" because he consistently testified that he is willing to post his property. (Def.'s Opp'n at 6.)  At the de novo evidentiary hearing, when the undersigned District Judge expressed doubt about Sher's ability to understand the gravity of pledging Property 1 as collateral for an appearance bond, Umer's counsel responded:

> I understand the court's concern, I too saw what the court saw, that is, an elderly man, eighty years old, clearly with difficulty in his memory.  I think what was clear to me . . . . [is that] [h]e does not want Umer Hayat in jail. And he kept going back to that point, even at times when it wasn't responsive to the question.

Although Sher testified that he does not want Umer in jail, his responses were rote and fail to convey that he truly understands what would happen if Umer fled after being released from jail.  For example, when Umer's counsel asked Sher if he agreed to allow Umer Hayat to use his property to help him get out of jail, Sher responded "okay."  When Umer's counsel asked Sher if he understood that he would lose his property if Umer was to flee, Sher responded by asking "where will he go?"  When the question was repeated, he said "don't care" and "what can I say I have already written the property."  In addition, when the judge asked Sher "what does lose the property mean to you," Sher said "meaning that he will be out of jail."  Moreover, when government counsel showed Sher a copy of the appearance bond with Sher's signature in the lower left-hand corner, Sher said he did not recognize the signature.  But on redirect examination, Sher said he recognized his signature as his own.

1    It is apparent Sher does not understand the obligations of
2  a surety and the risks he faces by pledging his property as
3  collateral for an appearance bond.  Consequently, Sher is not an
4  adequate surety and his property is inadequate for the purposes of
5  bail because in light of his mental state his property could not be
6  forfeited should Umer flee.  <u>See</u> <u>United States v. Figuerola</u>, 58 F.3d
7  502, 504 (9th Cir. 1995) (property could not be forfeited unless the
8  sureties understood their obligations under the bond at the time
9  they agreed to post their property).

10    Furthermore, even if Sher does fully understand his
11  obligations as a surety, his own testimony demonstrated that
12  Property 1 is not an adequate property for purposes of bail.  Sher
13  testified that he does not care if his property is forfeited.  In
14  addition, he indicated that although seven family members reside on
15  the property, alternative living arrangements are available.
16  Consequently, forfeiture of Property 1 would not inflict a "deeply
17  felt hurt" to Sher such that Umer could reasonably be expected to
18  return for future proceedings rather than flee.  <u>Townsend</u>, 897 F.2d
19  at 966.  Therefore Property 1 is inadequate for the purpose of bail.

20        iii.  <u>Safdar</u>

21    The state of the record regarding Safdar's adequacy as a
22  surety is stated in the November 18 Order, which observed that
23  Safdar misrepresented his property ownership when he spoke to
24  Pretrial Services.[10]  (November 18 Order at 10.)  Specifically,
25  Safdar told Pretrial Services that Property 3 was his only asset,
26  but when Umer filed a motion to reduce the amount of his appearance

27

28    [10]    The November 18 Order rejected the argument that Safdar's
misrepresentation could be explained by his culture.

18

1  bond, it was revealed that Safdar also owned Property 2.  (Id. at

2  10-11.)  Umer submitted Safdar's declaration in support of the bond

3  reduction motion, in which Safdar detailed how Sher transferred

4  Property 2 to him in September 2004, and how he obtained a loan for

5  $125,000 on the property secured by a first deed of trust.  (See id.

6  at 2.)  Safdar also declared that the loan had an adjustable

7  interest rate, which he expected to increase over the course of the

8  next twelve months.  (See id. at 2-3.)  He explained he could not

9  afford higher monthly payments, and asserted he had to refinance the

10 property as soon as possible to insure that the payments remained at

11 $500 per month.  (See id. at 3.)

12         The November 18 Order stated that in light of Safdar's

13 "frequent attention to matters involving the property, it is hard to

14 imagine that Safdar innocently misspoke about his property ownership

15 interest" when he was interviewed by Pretrial Services.  (Id. at

16 11.)  Nor can the misrepresentation be adequately explained by the

17 assertion that he did not tell Pretrial Services about Property 2

18 because he believed it was his father's asset.  When Safdar spoke

19 with Pretrial Services through a certified interpreter, he was able

20 to explain how he bought Property 3 with his father and how his

21 father's name was dropped from the deed when he wanted to refinance

22 to obtain a lower interest rate on a loan.  (October Pretrial

23 Services Report at 2.)  Therefore, Safdar understands that ownership

24 of property is dictated by the name on the deed.  It taxes credulity

25 to believe Safdar can explain the chain of ownership as to one

26 property, but not to another.

27         The November 18 Order also observed that Safdar has made

28 inconsistent statements about his relationship with Umer.

19

1  (November 18 Order at 10.)   Safdar told Pretrial Services that "he

2  feels a strong blood relationship with Umer, even if they do not

3  have a lot of personal contact."   (October Pretrial Services Report

4  at 2.)   However, during an interview with FBI agents, Safdar said

5  "while he and his father are related to the Hayats, they are not

6  particularly close with them."   (November 18 Order at 10.)   At the

7  de novo evidentiary hearing, Special Agent Ribail testified about

8  the interview with Safdar.   Special Agent Ribail confirmed that

9  Safdar described his relationship with Umer "as not being a good

10 relationship," and that Safdar said he did not have frequent contact

11 with Umer.

12      The testimony of Special Agent Ribail indicates that

13 Safdar and Umer do not have a close relationship.   Although Safdar

14 told Pretrial Services otherwise, his statements to Pretrial

15 Services are not credible because he has misrepresented facts to

16 Pretrial Services in the past.   Consequently, "there is reason to

17 believe that [Umer's] relationship with [Safdar] is not a close

18 one."   Koenig, 912 F.2d at 1193.   Therefore, Safdar is not an

19 adequate surety and his pledged property is inadequate collateral

20 for an appearance bond because the loss of his property would not be

21 a "deeply felt hurt" to Umer since they do not have a close

22 relationship.   Townsend, 897 F.2d at 966.

23 ////

24 ////

25 ////

26 ////

27 ////

28 ////

1                          CONCLUSION

2          For the stated reasons, the proposed sureties and

3    proffered properties are inadequate.

4          IT IS SO ORDERED.

5    Dated:   January 4, 2006

6
                              /s/ Garland E. Burrell, Jr.
7                             GARLAND E. BURRELL, JR.
                              United States District Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              21