UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

     Respondent/Plaintiff,

  v.

HAMID HAYAT,

     Petitioner/Defendant.

No. 2:05-cr-240-GEB

**ORDER**

Petitioner and movant Hamid Hayat ("Hayat") moves for habeas corpus relief under 28 U.S.C. § 2255, arguing his convictions and sentence should be vacated because his attorney, Wazhma Mojaddidi, provided him with deficient representation in violation of his federal Sixth Amendment constitutional right to effective assistance of counsel. ECF No. 531 (Hayat's Motion). Specifically, Hayat contends in his motion that Mojaddidi failed to adequately investigate and present certain defenses on his behalf and to effectively represent him on certain issues during the trial.

The motion was referred to a United States Magistrate Judge for proposed findings and recommendations under a federal statute and a local rule. The federal statute under which the referral was made "makes it clear that the district judge must review the magistrate judge's findings and recommendations . . . *if objection is made*, but not otherwise." United States v. Reyna-Tapia, 328 F.3d 1114, 1121 (9th Cir. 2003).

The magistrate judge held habeas evidentiary hearings on the motion. Habeas evidentiary hearings are usually required because "[w]ithout [those] hearing[s], it is often difficult to 'reliably determine whether [defense] counsel's investigation [of certain defenses] was deficient [because] what was investigated, and the scope of the investigation can rarely be discerned from the trial record.'" Williams v. Trammell, 782 F.3d 1184, 1218 (10th Cir. 2015) (quoting Fairchild v. Workman, 579 F.3d 1134, 1142 (10th Cir. 2009)). Further, typically it cannot be "determine[d] from the bare trial record whether [defense] counsel's choice of [trial strategy] was the result of [an] [objectively reasonable] strategic decision." Fairchild, 579 F.3d at 1142.

The magistrate judge filed proposed Findings and Recommendations ("F&Rs"), finding that Mojaddidi failed to adequately investigate certain defenses on Hayat's behalf and to effectively represent him on certain issues during trial. ECF No. 734 ("F&Rs"). The United States ("United States" or "government") filed objections to certain findings on April 6, 2019, ECF No. 744 ("Objs."), and Hayat filed a reply to those objections on May 4, 2019. ECF No. 747 ("Reply").

The F&Rs include credibility determinations of fact witnesses who testified before the magistrate judge during habeas evidentiary hearings. "A district [judge] may not . . . reject a magistrate judge's proposed credibility determination [concerning fact witnesses the magistrate judge observed testify] without hearing and seeing the testimony of the relevant witnesses." Johnson v. Finn, 665 F.3d 1063, 1074 (9th Cir. 2011).

The F&Rs also include legal conclusions premised on legal

2

opinions of attorney expert witnesses who testified during the habeas evidentiary hearings and opined on certain ineffective assistance of counsel claims. Legal conclusions are reviewed under the de novo review standard. "De novo review means that the reviewing court 'does not defer to the lower court's ruling but freely considers the matter anew, as if no decision had been rendered below.'" Dawson v. Marshall, 561 F.3d 930, 933 (9th Cir. 2009) (brackets omitted) (quoting United States v. Silverman, 861 F.2d 571, 576 (9th Cir. 1988)). A district judge has discretionary authority to rely on attorney expert testimony on the ineffective assistance of counsel legal standards, and may exercise that discretion by rejecting a magistrate judge's findings which are premised on attorney expert legal opinions, since "the district judge is himself . . . qualified to understand the legal analysis required" when determining whether counsel's representation of Hayat was ineffective representation. Bonin v. Calderon, 59 F.3d 815, 838 (9th Cir. 1995). cf. LaGrand v. Stewart, 133 F.3d 1253, 1270 (9th Cir. 1998)(stating no authority was found supporting petitioner's "contention that only outside expert testimony can provide a basis on which to measure counsel's performance.") Findings based on attorney expert legal testimony are rejected.

The overview of facts and issues concerning the motion are stated in the direct appeal decision issued in United States v. Hayat, 710 F.3d 875, 880-84 (9th Cir. 2013), as follows:

> Hamid Hayat is a U.S. citizen of Pakistani descent. He lived in the United States until he was seven and then, between the ages of seven and eighteen, with his grandparents in Pakistan. Hayat returned to the United

States in 2000 to live with his parents in Lodi, California. Three years later, in April 2003, he traveled to Pakistan with his family. He spent just over two years in Pakistan on this second stay, returning to the United States in late May 2005. Days after his return, Hayat was arrested by FBI agents and charged with providing material support to terrorists and making false statements to government officials. The events giving rise to Hayat's arrest are as follows:

In October 2001, FBI agents in Oregon interviewed Naseem Khan, a 28-year-old Pakistani immigrant, in connection with a money laundering investigation. Khan informed the agents that he had regularly observed Ayman al Zawahiri, Osama bin Laden's second-in-command and one of the FBI's 22 most-wanted terrorists, at a mosque in Lodi, California, in 1999. Khan later told the agents that he had also seen two other individuals on the FBI's 22 most-wanted list in Lodi during the same period.

The FBI then hired Khan as a confidential informant and asked him to return to Lodi to gather additional information on a suspected terrorist cell. Khan agreed. He began his work as an informant in Lodi in December 2001. Approximately eight months later, in August 2002, Khan met Hayat, who was nineteen years old at the time and living in his parents' garage. As explained in greater detail below, recorded conversations between Khan and Hayat indicated that Hayat's father was linked to a terrorist organization in Pakistan and that Hayat's uncle and grandfather were recruiters for "jihad."

Between August 2002 and October 2003 Khan and Hayat spoke regularly. Khan recorded seven of these conversations, took notes on others, and reported to the FBI soon after every conversation with Hayat, summarizing for the agents those conversations that were not recorded. The recorded conversations were introduced at trial, as was testimony by Khan regarding unrecorded conversations. Because Khan and Hayat frequently spoke to each other in Pashto and Urdu, the jurors were provided with English translations of the pertinent

4

parts of the recorded conversations.

In the recorded conversations, Hayat made several anti-American and anti-Semitic remarks. At one point, for example, he expressed pleasure over the murder of *Wall Street Journal* reporter Daniel Pearl because his death meant that "[n]ow they can't send one Jewish person to Pakistan." In addition, Hayat at times spoke approvingly of Islamic fundamentalist groups such as Jaish-e-Mohammed and indicated his respect for their leaders. He also professed to know and to admire Pakistanis who had engaged in "jihad." Some of these people Hayat knew because they had studied in a madrassah, or religious school, in Pakistan run by his grandfather, which Hayat had also attended. Hayat told Khan that his grandfather was a prominent cleric and that after 9/11, Pakistani President Musharraf had sent him and others to Afghanistan to persuade the Taliban to hand over Osama bin Laden. Hayat also described to Khan a terrorist training camp in Pakistan—he said he had seen a video of it—and, on a few occasions, expressed interest in attending such a camp.

Five of the recorded conversations took place while Hayat and Khan were both in Lodi. At one point, when the two were discussing travel to Pakistan and a possible meeting with Hayat's uncle, Hayat said "I have one objective now. If I went to Pakistan, now, see, <u>straight away</u>, I'll stay at home for one or two <u>weeks</u>, then I'm going for <u>training</u>, friend." (Underlined portion spoken in English).

Hayat traveled with his family to Pakistan in April 2003. Two of the recorded conversations took place when he was there. Like the earlier conversations, they covered a wide range of topics. On one occasion, Khan scolded Hayat for being lazy and not going to a training camp. In response, Hayat protested that the camp was closed during hot weather and that had the camp been open, he "would have been there." On another occasion, Khan relayed to Hayat a conversation in which Hayat's father explained that "[Hayat wi]ll enter the Madrassah, and, God Willing, he [will] go for training!" Hayat responded to Khan: "Um-hmm. . . . <u>No problem</u>, absolutely."

(Underlined portion spoken in English).

In another of the recorded conversations, Hayat explained to Khan how to send money to Sipah-e-Sahaba ("SSP"), a Pakistani organization that Pakistan declared a terrorist organization in 2002. During a conversation with Khan, Hayat expressed admiration for members of SSP who die as "martyrs." Hayat boasted that he gave more money to SSP than any other member of his Pakistani madrassah, and stated that he gave money to SSP because his money was more likely to be used to acquire "weapons, books and everything" than if he gave to other groups, which wasted money. (Underlined portion spoken in English). Hayat also reported that when someone told him that he could go to jail for giving SSP money, he replied, "Fuck you. Who cares, man, who goes to jail, man? . . . . Fuck, look what's America doing. . . ." (Underlined portion spoken in English).

Hayat made several statements to Khan indicating Hayat's knowledge of his family's involvement in terrorist activities. For example, Hayat explained that his father in Lodi had sent money to SSP. Hayat also told Khan that his grandfather, who was the leader of the madrassah Hayat attended in Pakistan, had called a special meeting in 1999 where he recommended that his students leave the madrassah to go participate in jihad. In addition, Hayat explained that if someone were interested in attending a training camp, that person could contact Hayat's maternal uncle, who would either accompany that person "to the Jehad people's office," or make a phone call to that office on the interested person's behalf.

Hayat's direct interactions with American law enforcement began when he attempted to reenter the United States in May 2005. On May 30, 2005, Hayat's return flight to San Francisco was diverted to Japan because Hayat's name appeared on the federal government's "No Fly" list. Hayat was interviewed in Japan by FBI agent Lawrence Futa. Futa questioned Hayat about his two-year stay in Pakistan, including whether Hayat had joined a terrorist organization or attended a terrorist training camp. Hayat denied joining a terrorist group or attending

a training camp while in Pakistan. Futa concluded that Hayat "posed [no] immediate threat" and could be permitted to return to the United States. Hayat left Japan and flew to San Francisco that same evening.

Four days later, on June 3, 2005, FBI agents Tenoch Aguilar and Sean Wells interviewed Hayat at his parents' home in Lodi. After again explaining the reason for his family's trip to Pakistan—because of his mother's health—and his activities while in Pakistan, Hayat again denied having attended a terrorist training camp and stated that "he would never be involved with anything related to terrorism, and didn't know why anybody would say otherwise." After eliciting this response, Aguilar and Wells asked Hayat to come to the FBI office in Sacramento for further questioning.

Hayat arrived at the FBI office in Sacramento around 11 a.m. the following morning and was interviewed in four waves. Hayat at first denied having attended a terrorist training camp, but during the second session admitted that he had attended a camp for a few days during an earlier stay in Pakistan in 2000, where he "observed and heard weapons training," and also in 2003, when he himself received "pistol training" at a camp in "Balakot."

The third and fourth sessions, which were videotaped, took place during the afternoon and evening of June 4, 2005, and the early morning hours of June 5. During the third interview, Hayat confirmed that he had attended a camp to train for jihad and said he was trained to use a pistol and rifle and taught how to kill American troops.

Before the final session, Hayat was given *Miranda* warnings (for the second time that day) and signed an Advice of Rights form (also for the second time). Hayat reported that at the training camp, he was told to expect to receive orders in the United States. When someone wanted to transmit orders to him, the person would first contact Adil Khan (a prominent Islamic figure in the Lodi, California area); Khan would contact Shabbir Ahmed (the Imam at Hayat's Lodi mosque); and Shabbir would contact Hayat. Also, by the end of the interview Hayat had

suggested that his grandfather was involved in jihadist activities, indicating that his grandfather may have held a leadership position in the terrorist camp Hayat attended.

The FBI arrested Hayat at the end of this set of interviews.

On January 26, 2006, the government filed a second superseding indictment against Hayat, charging him with one count of violating 18 U.S.C. § 2339A (providing material support to terrorists) and three counts of violating 18 U.S.C. § 1001 (making false statements to the FBI). Section 2339A reads, in relevant part,

> Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of [various provisions prescribing penalties for terrorist acts] . . . shall be . . . imprisoned not more than 15 years. . . .

18 U.S.C. § 2339A(a). The statute defines "material support or resources" as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials." *Id.* § 2339A(b)(1). The prosecution's case was that Hayat had provided his personal services to a terrorist organization by attending the training camps in Pakistan and returning with the intent to carry out acts of terrorism when directed to do so. The three counts of making false statements to the FBI were related to Hayat's initial statements to various FBI agents in California, in which he denied attending a terrorist training camp while in Pakistan.

Hayat's trial began on February 14, 2006. In addition to the seven recorded conversations between Hayat and Khan, the government presented Khan's testimony about those conversations and Hayat's confessions to the FBI. The jury viewed the videotaped confessions, and several agents, including Futa, Aguilar, and Sweeney, testified about their interviews with Hayat. The government also introduced a "scrapbook" that agents had seized from Hayat's parents' garage, where Hayat was living. The scrapbook bore Hayat's name on the cover and contained clippings from Pakistani newspapers. Several of the articles in the scrapbook discussed Islamic fundamentalist groups, including the Taliban, and their leaders, including Osama bin Laden. Khan testified that Hayat had shown him the scrapbook while expressing support for the fundamentalist groups described in the articles.

The government's evidence also included a note written in Arabic that government agents had found in Hayat's wallet after his return from Pakistan. Khaleel Mohammed, an expert in Islamic studies who testified as an expert witness for the government, testified that the note was an Islamic supplication. He provided the following translation of the Arabic phrase: "Oh Allah we place you at their throats and we seek refuge in you from their evils." Mohammed opined that the supplication was both uncommon and "not peaceful," and that the type of person who would carry such a supplication was "[a] person who perceives him or herself as being engaged in war for God against an enemy."

Finally, the government presented testimony from two additional experts, Hassan Abbas and Eric Benn. Abbas, an expert on extremist groups, testified to the location and nature of typical terrorist training camps in Pakistan. Benn, a satellite imagery expert who had analyzed satellite images to determine the likelihood that there was a militant training camp near Balakot between 2003 and 2005, characterized the likelihood as "a good strong possible." He further testified that when an analysis of the satellite imagery was combined with the description Hayat had provided in his confession about his travel to the camp, his assessment of the likelihood that a military

training camp existed outside Balakot increased to "probable."

Hayat did not testify. He presented an expert, Anita Weiss, who testified that it is common for Pakistanis to carry a talismanic prayer, known as a *ta'wiz,* for protection while traveling. The district court did not permit Ms. Weiss to express her opinion on whether the note found in Hayat's wallet was a *ta'wiz* because Weiss does not speak or read Arabic.

Hayat also presented testimony from eleven other witnesses—mostly FBI agents—and from Naseem Khan, who had also testified for the prosecution. One aspect of Hayat's defense was that Khan was an unreliable informant who had given the FBI implausible information—namely a report that three Al Qaeda members on the FBI's most wanted list had visited a mosque in Lodi—the accuracy of which the FBI was unable to confirm, and which was belied by testimony from a regular attendee of the Lodi mosque who never saw the men. Hayat's counsel also elicited testimony from Gary Schaaf, one of the agents who interviewed Hayat, that Schaaf and other agents used leading questions and that Hayat seemed tired during the interview. In addition, agent Terry Rankhorn testified that he had posed undercover as a convert to Islam and met with Hayat four times in 2002; Hayat never mentioned training camps to Rankhorn.[1]

---

[1] The magistrate judge supplemented the facts, finding: "Rankhorn also testified that he felt Hayat's talk was often 'more boasting than actual substance.'" F&Rs at 8:28. The referenced "boasting" phrase was in Rankhorn's response to Mojaddidi's examination question concerning Hayat's uncle in Pakistan. March 30, 2006 RT ("RT" refers to the trial transcript) at 3423:17-25;3424:1-12. The trial testimony concerning this boasting phrase follows:

Q. Do you recall Hamid telling you that his – I'm sorry-- his uncle was the King of Pakistan and that he could get cigars for you?

A. I don't recall him saying he was the King. I recall him saying he was a politician, an influential politician. And the conversation involved around he was getting some particularly hard to get cigarettes for Mr. Naseem Khan, and he had mentioned something to the effect of, oh, I can get lots of things.

Q. Did you believe him when he said that?

A. At the time I didn't personally believe he could. It seemed to me to be more boasting than actual fact.

> Jury deliberations began on April 12, 2005.  On April 25, 2005, after nine days of deliberation, the jury returned a verdict of guilty on all four counts charged in the indictment.

(alterations in original)(footnotes omitted).

## **The government's objections to the Magistrate Judge's findings and recommendations**

The government objects to the following findings: that Mojaddidi failed to adequately investigate whether Hayat had a viable alibi defense and to present that defense during trial; that Mojaddidi failed to adequately search for a false confessions expert; that Mojaddidi failed to adequately search for an Arabic language expert witness to counter the government's expert witness's testimony on the meaning of the supplication Hayat had in his wallet, failed to object to a portion of that expert's testimony as prohibited opinion testimony barred by Federal Evidence Rule 704(b), and failed to adequately counter the government's rebuttal closing argument on the probative value of that expert's testimony; that Mojaddidi and co-defendant's attorney Johnny Griffin jointly represented Hayat under a conflict of interest which adversely affected Hayat's defense; and "any finding" that Mojaddidi was ineffective because she

---

Q. Did Hamid seem to boast about other things in your conversations with him?

A. His air was such that -- of course, this was only my opinion at the time, that it was more -- yes, more boasting than actual substance.

RT 3423:17-25, 3424:1-8.

The magistrate judge also opines in a finding: "The taped conversations Hayat had with Naseem Khan showed a young man somewhat enamored of Pakistani terrorist leaders, hoping to impress the older Khan, and easily lead [sic] into a promise that he would attend such a camp when he reached Pakistan." F&Rs at 52:10-13.  This conclusory finding is rejected.

failed to obtain a security clearance or to find counsel with a security clearance. Objs. at 19 n.17, 24:20-25, 25:1, 98:11, 114:2-12, 119:8, 125:25-28, 127:20-22, 130:9-12, 140:9-11, 143:16-18, 176:24-25.

The government argues these findings should be rejected because the magistrate judge misapplied the "legal standard governing *habeas* review, including that court's erroneous refusal to give deference to trial counsel's decisions because of her inexperience." Id. at 1:21-23. Hayat rejoins:

> The outcome of the proceedings below . . . turned on the facts, which [the magistrate judge] determined based largely on her assessment of the testimony from multiple witnesses at the 2018 [habeas] evidentiary hearing over which [the magistrate judge] presided. Chief among those witnesses was Wazhma Mojaddidi, Hamid Hayat's trial counsel.
>
> At the [habeas] hearing . . ., the magistrate heard and carefully weighed attorney Mojaddidi's explanation of her trial representation of Hamid . . . . Based on all of the evidence before [the magistrate judge], including testimony from key experts, the magistrate found as fact that Mojaddidi's ignorance of the law and errors in fact and in logic led her to make "strategic" decisions that were uninformed and unreasonable, constituting deficient performance.

Reply at 1:10-19 (footnote omitted).

The magistrate judge finds Mojaddidi's testimony at the habeas evidentiary hearing "showed that she relied on Griffin, [counsel for Hamid Hayat's father and co-defendant Umer Hayat,] to such an extent that they were jointly representing Hamid [Hayat]." F&Rs at 107:15-16. The magistrate judge also finds Mojaddidi "understood that she was not competent to represent

12

Hayat without mentorship from another attorney. [Mojaddidi] testified that she undertook representation of Hamid because she understood that she 'would rely on [Griffin] in [her] representation of Hamid' . . . . And, she relied on his advice and her own research." Id. at 107:16-24 (some alterations in original) (internal citation omitted).

The magistrate judge finds the "best evidence" of the joint representation was "the decision that a rush-to-trial strategy was in the best interests of both defendants. Mojaddidi simply followed Griffin's decisions that were in the best interests of his client, not hers." Id. at 106:6-8. The magistrate judge "recognize[d] a joint defense agreement in which one defendant's attorney takes a lead role can be perfectly acceptable," id. at 109:9-10, but finds in this case it became unacceptable "when the first superseding indictment charged Hayat with material support for terrorism, [because at that time] the basic defense strategy [of rushing to trial caused] the representation of Hamid to come into conflict with Griffin's strategy for the representation of Umer [Hayat]," id. at 105:20-22. The magistrate judge finds this conflict of interest "caused Hamid [Hayat]'s defense to forego many viable litigation strategies," and that "this adverse effect should result in a presumption [that Hamid Hayat's defense was] prejudice[d]" under the United States Supreme Court's presumed prejudice rule. Id. at 111:9, 13-14.

What the magistrate judge observed during the habeas evidentiary proceeding concerning Mojaddidi's deficiencies in her representation of Hayat differs from what the district judge observed about Mojaddidi's representation of Hayat during the

trial proceedings.  <u>Cf.</u> <u>Bean v. Calderon</u>, 163 F.3d 1073, 1081 (9th Cir. 1998) (indicating that the evidence developed at a habeas evidentiary hearing concerning counsel's performance may differ from evidence of how counsel represented defendant during the jury trial proceedings; stating the evidence presented "at the federal habeas hearing was far different from [what was observed about counsel's representation of defendant during the] jury [trial proceedings]").  During trial proceedings, Mojaddidi appeared to independently and ably represent Hayat, and that representation did not appear tainted by a conflict of interest.

Neither defense counsel informed the trial judge that conflicts existed in this case.  Defense counsel did inform the trial judge that "in certain areas [they had] a common, joint defense."[2]  "[W]e generally presume that the lawyer is fully

_____

[2] During a hearing on February 3, 2006, Mr. Griffin informed the district judge:

> [R]ecognizing there are going to be two juries, and basically two cases being done in one, Ms. Mojaddidi will represent Mr. Hamid Hayat and I'll be representing Mr. Umer Hayat, we — in certain areas we have a common, joint defense. . . . [I]t's our intention, with the Court's permission of course, to continue to assist each other even though, for example, say, my jury is not in the courtroom.
>
> That assist does not mean that I'm going to examine witnesses on behalf of Mr. Hamid Hayat, but that I would be able to sit at counsel table, be present in the courtroom during that portion where, frankly, it doesn't involve Umer Hayat, and vice versa, when my jury, as I'm referring to it, is in the courtroom, that Ms. Mojaddidi will be able to sit at counsel table and provide me assistance in terms of various matters, but she will not, for example, object, examine any witnesses, but that she would be in the courtroom at counsel table providing me assistance.

RT 60:17-25, 61:1-9.

> Further, during the proceeding on February 14, 2006, Mr. Griffin stated:
> The defense jointly has retained Mark Reichel, private attorney from Sacramento, to provide consultation to the defense jointly.  It is not anticipated at this point that he would examine any witnesses.  He may very well assist in the preparing briefs and motions if various issues come up during the course of the trial.
> If, however, we determine that we want him to play a role

14

conscious of the overarching duty of complete loyalty to his or her client. Trial courts appropriately and 'necessarily rely in large measure upon the good faith and good judgment of defense counsel.'" <u>Burger v. Kemp</u>, 483 U.S. 776, 784 (1987) (quoting <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 347 (1980)).

> [T]he rule applied when the trial judge [was] not aware of [an asserted] conflict (and thus not obligated to inquire) is that prejudice [resulting from counsel's representation of a defendant] will be presumed only if [a shown] conflict has significantly affected counsel's performance—thereby rendering the verdict unreliable, even though . . . prejudice [from counsel's representation under the <u>Strickland</u> standard)] cannot be shown.

<u>Mickens v. Taylor</u>, 535 U.S. 162, 172-73 (2002).

However, the Ninth Circuit states in <u>United States v. Walter-Eze</u>, 869 F.3d 891, 906 (9th Cir. 2017), <u>cert.</u> <u>denied</u>, 139 S.Ct. 1196 (2019), that the United States Supreme Court's "reasoning regarding when prejudice should be presumed does not control," when vindication of a petitioner's Sixth Amendment right to counsel can be resolved under <u>Strickland</u>'s familiar performance-and-prejudice framework, explaining:

> As the Supreme Court clarified in <u>Mickens</u>, the presumed prejudice rule was not intended "to enforce the Canons of Legal Ethics, but to apply needed prophylaxis in situations where <u>Strickland</u> itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel." It follows that where a case is sufficiently straightforward such that it can

---

on the record in the case, he would, with request and permission of the Court, request to substitute in as either co-counsel or association of counsel either for me or Ms. Mojaddidi. He will not step in as attorney of record for both of us because each defendant has separate counsel.
RT 18:22-25, 19:1-8. Mr. Reichel is an experienced federal criminal law practitioner.

be resolved under <u>Strickland</u>'s familiar performance-and-prejudice framework, [the <u>Cuyler v. Sullivan</u>] rule of presumed prejudice does not apply.

<u>Id.</u> (internal citation omitted).  Therefore, Hayat's motion is analyzed under <u>Strickland</u>'s performance-and-prejudice framework.

## Ineffective Assistance of Counsel Claims

Under <u>Strickland</u> . . . an ineffective assistance of counsel claim has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel's representation fell below an objective standard of reasonableness.  There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

<u>Stanley v. Cullen</u>, 633 F.3d 852, 862 (9th Cir. 2011) (internal quotations and citations omitted).

The magistrate judge finds Mojaddidi committed several errors, and that Mojaddidi's failure to adequately investigate whether alibi witnesses existed who knew of Hayat's whereabouts during the time he was charged with attending a terrorist training camp and to present that defense during the trial is singularly prejudicial.

## Failure to investigate potential alibi witnesses and to present an alibi defense

The government objects to the alibi defense findings, arguing Mojaddidi "exercised her own independent judgment . . . to pursue an alternative defense strategy over an alibi defense, based on the totality of facts known to her and based on her

16

belief that it would be in the best interests of Hayat." Objs. at 54:24-26. Hayat rejoins that the magistrate judge considered "Mojaddidi's testimony concerning her justifications for failing to conduct [an adequate investigation of the viability of an alibi defense and] deemed all of them unreasonable, resting as they did on errors of fact, law, and/or logic." Reply at 12:25-26, 13:1.

The magistrate judge finds Mojaddidi's failure to adequately investigate the viability of an alibi defense was objectively unreasonable, explaining:

> The evidence adduced at the evidentiary hearing showed that Mojaddidi initially considered an alibi defense. (IV TR 732.) She testified that in her discussions with Hayat, she learned that he spent his time in Pakistan in either Behboodi or Rawalpindi. (Id. at 726-27.) He told her he spent time playing cricket, playing video games, and hanging out in front of the local store in Behboodi. (Id. at 727.) She knew that he spent time with family members and that there were others in Pakistan who could testify to his whereabouts. (Id.)
>
> . . . .
>
> . . . Despite knowing that there were others in Pakistan who could provide information on Hayat's whereabouts, Mojaddidi testified that she did not conduct, or have an investigator conduct, interviews of witnesses in Pakistan. (Id. at 781.)
>
> In her declaration in support of Hayat's motion for a new trial, Mojaddidi stated that she was also aware that [Hayat's cousin], Jaber Ismail, "had spent a substantial amount of time with Hamid in Pakistan." (ECF No. 441-2 at 2.) However, because Jaber was in Pakistan at the time of trial, Mojaddidi stated that she "knew [she] would be unable to serve him with a subpoena to testify at Hamid's trial." (Id.) At the evidentiary hearing, Mojaddidi testified that she did not interview Jaber. (IV TR 738.)

17

Mojaddidi summarized her investigation into a possible alibi defense as follows: "I spoke with his mother, his uncle, I reviewed the [FBI interview reports in the] 302s, and one of his cousins was a person that I did consider, and ultimately decided not to use him." (IV TR 737.)

. . . .

Mojaddidi testified that she did not consider many potential alibi witnesses as viable because they did not see Hayat every day. For example, she did not believe the Pakistanis that Hayat played cricket with on a regular basis were viable witnesses because Hayat did not tell her that he played cricket every day. . . .

. . . .

. . . When asked whether she considered Hayat's statement that he had attended a [terrorist training] camp for three to six months, Mojaddidi testified that she did not "know why I would pursue something that I knew my client told me wasn't true." (Id. at 782.) However, Mojaddidi was aware that Hayat's confession, which referred to attending a camp for "months," provided the basis for the government's case. (Id. at 743.)

Mojaddidi testified that she was unaware that Rule 15 [of the Rules of Criminal Procedure] permitted her to seek to take the depositions of foreign witnesses in lieu of in-court testimony. (IV TR 737.) . . . Mojaddidi also testified that Rule 15 was not relevant because she had rejected an alibi defense on the basis of a lack of "viable" witnesses. However, that testimony is belied by other evidence.

. . . .

First, Mojaddidi believed that the only legitimate alibi witnesses were witnesses who saw Hayat every day. Yet, the indictment charged Hayat with attending a terrorist training camp for a "period of months," and the only evidence adduced at trial regarding Hayat's attendance at a training camp was that he had done so for somewhere between three and six months. Thus, Mojaddidi was

not required to account for Hayat's whereabouts every day in Pakistan over the two years he was there. Rather, an alibi defense needed to show that Hayat was seen during every continuous three-month period between October 2003 and November 2004, the dates identified in the indictment. Further, Mojaddidi's uncertainty about the frequency with which witnesses in Pakistan saw Hayat provided "no reasonable basis" to decide not to investigate. See Duncan [v. Ornoski], 528 F.3d [1222,] 1235 [(9th Cir. 2008)] (defense counsel's "mere" belief that certain testimony "might not be helpful" provided no basis to decide not to investigate it further); Ramonez v. Berghuis, 490 F.3d 482, 489 (6th Cir. 2007) (a decision to forego investigation into witnesses based on a "guess" about what those witnesses might say is not reasonable); Rios v. Rocha, 299 F.3d 796, 806 (9th Cir. 2002) (an unreasonable assumption is not a basis for a reasonable strategic decision); Lord v. Wood, 184 F.3d 1083, 1095 (9th Cir. 1999) (counsel's "vague impression" that witnesses were not credible insufficient to excuse his failure to interview them).

Second, Mojaddidi was unaware of Rule 15 of the Rules of Criminal Procedure. "An attorney's ignorance of a point of law that is fundamental to [her client's] case combined with [her client's] failure to perform basic research on that point is a quintessential example of unreasonable performance under Strickland." Hinton v. Alabama, 571 U.S. 263, 274 (2014). While Mojaddidi may have had good reason to reject [certain individuals that the government considered to have been involved with terrorism] as potential witnesses, she did not have any such basis to reject others in Pakistan. Because she felt she had no way to obtain their testimony, Mojaddidi failed to conduct an investigation into the possible testimony of other Pakistani witnesses. As a result, Mojaddidi failed to make informed decisions about an alibi defense.

. . . .

This court also notes that the evidence in the record is sparse about just what sort of investigation Mojaddidi conducted. She appeared to recall only talking with Hayat

and his mother for a "list" of potential alibi witnesses. She did not recall talking with his other family members but stated that she believed she did so. She did not testify about just what she asked Hayat's family members regarding possible alibi witnesses. Did she ask Hayat and his family members appropriately probing questions to identify friends and family members in Pakistan? Or, as the evidence before this court indicates, did she make little attempt to investigate witnesses in Pakistan because she did not feel she could obtain their testimony?

Mojaddidi's misconceptions caused her to make "strategic" decisions that were wholly uninformed. Mojaddidi's determination that witnesses were not viable was based on an error in logic. She did not understand that an alibi witness did not have to have been with Hayat every day. Her determination was further based on an unreasonable lack of knowledge of criminal law because she was unaware of Rule 15. For these reasons, Mojaddidi's decision that the witnesses were not viable was not a reasonable basis for her tactical decision to forego further investigation into alibi witnesses and to give up on an alibi defense. See Thomas v. Chappell, 678 F.3d 1086, 1104 (9th Cir. 2012) (counsel's decision not to call a witness can only be considered tactical if he had "sufficient information with which to make an informed decision"); Avery v. Prelesnik, 548 F.3d 434, 437 (6th Cir. 2008) (Counsel cannot make a strategic decision not to have alibi witnesses testify when "he had no idea what they would have said.") Moreover, Mojaddidi's conduct, without considering her "strategy," was objectively unreasonable. A reasonably competent attorney would have done more to investigate Hayat's alibi.

Finally, it is worth noting that an alibi defense was not at odds with challenges to the government's evidence. Mojaddidi could very well have initiated investigations in Pakistan early on and then determined whether the witnesses would be able to appear in the United States or whether she would need to move for Rule 15 depositions. She had months to do so. Showing that Hayat could not have been at a jihadi training camp for the "period of months" specified in the indictment would have been completely

consistent with the defense that Hayat's
confession should not be credited and the
government lacked other supporting evidence.

F&Rs at 24:20-25, 26:7-19, 27:2-5, 14-23, 28:19-22, 29:1-21, 32:18-25, 33:1-20 (some alterations in original) (footnote omitted).

These factual findings are adopted. "A lawyer has a duty to investigate what information . . . potential [alibi]-witnesses possess, even if [she] later decides not to put them on the stand." Sanders v. Ratelle, 21 F.3d 1446, 1457 (9th Cir. 1994) (internal quotations and original alterations omitted). "While it is strongly presumed that [defense] counsel made all significant decisions in the exercise of reasonable professional judgment, . . . counsel cannot be said to have [exercised reasonable professional judgment] without first procuring the information necessary to make such a decision." Williams v. Filson, 908 F.3d 546, 567 (9th Cir. 2018) (internal quotations and citation omitted).

**Failure to procure and present a false confession expert**

The United States also objects to the magistrate judge's following findings that Mojaddidi was ineffective because she did not procure a false confession expert:

The evidence before the [magistrate judge]
makes clear that Mojaddidi did not seriously
consider using a false confessions expert.
Rather, she and Griffin, from the beginning,
decided that [former FBI special agent James]
Wedick would testify about: (1) the
interrogation techniques used and, (2) why
those techniques can render a confession
unreliable. The problem is that Wedick did
not have the expertise to testify to that
second, and most important, point. As noted
by the district [judge in a ruling on the
government's motion to exclude Wedick's

21

proposed testimony], Wedick had no background in psychology or other expertise to talk about the effect of the interrogation techniques on a suspect.

F&Rs at 60:1-7.

The United States argues:

> Mojaddidi reviewed all of Hayat's FBI interviews and believed that the most important evidence against him was his confession. (W.M. Depo. 49:5-14, 68:16-18, 162:18-19, 207:6-11; Tr. 743:2-4). Ms. Mojaddidi was familiar with methods to challenge purported false confessions, had "learned about" the law governing voluntariness of a confession, and had discussed it with Mr. Griffin and James Wedick, a former FBI special agent with 35 years of experience, who was an investigator for [Hamid] Hayat and Umer [Hayat] before and through their 2006 trials. (W.M. Depo. 41:9-14, 70:4-16; Tr. 574:14-610:22, 583:6-11, 744:2-15). Ms. Mojaddidi originally intended to challenge Hayat's confession with a defense expert on false confessions and cross-examination of his government interrogators. (W.M. Depo. 207:12-209:17). . . . Ms. Mojaddidi "certainly" knew a challenge to the "voluntariness" of a confession was a legal basis for a motion to suppress. (Tr. 744:18-20).
>
> The defense intended to call Wedick as an expert to explain why Hayat's confession was unreliable. (W.M. Depo. 70:9-16; Tr. 594:6-9). As an FBI agent, Wedick had conducted hundreds of interviews and interrogations, and agreed to serve as an expert to offer an opinion on the techniques used to elicit Hayat's confession, among other things. (W.M. Depo. 207:16-208:4; Tr. 575:12, 604:6-21, 724:9-25; Gov. Sup. Ans. Ex. 18). Ms. Mojaddidi was aware Wedick had never previously qualified as an expert in the field of false confessions but she believed he would be "good" and would be deemed qualified to testify. (W.M. Depo. 70:21-23, 71:5-7, 208:16-17, 286:4-6). Ms. Mojaddidi was aware there were other potential false confession experts, and considered information sent to her by other experts in the field but did not contact

them.  (Id. at 70:24-71:7, 208:7-17).
Ultimately, she decided to utilize Wedick as
an expert on behalf of Hayat.  (W.M. Depo.
208:18-209:1; Tr. 594:6-9).

Objs. at 98:16-28, 99:1-8 (footnote omitted).

The United States further argues: "Mojaddidi reasonably
believed that Wedick's experience in conducting FBI
interrogations would be sufficient to establish his
qualifications to offer an expert opinion concerning the defense
theory of Hayat's purportedly unreliable confession."  Id. at
113:1-3.  Mojaddidi disclosed Wedick in her Rule 16 of the
Federal Rules of Criminal Procedure disclosure statement,
explaining:

> Wedick would testify, among other things,
> that "the FBI Sacramento office had the
> capability to videotape Hamid Hayat's
> interview right when it actually started";
> that "the interviewing agents did not
> consider but should have considered [Hayat's]
> vulnerabilities as an interviewee"; and that
> the agents "all used leading questions during
> the interviews of Hamid Hayat."

Hayat, 710 F.3d at 903 (alteration in original).

The United States moved for an order excluding Wedick's
proposed testimony, and the motion was granted.  F&Rs at 57:11–
25, 58:1-7.

> The district [judge] excluded Wedick's
> testimony in its entirety, finding that much
> of the testimony was of "marginal probative
> value" and that its value was outweighed by
> the risk of confusing the jury, wasting time,
> and presenting needless cumulative evidence.
> The [district judge] also concluded that
> Wedick's testimony "would not assist the
> trier of fact."

Hayat, 710 F.3d at 903.

Hayat has not shown that Mojaddidi was objectively

23

unreasonable in her belief that Wedick could be qualified to testify as a false confession expert. Further, during trial, Mojaddidi "thoroughly explored the conduct of the [FBI] agents who participated in Hayat's interview, including the improper use of leading questions, during her cross-examination of those agents." Id. Therefore, the magistrate judge's finding that Mojaddidi's failure to procure a different false confession expert constituted deficient representation is rejected.

## **Failure to procure and present an Arabic language defense expert on the meaning of the supplication**

The United States objects to the finding that Mojaddidi failed to adequately search for an Arabic language expert to counter the government's Arabic language expert's testimony on the supplication Hayat carried in his wallet. Objs. at 132:18-23, 133:1-21. The United States argues: "Mojaddidi could not obtain an Arabic-speaking expert to opine on the correctness of Dr. Mohammed's translation and focused instead on effectively cross-examining him." Id. at 128:24-25.

Hayat replies:

> [the magistrate judge noted] the sparseness of the record regarding Mojaddidi's efforts at locating an Arabic language expert – Mojaddidi provided no details in her testimony nor supporting documentation as to those efforts – the magistrate stated that "without knowing who those people were it is not possible to determine whether any would have qualified as an expert or what their testimony could have been." (F&R at 86.)

Reply at 36:6-10.

The magistrate judge finds:

> Mojaddidi testified at her deposition

24

that she attempted to find an Arabic language
expert who could testify about the meaning of
the supplication. (Mojaddidi Depo. at 199
(ECF No. 548 at 239).) Mojaddidi further
testified that [defense expert Anita Weiss]
provided some names and Mojaddidi contacted
people . . . who might be able to provide
that testimony. (Id.) However, [Mojaddidi]
was "unsuccessful." (Id.) Mojaddidi
estimated that she contacted "at least ten"
people to testify regarding the supplication.
(Id. at 200.) She was unable to identify any
of the people she contacted.

F&Rs at 86:5-11.

The magistrate judge also finds:

The record is sparse about Mojaddidi's
conduct in attempting to locate an Arabic
language expert to testify about the
supplication. While she testified that she
contacted "at least ten people," without
knowing who those people were it is not
possible to determine whether any would have
qualified as an expert or what their
testimony could have been. . . .

Hayat provides an article from the
Atlantic Monthly, published in October 2006,
shortly after trial. The author contacted
Professor Bernard Haykel, who had testified
for the defense in a 2003 terrorism trial in
Detroit; Ingrid Mattson, a professor of
Islamic Studies at Hartford Seminary; and
Salman Masood, a Pakistani journalist in
Islamabad. (EH Ex. ZZ at 90-91.) Each of
these people was familiar with the
supplication and told the author it is
"common." The fact that the article's author
found three people who knew the supplication,
two of whom who were scholars and potential
experts, shows that there were experts
available. Haykel testified in the present
case that he was available in March 2006 and,
if asked, would have testified at Hayat's
trial.

F&Rs at 86:14-28, 87:1-2.

The information Mojaddidi provided during the habeas
proceeding on her efforts to find an Arabic language
supplication expert fails to evince that when she discontinued

25

her search, that information "would [have led] a reasonable attorney to [conclude there was no need to search] further." Wiggins v. Smith, 539 U.S. 510, 527 (2003). "Strickland demands that such decisions be reasonable and informed." Jennings v. Woodford, 290 F.3d 1006, 1014 (9th Cir. 2002) (citing Strickland, 466 U.S. at 691). Therefore, the magistrate judge's findings on this issue are adopted.

**Failure to object to Dr. Mohammed's testimony under Rule 704(b)**

The United States objects to the finding that Mojaddidi should have challenged Dr. Mohammed's testimony as impermissible opinion on Hayat's state of mind under Rule 704(b), because the "legal precedent 'raised serious questions' about this issue." F&Rs at 83:20-22. The United States argues this conclusion "conflicts with the Ninth Circuit's holding in Hayat, 710 F.3d at 901-02 that, under established precedent, Dr. Mohammed's testimony was proper under Rule 704(b)." Objs. at 124:14-15. Hayat rejoins the government is wrong because "a ruling that the admission of evidence did not constitute plain error does not mean that evidence should have and would have been admitted over a proper objection." Reply at 34:5-7.

Hayat has not shown that Mojaddidi's failure to object to this testimony was constitutionally deficient representation:

> Under [Ninth Circuit] precedent, Rule 704(b) does not bar testimony supporting an inference or conclusion that a defendant does or does not have the requisite mental state, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony. . . .
>
> . . . .

26

> . . . Mohammed testified about the kind of person who would carry a note such as the one found in Hayat's wallet, but he never commented directly on Hayat's mental state.

Hayat, 710 F.3d at 901-02 (internal quotations and citations omitted).

The magistrate judge's finding is rejected because Hayat has not shown Mojaddidi's failure to object fell below the objective standard of reasonableness.

### Other Objections

The government objects to "any finding that Ms. Mojaddidi's failure to seek a security clearance was deficient." Objs. at 19 n.17. The United States argues this finding should be reversed "because it is unnecessary to dispose of Hayat's claim and, more importantly, establishes a rule, contrary to law, that defense counsel in a case possibly involving classified information is *per se* ineffective for failing to seek and obtain an unnecessary security clearance." Id. This conclusory legal finding is rejected.

The government also objects to the admission of Tahir Anwar's affidavit and testimony during the habeas proceeding, arguing this evidence "was inadmissible because he was not a percipient witness and therefore could not offer a lay opinion on facts he did not perceive." Objs. at 131 n.92. The magistrate judge finds Anwar's testimony was admissible as percipient witness evidence under Evidence Rule 701, and has probative value on the deficiency representation finding that Mojaddidi should not have aborted her search for an Arabic language expert on the meaning of the supplication Hayat possessed when she did. F&Rs

27

at 90:24-27, 91:1-5.  The admissible portion of the challenged lay witness evidence has minimal probative value on the deficiency finding that Mojaddidi should have procured an Arabic speaking expert witness on the meaning of the supplication to more effectively counter the prosecution's expert witness's testimony on this issue.

The government also objects to the magistrate judge's findings that Mojaddidi was ineffective when she failed to object to the government's rebuttal closing argument on the probative value of Dr. Mohammed's testimony and by her failure to respond to the government's characterization of Dr. Mohammed's testimony in her closing argument.  Objs. at 140:9-11.

Mojaddidi gave her closing argument before the government gave a rebuttal closing argument, so she was not authorized to make additional closing argument.  Standard procedure in criminal cases in which the government must prove each element of a crime beyond a reasonable doubt prescribes that the government gives its opening closing argument, followed by the defense closing argument, and then the government gives a rebuttal closing argument.  Further, abstaining from objecting during closing argument is a common choice: "Because many lawyers refrain from objecting during . . . closing argument, absent egregious misstatements, the failure to object during closing argument is within the 'wide range' of permissible professional legal conduct."  United States v. Necoechea, 986 F.2d 1273, 1281 (9th Cir. 1993) (citing Strickland, 466 U.S. at 689), as amended on denial of reh'g (Apr. 15, 1993).

In addition, Mojaddidi appears to have anticipated and

adequately addressed the subject portion of the government's rebuttal closing argument when she gave her closing argument, and her closing argument has not been shown to be an objectively unreasonable argument. See RT 4322:2-25, 4323:1-25, 4324:1-2 (April 12, 2006).[3] Further, the trial judge explained to the jury in the jury instructions that closing arguments are not evidence, and if the facts as jurors remember them differ from the way the lawyers state them, each juror's memory of them controls.

---

[3] The relevant portion of Mojaddidi's closing argument follows:

   The government's expert, Dr. Mohammed, testified that it was a prayer carried by a warrior. Dr. Mohammed admitted on the stand that his views were controversial amongst Muslim scholars. . . .

   Dr. Mohammed has never been to Pakistan and he doesn't understand the culture. In fact, he had to send e-mail asking former students of his, who are not scholars, what the significance of carrying such a prayer was in Pakistan. He didn't know himself. And he ultimately based his opinion about that prayer on a person he's never met in Uzbekistan, and on a man who no longer works for an Egyptian university because of his radical views.

   . . . He essentially called random people who he knew would agree with him.

   And he catered his testimony to draw one conclusion. Even when I asked him about the two major sources that he relied upon, and I pointed out that one of those sources had this prayer in the Book of Traveling, he attempted to put that in the context of jihad. He had one goal. That was the conclusion he wanted to draw, and he was going to draw it however he had to.

   He also gave a literal translation, and admitted that literal translations can often change the meaning of the words.

   See, the problem with Dr. Mohammed's testimony about that prayer is that he has no idea of the cultural context of carrying such a prayer in Pakistan. He can't possibly because he just doesn't know about Pakistani culture.

   Dr. Anita Weiss, however, is an expert on Pakistani culture. You heard her tell you that carrying prayers in Arabic is a very common practice in Pakistan, especially by travelers for safety reasons. The government either doesn't understand the cultural significance of carrying a ta'wiz or it didn't want you to know about it. Because had they asked their other expert, Mr. Abbas, who knows about Pakistani culture, he would have told them that Dr. Mohammed's conclusions were wrong, and that prayers like those are commonly carried by travelers and not warriors. So Dr. Mohammed's testimony itself was problematic. And the existence of that prayer in Hamid's wallet doesn't prove that he went to a terrorist training camp.

1    Therefore, these findings are rejected.

2                              **Prejudice**

3       Since Hayat has shown his counsel's representation was

4    deficient on two issues, the remaining question is whether

5    Hayat's defense was prejudiced by counsel's errors. Hayat "is

6    deemed to have suffered 'prejudice' as the result of [counsel's]

7    performance if he succeeds in demonstrating that 'there is a

8    reasonable probability that, but for counsel's errors, the result

9    of the proceeding would have been different.'" Bonin, 59 F.3d at

10   833 (quoting Wade v. Calderon, 29 F.3d 1312, 1323 (9th Cir.

11   1994), overruled on other grounds by Rohan ex rel. Gates v.

12   Woodford, 334 F.3d 803, 815 (9th Cir. 2003)).

13      To determine prejudice, the court "must compare the evidence

14   that actually was presented to the jury with that which could

15   have been presented had counsel acted appropriately." Cannedy v.

16   Adams, 706 F.3d 1148, 1163 (9th Cir. 2013) (quoting Thomas,

17   678 F.3d at 1102), as amended on denial of reh'g, 733 F.3d 794

18   (9th Cir. 2013). The court then decides whether "a reasonable

19   probability" exists that a juror "hearing the additional evidence

20   developed in the postconviction [habeas] proceedings," would have

21   made a different decision. Williams v. Taylor , 529 U.S. 362,

22   396-97 (2000). "Some errors will have had a pervasive effect on

23   the inferences to be drawn from the evidence, altering the entire

24   evidentiary picture, and some will have had an isolated, trivial

25   effect." Strickland, 466 U.S. at 695-96.

26   **Prejudice from failure to investigate potential alibi witnesses**

27      Hayat's habeas counsel presented six alibi witnesses at the

28   habeas evidentiary hearing. F&Rs at 11:28. These witnesses

could have testified at trial if Mojaddidi had adequately investigated a potential alibi defense and presented that defense during trial. The magistrate judge finds all six alibi witnesses sufficiently credible, explaining that notwithstanding Hayat's confession that he attended a training camp for three to six months, the witnesses' testimony "directly contradicted" the confession, their "testimony was consistent," and demonstrated that "the longest period of time Hayat was absent from his family's village in Behboodi was one week." F&Rs at 47:5-10. The magistrate judge explains:

> [the six witnesses] accumulated testimony . . . show[s] that Hayat was not absent from Behboodi or Rawalpindi for any consecutive three-month period. The court has no problem accepting the fact that family members and good friends, who typically saw Hayat on a daily or weekly basis when he was in Pakistan at that time, would have remembered such an extended absence. Their memories did not need to be perfect about the events of those two years to have that recollection.
>
> Further, the witnesses corroborated each other on some important points during the relevant time period of Fall 2003 to Fall 2004. Raheela[, Hayat's sister,] and Jaber[, Hayat's cousin,] recalled that when Hayat's family first arrived in Pakistan, they spent a short period of time in Rawalpindi before moving to Behboodi where they resided during their stay. (I TR 131-32; II TR 308.) Raheela and Rafaqat[, Hayat's friend,] recalled that Hayat's trips to Rawalpindi with his family for his mother's medical treatments occurred once or twice a month. (I TR 136-37; VI TR 962.) Several witnesses recalled that besides the trips to Rawalpindi, which sometimes included Islamabad, Hayat only took two trips, both to Multan and neither of which exceeded a week. (I TR 138-40 (Raheela); II TR 314-15 (Jaber); VI TR 935-36 (Anas); VI TR 960 (Rafaqat).)
>
> The lynchpin of the government's case

> against Hayat was Hayat's confession.
> Without it, the government could not have
> proven Hayat took any act in material support
> of terrorism. The alibi witness testimony
> would have undermined jurors' reliance on
> Hayat's confession.

F&Rs at 51:18-28, 52:1-6 (footnote omitted).

The magistrate judge's factual determinations concerning the testifying alibi witnesses are adopted.

## Prejudice from failure to call a defense Arabic language expert witness on the supplication

Hayat's habeas counsel also presented Dr. Bernard Haykel, a professor of Near Eastern Studies at Princeton University, who testified as an expert on the Arabic language, Islamic culture, and Islamic political movements, and gave his expert opinion on the supplication found in Hayat's wallet. F&Rs at 88:12-28, 89:1-10. The magistrate judge finds Haykel's testimony "clear and unequivocal – the supplication Hayat carried was commonly used by many Muslims, not just by jihadis." F&Rs at 90:18-19.

> Haykel defined a "supplication" as an
> invocation or prayer to God. [(IV TR 634.)]
> In Arabic, such a supplication is called a
> "du'a." (Id.) The source of this du'a is
> the Hadith, a tradition of the Prophet
> Muhammad. (Id.) This du'a is found in a
> number of different collections of prophetic
> traditions. (Id. at 636.) Haykel testified
> that he was familiar with the supplication.
> (Id. at 635) He had heard it used. (Id.)

> Haykel testified that the literal
> translation of the du'a is "Oh, God, we ask
> you to be at the throats [of our enemies].
> And we seek your help and assistance from
> their evils or their misdeeds." (IV TR 638.)
> The idiomatic translation provided by Haykel
> is "Oh, God, we ask, or beseech, you to . . .
> confront out enemies. And we ask you for
> help from their evil deeds." (Id. at 639.)
> Haykel explained that "tradition tells us

32

that [the Prophet] used [this du'a] at a time when he was about to begin travel. . . . And travel at the time in Arabia . . . was fraught with danger." (Id.)

Haykel testified that this du'a is not exclusive to any particular group. "All Muslims use it." (IV TR 640.) He testified that some invocations may call on God to help defeat an enemy. (Id. at 642.) However, the supplication Hayat carried was not an "offensive invocation" like that. Rather, it would be used when a Muslim is afraid that someone might harm him. (Id.) Haykel has heard the prayer used by religious leaders leading midday Friday prayers. (Id. at 642-43.)

Haykel testified that an opinion that anyone who carried or recited this supplication would necessarily be involved in violent jihadi behavior was unfounded. (IV TR 644-45.) "[A]ll Muslims use this supplication, not just jihadis." (Id. at 675.)

F&Rs at 88:19-28, 89:1-10 (some alterations in original) (footnote omitted).

Haykel's expert opinion that the supplication is used by many Muslims, "not just jihadis," supports Hayat's argument that Mojaddidi's failure to present an Arabic language expert on the meaning of the supplication during trial contributed to the prejudice Hayat suffered.

## **Prejudice Analysis**

The remaining issue is whether there is a "reasonable probability" that Hayat's jury, or a juror, would have reached a different decision had evidence been presented to the jury that was not presented because of counsel's errors. Thomas, 678 F.3d at 1105. "Prejudice is established if there is a reasonable probability that at least one juror would have struck a different balance . . . ." Hamilton v. Ayers, 583 F.3d 1100, 1131 (9th

33

Cir. 2009) (quoting Belmontes v. Ayers, 529 F.3d 834, 863 (9th Cir. 2008), rev'd on other grounds sub nom. Wong v. Belmontes, 558 U.S. 15 (2009)). When considering this reasonable probability issue, the court examines whether "objective clues" exist "as to [a juror's] assessment of the case strongly suggest[ing] that the case was close." Thomas, 678 F.3d at 1103. Objective clues could include the length of jury deliberations, a jury request for a readback of testimony, and a jury communication evincing that the jury reached an impasse in its deliberations.

"Longer jury deliberations weigh against a finding of harmless error because lengthy deliberations suggest a difficult case." United States v. Velarde-Gomez, 269 F.3d 1023, 1036 (9th Cir. 2001) (en banc)(internal quotations omitted)(indicating complexity of trial issues are considered when deciding this factor by concluding "the four-day jury deliberations were relatively lengthy for this two-count drug importation and possession case."). "Further, [when] the jury asked for readbacks of . . . testimony while it was deliberating," that could evince "it evidently did not regard the case as an easy one." United States v. Blueford, 312 F.3d 962, 976 (9th Cir. 2002).

Hayat's jury took nine days to render a verdict. ECF Nos. 311-28. The jury deliberated on April 12, 13, 14, 17, 19, 20, 21, 24, and 25, 2006. The trial transcript shows that on Thursday April 13, 2006, there was discussion of the jury's request for readback of the videotaped interviews of Hayat. RT 4558:16-4559:1-15. An order issued on Monday, April 17, 2006,

34

stating in pertinent part: "Last week, . . . the Hamid jury . . . requested . . . the replay of certain videotapes. The replay before the Hamid jury is scheduled to begin at 9:00 a.m. on [Monday] April 17, 2006." Order, ECF No. 314. The docket minutes show that on Tuesday, April 18, 2006, the video replay was completed and the jury resumed deliberations and eventually recessed until Wednesday, April 19, 2006, at 9:00 a.m. On Wednesday, April 19, 2006, the docket minutes show another note was received from the jury, dated April 19, 2006. The trial transcript shows that the April 19, 2006 note concerned the phrase material and/or resources in a jury instruction. RT 4656:5-25, 4675, 4693:8-25, 4694-4697:1-4. Further discussion was held on this jury instruction issue on Thursday, April 20, 2006, and a supplemental jury instruction was given later that day. RT 4706-4708:1-8. On Friday, April 21, 2006, the judge received a jury note signed by the foreperson at 4:05 p.m., stating: "There is impass [sic] with a juror who does not seem to fully comprehend the deliberation process. I'm available to discuss this with you and counsel at anytime [sic]." The note is attached to an order filed April 26, 2006. ECF No. 326. The judge responded with the following written communication: "Jury, Please continue your deliberations." Id.

The trial transcript reveals that on Monday, April 24, 2006, at 1:55 p.m., the jury requested in a note: "Testimony of Agent Harry Sweeney of 6/4/05 interview with Hamid Hayat." RT 4782:4-4787:25 (April 24, 2006). This testimony covered Hayat's confession. The judge responded to the jury in writing on April 24, 2006, at 2:40 p.m., stating: "I am considering your request

35

and estimate it could take until 4:30 p.m. or approximately 9:00 o'clock a.m. on Tuesday, [April 25, 2006,] before the court reporter prepares that testimony." RT 4794:25, 4795:2-4 (April 24, 2006). The readback of agent Harry Sweeney's testimony of the interview with Hamid Hayat occurred on Tuesday, April 25, 2006. After the readback on April 25, 2006, the jury returned a guilty verdict on all four charged counts. ECF No. 328.

Even though the jury returned guilty verdicts after the agent Sweeney interview with Hayat was read back to the jury, the April 21, 2006 jury note evinces that one juror was clearly struggling to reach a verdict on which other jurors agreed. Therefore, "additional exculpatory evidence, [on Hayat's] alibi defense [and testimony from an Arabic language expert on the meaning of the supplication Hayat carried], had a strong likelihood of tipping the scales [for that juror] in the other direction." Foster v. Wolfenbarger, 687 F.3d 702, 710 (6th Cir. 2012). "And, because the jury was required to reach a unanimous verdict on each count, the outcome could have differed if only 'one juror would have struck a different balance.'" Weeden v. Johnson, 854 F.3d 1063, 1071 (9th Cir. 2017) (quoting Wiggins, 539 U.S. at 537).

Therefore, the F&Rs filed January 11, 2019, ECF No. 734, are adopted in part and the movant's convictions and sentence are vacated. Further, the Clerk of Court shall close the companion case No. 14-cv-1073 and enter judgment for the movant.

Dated: July 29, 2019

GARLAND E. BURRELL, JR.
Senior United States District Judge